
Exhibit A



STATE OF INDIANA )
                ) SS:
COUNTY OF ALLEN )

ALLEN SUPERIOR COURT

CAUSE NO. 02D02-2212-PL-400

| STATE OF INDIANA, | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) **ORDER DENYING MOTION FOR** |
| | ) **PRELIMINARY INJUNCTION** |
| TIKTOK, INC., and | ) |
| BYTEDANCE, INC., | ) |
| Defendants. | ) |

# INTRODUCTION

On March 3, 2023, the Plaintiff State of Indiana ("the State") appeared by attorneys Scott Barnhart, Cory Voight, Brian Barnes, Michael Kirk, and David Thompson, and the Defendants TikTok, Inc., and ByteDance, Inc. (collectively "TikTok") appeared by attorneys Alexander Berengaut, John Hall, and Daniel Pulliam for a hearing on the State's Motion for Preliminary Injunction (filed December 7, 2022), TikTok's Response in Opposition (filed February 22, 2023), and the State's Reply in Support (filed March 1, 2023).

Argument was heard and evidence was presented. The Court took the matter under advisement. Having considered the motion, memoranda, the applicable law, and the arguments made by counsel, the Court now concludes and Orders as follows.

# DECISION and DISCUSSION

## Background

At the heart of the State's case against TikTok is the State's allegation that TikTok engaged in illegal deceptive consumer practices by indicating that the TikTok app contains "Infrequent/Mild" instances of these four specific subject matter categories: "Profanity or Crude Humor"; "Mature/Suggestive Themes"; "Alcohol, Tobacco, or Drug Use or References"; and "Sexual Content or Nudity." The State alleges TikTok should describe its app as containing "Frequent/Intense" depictions of the four categories. In its motion for preliminary injunction, the State seeks to prohibit TikTok from making the above referenced "Infrequent/Mild" representations to the Apple App Store regarding the TikTok app. Unless otherwise indicated, references to "TikTok" in this Order are generally to the TikTok app and business, as opposed to any particular corporate entity.

The State originally filed its Complaint and motion for a preliminary injunction with supporting materials on December 7, 2022. A preliminary injunction hearing was set for December 22, 2022. On December 19, 2022, the Court held a Status Conference and then issued a Status Conference Order continuing the preliminary injunction hearing to March 3, 2023. On December 28, 2022, the Court issued an Order with a preliminary case management plan for limited discovery and a briefing schedule, all relating to the preliminary injunction hearing. The December 28, 2022 Order also consolidated this case with another case between the State and TikTok (Cause Number 02D03-2212-PL-401) for purposes of case management,

discovery, and mediation. Cause Number 02D03-2212-PL-401 was subsequently removed to federal court.

On January 19, 2023, TikTok filed a motion to vacate the March 3, 2023 hearing on the State's motion for preliminary injunction. The State filed a response to the motion to vacate on January 20, 2023, and TikTok filed a reply in support of its motion on January 26, 2023. On February 1, 2023, the Court held a hearing on TikTok's motion to vacate. At the February 1, 2023 hearing, the State withdrew its affidavit of Megan Wold, originally filed in support of its motion for preliminary injunction, and substituted it with the affidavit of Christopher Byorni. Accordingly, the Court amended the deadlines previously established in the initial case management order, but confirmed the March 3 preliminary injunction hearing date, and then denied the motion to vacate.

The Court issued an Order on the State and TikTok's joint stipulation governing expert discovery on February 13, 2023. TikTok filed its response in opposition to the preliminary injunction on February 22, 2023. On February 27, 2023, the Court issued an Order pursuant to the State and TikTok's joint stipulation governing the preliminary injunction hearing.

The Court conducted a hearing on the State's motion for preliminary injunction on March 3, 2023. At the preliminary injunction hearing, the State presented the following witnesses: Dr. Megan O'Bryan, Dr. Jon Patrick Allem, and Mr. Christopher Byorni. At the hearing, TikTok's witnesses were Dr. Tracy Elizabeth and Dr. Charles Cowan. The State and TikTok agreed that post-hearing briefs were due on March 31, 2023, and the Court would

issue its Order on the preliminary injunction by May 4, 2023. Accordingly, on March 31, 2023, the State and TikTok filed a Joint Stipulation of Facts, and the State and TikTok each filed Proposed Findings of Fact and Conclusions of Law. Most of those stipulated facts are included herein.

## Findings of Fact

After receiving evidence, and determining the credibility of witnesses, the Court finds the following relevant facts to have been proven by the greater weight of the evidence.

1. TikTok, Inc. is a for-profit entity incorporated in the State of Washington. TikTok operates a social media app known as "TikTok." TikTok, Inc. is headquartered at 5800 Bristol Pkwy, Culver City, California.

2. ByteDance, Inc. is a multinational internet technology holding company and is the parent company of TikTok, Inc. ByteDance, Inc. is headquartered at Room 503 5F, Building 2, 43 North Third Ring West Road, Beijing, 100086 China.

3. The TikTok app has more than 1 billion users globally, and approximately 100 million users in the United States, including users in Indiana.

4. TikTok makes its app available for download globally, including in Indiana. Many Hoosiers have downloaded TikTok. In Indiana, the TikTok app has been activated by a device using an Indiana IP address over six million times from January 1, 2021, to December 31, 2022.

5. TikTok earns significant income by serving the American market, including the Indiana market.

6. TikTok is an entertainment platform that allows users to create, share, and view videos. There are several different ways in which a TikTok user can access video content on the TikTok app. TikTok makes videos available to users through a "For You" feed. This "feed" provides a "personalized experience" for each TikTok user. On the app, users may also view videos in other ways, including searching for videos using keywords or hashtags, and by "following" other users to view videos through a "Following" feed. Videos posted to TikTok can also be accessed by searching for topics on the "Discover" page, or from other people sharing links to specific videos.

7. As with most free apps, TikTok presents advertisements on its app, based on users' presence in any given location. For example, if the TikTok user's location indicates they are in Indiana, the TikTok user may see an ad on the app from an advertiser wanting to reach consumers in Fort Wayne or Indianapolis, Indiana.

8. Over 75 percent of video content on TikTok is consumed through TikTok's "For You" feed. This involves users scrolling through videos that are automatically selected and offered to them. TikTok users can move to the next video on the For You feed by "swiping up" on their touchscreen device.

9. TikTok's automatic selection of videos offered to users on their For You feed is informed by several indicators. For example, if a user likes or re-watches a particular video, his or her For You feed may tend to include more of that type of video content. Users can also indicate that they are not interested in content by "long pressing" on a video (i.e., holding their finger on the screen longer than a brief tap) and then selecting that they are not interested in that type of content.

10. TikTok's content is available to users through its "autocomplete" feature when users begin to search for content.

11. Autocomplete is a feature that is now common on many apps, including iPhone and Android texting. With autocomplete, when a user types in one or more characters, or types in an emoji, the app suggests that there are some searches the user might want to try.

12. Between January 1, 2021, and January 8, 2023, 8,009,338,251 videos were uploaded to TikTok in the United States. During this same time period, there were more than 21 trillion views of videos uploaded on the app in the United States.

13. Apple Inc. ("Apple") operates a digital distribution platform, commonly known as the "App Store," through which app developers can make their apps, such as TikTok, available for download. Google and Microsoft also provide platforms for app developers to distribute their apps.

14. The TikTok app has been available for download for free in the App Store since 2018. Before potential TikTok users can create a TikTok account on the TikTok app, they must provide a birthdate on the TikTok app. TikTok has a 13+ version/experience of the app, as well as a more limited version for children 13 and under. If a user enters a birthdate indicating they are under 13, they cannot create an account on TikTok's 13+ experience, and are instead placed in the TikTok under-13 experience.

15. The State's case against TikTok concerns TikTok's responses to an age rating questionnaire that developers of software apps must complete in order to have their apps distributed by Apple on the App Store.

16. All of the text in that App Store questionnaire is provided by Apple.

17. The App Store's questionnaire includes a question that asks the app developer to "select the level of frequency for each content description that best describes your app." Apple requires a response to this question with respect to twelve categories of content it labels "Apple Content Descriptions." The only permitted responses on Apple's questionnaire are: "None," "Infrequent/Mild," or "Frequent/Intense."

18. TikTok submitted the response to Apple regarding the content description "Profanity or Crude Humor" for the TikTok app as "Infrequent/Mild." TikTok submitted to Apple the response regarding the content description "Mature/Suggestive Themes" for the TikTok app as "Infrequent/Mild." TikTok submitted the response to Apple regarding the content description "Alcohol, Tobacco, or Drug Use or References" for the TikTok app as "Infrequent/Mild." TikTok submitted the response to Apple regarding the content description "Sexual Content or Nudity" for the TikTok app as "Infrequent/Mild."

19. As a result of TikTok's submitted responses to the App Store questionnaire, Apple assigned the TikTok app a 12+ age rating.

20. For those apps that qualify for a 12+ age rating, Apple also offers app developers the option to instead select a 17+ age rating by checking a box that reads, "Restrict to 17+" on the final screen of the App Store questionnaire. TikTok did not check this box for the TikTok app. Accordingly, Apple has assigned TikTok with a 12+ age rating.

21. Apple provides "Content & Privacy Restrictions" options, through which parents can set certain controls, including age-related restrictions for apps with specific ratings, for their children's Apple devices. If an app is assigned a 17+ age rating, iPhone (and other Apple products) users under 17 whose parents have enabled Apple's parental controls to

restrict downloads of 17+ apps, are unable to download or use such an app on their restricted Apple devices.

22. There is not an Indiana-specific (or other U.S. state-specific) version of TikTok. The App Store distributes the TikTok app on a nationwide basis. The version of the TikTok app available for download on the App Store in Indiana is the same version available throughout the United States. There are no Indiana-specific disclaimers on the App Store page description regarding the TikTok app. The government of China, with its policies that severely limit free speech, requires ByteDance to use a more limited form of the TikTok app (under a different name) in the Chinese market.

23. The App Store lists a written description of the TikTok app and its features. This description includes links to the app's "Terms of Service" and the app's "Privacy Policy."

24. Instagram and Spotify are among the many other free apps available for download on the App Store. These two are listed on the App Store with a 12+ age rating. The free social media app Twitter is listed on the App Store with a 17+ age rating. Also, as of December 16, 2022, the free version of YouTube was available for download on the App Store, listed with a 17+ age rating. However, as of the date of the preliminary injunction, the free version of YouTube is now listed on the App Store with a 12+ age rating.

25. TikTok is also available to download on Android devices via the Google Play Store and the Microsoft Store. TikTok has a "T" for "Teen" rating on both the Google Play Store and the Microsoft Store.

26. On May 2, 2022, the State of Indiana Inspector General ("Inspector General") filed an investigative report, stating that on April 28, 2022, the

Indiana Office of Attorney General notified the Inspector General that the Attorney General wished to retain outside counsel, who would "represent the State of Indiana in evaluating a potential cause of action against TikTok . . . for violations of Indiana or federal law by intentionally distributing a dangerous product or service without adequate warning to consumers and publicly misrepresenting the dangers its product poses to consumers, particularly children."

27. Subsequently on July 26, 2022, the Indiana Attorney General issued a Civil Investigative Demand to TikTok.

28. At the preliminary injunction hearing, the Court heard testimony from the State's witness Dr. Megan O'Bryan. As a clinical psychologist, based in Indianapolis, she speaks to children and teenagers in central Indiana about their use of social media apps, including TikTok. Dr. O'Bryan counsels teenagers about self-regulating their use of apps and the content they view on apps.

29. Dr. O'Bryan testified about her concerns regarding adolescent use of social media, including TikTok and other platforms. With respect to Apple's four content descriptions of the TikTok app at issue in this case (see above, at paragraph 18), Dr. O'Bryan testified that she is concerned about the effect social media's sexual content has on teenagers. One of her concerns is that as a result of viewing what she described as "hypersexualized" social media content, sexual behavior may become normalized for teenage girls, who might then try to recreate it in their own social media videos. Another of her concerns is that teenage boys who view sexual content on social media might move on to view pornography. Dr. O'Bryan did not testify that pornography was available on TikTok.

30. Dr. O'Bryan has an impression that the unique features of TikTok have led her patient population, especially those 12–15 years of age, to struggle more with TikTok than with other social media platforms. Dr. O'Bryan explained that "over usage is much more problematic with TikTok" and "desensitization is much more prevalent on TikTok" than on other social media platforms, like Snapchat. Dr. O'Bryan testified that "frontal lobes are not developed yet" in teenagers, so they have comparatively less ability to regulate their usage of the app, and persistent usage can lead to significant exposure to "hypersexualized videos." Dr. O'Bryan added that with her patient population, depiction of drug use could follow the same pattern.

31. Dr. O'Bryan testified that she did not attempt to quantify all of the content that is available on TikTok. Regarding the type of content that constitutes "sexual content," Dr. O'Bryan admitted that there is disagreement about the meaning of this term, and that "you would need to come to an understanding of the definition." For example, Dr. O'Bryan testified that some people might believe that videos of people kissing depict sexual acts and therefore contain sexual content, whereas other people would not describe the same kissing videos as having any sexual content. She testified that without a better definition of the word "sexual," there is disagreement regarding the meaning of the term.

32. Regarding the "intensity" of specific videos submitted into evidence by the State, Dr. O'Bryan testified that the level of intensity of a video posted to TikTok depicting pole-dancing was comparable in intensity to a depiction of pole-dancing in the PG-13 rated film "Rock of Ages," an excerpt of which was played during the hearing.

33. Dr. O' Bryan also testified that she has not conducted an analysis to categorize specific content on TikTok as "mild" or "intense." Dr. O'Bryan testified that most people would have different interpretations of what is meant by categorizing content as "mild" or "intense." For example, Dr. O'Bryan testified that most people have their own definitions of the difference between a mild and an intense depiction of alcohol use.

34. The Court also heard testimony from the State's witness Dr. Jon-Patrick Allem. Dr. Allem testified about the study that he performed for the State, as well as his findings reflected in his report. In his study, Dr. Allem identified substance use related material on TikTok by selecting and searching the app via certain hashtags related to alcohol, tobacco, and drugs, and he analyzed the content of the videos he found under those hashtags. The hashtags he chose for his sample of videos related to alcohol, tobacco, and what he described as "hard drug" use.

35. Dr. Allem's study evaluated 194 TikTok videos in total. Dr. Allem testified that his study coded the videos for certain content, including whether a video depicts or mentions substance use, whether it depicts substance use in a positive fashion, whether it depicts substance use in a neutral fashion, or whether it depicts substance use in a negative fashion.

36. Dr. Allem's study revealed that just under 70 percent of the 194 TikTok substance (alcohol, tobacco, and drug) use videos he reviewed had a "neutral" sentiment toward substance use. These neutral videos have over 2 billion views, and 174 million "likes." About 25 percent of the substance use videos Dr. Allem reviewed were "positive" towards substance use. These positive substance use videos had over 662 million views, and nearly 56 million "likes." About 6 percent of the 194

TikTok substance use videos were "negative" toward substance use, with over 133 million views and 12.6 million "likes."

37. Dr. Allem's study did not code the videos for "mild" or "intense" depictions of substance use. Dr. Allem testified that it would be difficult to categorize videos as "mild" or "intense" without definitions of those terms.

38. Dr. Allem testified that his research did not involve comparing the amount of substance use content on TikTok to the amount of all other content on TikTok.

39. Some alcohol, tobacco, and drug use videos are accessible on TikTok, in part, because of what TikTok internally refers to as "policy gaps," where a TikTok safety policy does not cover a particular video or type of content.

40. The State's third witness was Christopher Byorni. Byorni is a special investigator for the Indiana Attorney General. The Indiana Attorney General provided Byorni with written instructions, which he followed, to conduct specific searches, find specific users, and find and record specific videos on TikTok. Byorni testified that he only looked for videos specified in the instructions that he received from State's counsel; he did not look at other types of content available on the TikTok platform, nor does he know how many total videos or video views there are on TikTok.

41. The State's instructions directed Byorni to record 30 videos on the For You feed prior to performing the searches as directed by the instructions. Byorni was also instructed to record 30 videos on his For You feed after he completed the specific searches. After completing the directed searches, Byorni's recording of his For You feed contained no drug use

and no sexual content. Byorni testified that he believed a few videos in the recording contained "swearing."

42. Byorni did not evaluate the frequency of the types of content he was asked to record. Byorni did not evaluate the mildness or intensity of the videos he was asked to find.

43. Byorni found that by typing in an emoji or just a few letters, TikTok's autocomplete feature could recommend drug and sex related content. He found that a snowflake emoji led to cocaine related search suggestions. He found that typing in "shro", led to suggestions for hallucinogenic drugs.

44. TikTok's first witness was Dr. Tracy Elizabeth. Dr. Elizabeth is the Head of Family Safety & Developmental Health at TikTok. She oversees a policy team at TikTok that focuses on youth safety and well-being. Dr. Elizabeth testified about her twenty years of related experience before joining TikTok, which included being an elementary school teacher, receiving a doctorate in adolescent development and media, and her industry experience at Netflix in establishing content standards for teenagers.

45. Dr. Elizabeth testified that the vast majority of content on TikTok is safe, affirming, healthy, and suitable for users of all ages. This assessment is based on her three years of professional experience at TikTok viewing content posted to TikTok on a regular basis, including her personal experience using TikTok.

46. Dr. Elizabeth testified that the dissemination of harmful user-generated content is an industry-wide challenge for all social media user-generated content companies. She testified about TikTok's multi-layered approach for dealing with the issue.

47. Dr. Elizabeth testified regarding TikTok's "Community Guidelines." TikTok's Community Guidelines are a set of norms and a code of conduct for TikTok. The Community Guidelines are a public document that informs users about the rules for using the TikTok platform. The Community Guidelines provide that videos on the app featuring certain content are subject to content moderation, including removing a particular video or a user from the app, restricting a video to certain age groups, and making a video or a user's content ineligible for recommendation for the For You feeds of all or a subset of users. The Community Guidelines prohibit, for example, depictions of nudity and sexual intercourse. The Community Guidelines are developed in partnership with outside experts, including several non-profit organizations focused on the protection of minors.

48. To enforce its Community Guidelines, TikTok uses human and machine (A.I.) moderators to identify and remove content that violates the Community Guidelines. A.I machine learning models are designed to detect content that violates the Community Guidelines, and to either remove or refer such content to humans for moderation. TikTok maintains more specific internal policies for its human moderators to identify content that violates the Community Guidelines. This includes an internal "playbook" that specifically describes the nuances of what is and is not a violation of the Community Guidelines.

49. Approximately 90% of videos removed for violating TikTok's Community Guidelines are taken down before the video has been viewed. TikTok's moderation processes, however, do not catch all posted content that violates the Community Guidelines. TikTok refers to content that should have been caught by its moderation processes, but nevertheless

appears on the platform, as "leakage."

50. Dr. Elizabeth testified that, as a further layer of protection, some posted content may trigger a "Trust and Safety" policy concern, but not be so egregious as to violate the Community Guidelines. These videos are not subject to removal from the app. In these circumstances, TikTok tags content as "not for feed," which means that the content is not available on the For You feed, and can be accessed only through means such as searching specifically for the content.

51. Dr. Elizabeth testified that TikTok has created a specialized user experience for teenagers to promote online safety for younger users. For example, users 13 to 15 years of age have their accounts set to "private" by default, do not have access to direct messages, and cannot host a livestream. Dr. Elizabeth also testified regarding TikTok's "Family Pairing" tool, which enables parents to manage their children's TikTok experience by limiting screen time, and by turning off the search feature, among other options. Dr. Elizabeth testified that she regards TikTok as offering some of the most comprehensive safety features available among its social media competitor services.

52. TikTok internally reports that its drug content moderation policies have suffered from "significant levels of leakage, confusion, and mismoderation due to policy gaps." In a report from August 29, 2022, TikTok internally assessed "U.S. Safety Quality" by examining "curated example cases." The report compiled a total of 61,962 videos to assess the accuracy of TikTok's content moderation. The goal of the report was to better analyze what kinds of content were "contributing to the low accuracy and/or high leakage" for a given issue.

53. TikTok's data reveals that between July and September 2022, 110

million videos were removed from TikTok due to its Community Guidelines, and that 11 million of those videos had been viewed prior to removal.

54. While it is not mentioned in the Community Guidelines, TikTok's internal policies actually do permit use of profanity and mature/suggestive themes when posted videos are set to music.

55. The Court heard testimony regarding the application of this internal policy. On cross-examination, Dr. Elizabeth was presented with several TikTok videos that were set to rap music. One such video contained the rap lyrics, "I just want you to fuck me to sleep. Fuck me so good," and "I want my cheeks clapped daddy. Clap'em. So lay me down while I arch that ass back back. I need that good pipe daddy." Several other videos in evidence contain similar overtly sexual rap lyrics. Dr. Elizabeth admitted that these videos do not violate TikTok's Community Guidelines, and can be served in the For You feed.

56. Dr. Elizabeth testified that the use of profanity in song lyrics is a mitigating factor that softens the intensity of the profanity, given that profane song lyrics are common in society. Profane song lyrics are commonly available to teenagers on many other platforms, such as Spotify, Apple Music, Pandora, and other apps that people now commonly use to listen to music.

57. Dr. Elizabeth further testified regarding TikTok's interactions with Apple in December 2022, regarding the TikTok age rating. Apple contacted TikTok in December 2022, inquiring about the basis for TikTok's App Store rating. TikTok provided Apple a written response explaining why TikTok believes that its answers to the App Store questionnaire were accurate. Following that response, Apple did not change the rating, and

TikTok has not heard any additional concerns from Apple regarding the TikTok rating.

58. Dr. Elizabeth testified that, in her opinion, TikTok's "content descriptors" on the App Store "very much land appropriately in the infrequent response option."

59. TikTok depends on users accurately submitting their age. However, significant numbers of 13-to-15-year-old TikTok users falsely input their age as being 18+. Additionally, very few parents use TikTok's "Family Pairing" tool to monitor their children's use of the app.

60. Dr. Elizabeth also testified regarding the consequences to TikTok of the injunction requested by the State. These consequences include: TikTok's reputation would be harmed by being associated with an incorrect, older age rating, which could place TikTok in parity with pornography; TikTok would lose goodwill and relationships with its partner organizations; and TikTok would also lose teenage users to competitor platforms, such as YouTube, Instagram, and Snapchat, which are rated 12+ in the App Store.

61. TikTok's second witness was Dr. Charles Cowan. Dr. Cowan is an expert in the area of statistics, economics, and research.

62. Dr. Cowan criticized Dr. Allem's study. Dr. Cowan testified that Dr. Allem's methodology was biased. Dr. Cowan faulted Dr. Allem's study of substance related content by selecting particular hashtags rather than attempting to identify the incidence of substance related content within the overall pool of all videos available on TikTok.

63. Dr. Cowan also testified about several other errors in Dr. Allem's mathematical calculations.

64. Dr. Cowan testified that Dr. Allem's study did not take into consideration

the way that teenagers use TikTok, which is primarily via the For You feed.

65. Dr. Cowan testified that Dr. Allem's report did not establish the frequency or prevalence of substance related content on TikTok.

66. The Court finds Dr. Cowan's criticism of Dr. Allem's study (and Dr. Allem's testimony) to be generally convincing.

## Personal Jurisdiction

TikTok argues that this Court lacks personal jurisdiction over TikTok. The State disagrees. As Chief Justice Rush stated in *Boyer v. Smith*, 42 N.E.3d 505, 507 (Ind. 2015), "Indiana courts may exercise personal jurisdiction over non-residents to the fullest extent of 'minimum contacts' precedent under the Fourteenth Amendment." However, the Court must "scrutinize those contacts closely so out-of-state defendants will not be unfairly called into our state to defend themselves." *Id.* In explaining that Indiana's personal jurisdiction approach mirrors the federal "minimum contacts" analysis, the Chief Justice went on to state:

> Personal jurisdiction refers to a court's power to impose judgment on a particular defendant. In Indiana, personal jurisdiction analysis begins with Indiana Trial Rule 4.4(A), which sets out examples of activities that often support jurisdiction. It also provides that "a court of this state may exercise jurisdiction on any basis not inconsistent with the Constitutions of this state or the United States."

> In *LinkAmerica Corp. v. Cox*, we interpreted this catchall "any basis" provision to "reduce analysis of personal jurisdiction to the issue of whether the exercise of personal jurisdiction is consistent with the federal Due Process Clause." 857 N.E.2d at 967. More specifically, before an Indiana court can properly assert personal jurisdiction over a defendant, the Due Process

Clause of the Fourteenth Amendment mandates that the defendant have "certain minimum contacts with the state such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice." *Id.* (citing *International Shoe Co. v. Washington*, 326 U.S. 310, 316, 66 S. Ct. 154, 90 L. Ed. 95 (1945)). Minimum contacts include acts defendants themselves initiate within or without the forum state that create a substantial connection with the forum state itself. *See Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475, 105 S. Ct. 2174, 85 L. Ed. 2d 528 (1985); *see also Anthem Ins. Cos., Inc. v. Tenet Healthcare Corp.*, 730 N.E.2d 1227, 1235 (Ind. 2000), superseded on other grounds by *LinkAmerica*.

The "minimum contacts" test of *International Shoe* and its progeny ensures that a defendant's contacts with Indiana make an Indiana court's exercise of personal jurisdiction fair and just. *LinkAmerica*, 857 N.E.2d at 967 (citing *Int'l Shoe Co.*, 326 U.S. at 316). To state this another way, due process requires that potential out-of-state defendants be able to predict what conduct might make them liable in our courts. *Burger King*, 471 U.S. at 472 (quoting *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297, 100 S. Ct. 559, 62 L. Ed. 2d 490 (1980)). *See also Int'l Shoe Co.*, 326 U.S. at 319; *Anthem Ins. Cos.*, 730 N.E.2d at 1235-36. "The Due Process Clause . . . gives a degree of predictability to the legal system that allows potential defendants to structure their primary conduct with some minimum assurance as to where that conduct will and will not render them liable to suit." *World-Wide Volkswagen*, 444 U.S. at 297 (internal citation omitted). Consistent with this longstanding precedent, Indiana courts will employ caution and exert potentially coercive legal authority only over a defendant who has the requisite minimum contacts to Indiana. *Int'l Shoe Co.*, 326 U.S. at 316 (citing *Pennoyer v. Neff*, 95 U.S. 714, 24 L. Ed. 565 (1877)).

*Boyer*, 42 N.E.3d at 509.

The personal jurisdiction requirement of the Due Process Clause recognizes two different types of personal jurisdiction: general jurisdiction and specific jurisdiction. TikTok maintains that the Court lacks specific personal

jurisdiction over it. Specific jurisdiction is the centerpiece of modern jurisdiction theory, while general jurisdiction now plays a reduced role. *Boyer*, at 510. Specific jurisdiction exists when the suit "arises from or is closely related to" the minimum contacts of the defendant with, or "substantial connection" to, the forum state. *Id.* "Specific jurisdiction also requires purposeful availment—meaning a defendant invoked her contacts or connection with Indiana, and therefore should have reasonably anticipated being called into court to answer for her actions." *Id.* (quoting *LinkAmerica*, 857 N.E.2d at 967).

TikTok argues that, as it concerns the jurisdictional analysis, the conduct at issue in this lawsuit is TikTok's "Infrequent/Mild" responses to the App Store questionnaire. The State contends that it is these responses that are deceptive, and therefore this is the TikTok conduct that violates Indiana consumer protection law. The State argues that specific jurisdiction exists because: (1) TikTok has a substantial number of users in Indiana; (2) TikTok derives millions of dollars in revenue from advertising purchased within Indiana; and (3) TikTok geographically targets advertising to users located in Indiana.

The difficulty with the State's arguments is that those three activities all relate to contacts that would exist in any of the 50 states where TikTok is available via Apple's App Store. Our Indiana Court of Appeals addressed the issue in a similar case involving whether presence on the internet provides the basis for an Indiana court to exercise jurisdiction over defendant. *Wolf's Marine, Inc. v. Brar*, 3 N.E.3d 12 (Ind. Ct. App. 2014). There, our appellate court agreed with a related ruling from the U.S. Court of Appeals for the Seventh

Circuit: "If the defendant merely operates a website, even a 'highly interactive' website, that is accessible from, but does not target, the forum state, then the defendant may not be haled into court in that state without offending the Constitution." *Wolf's Marine*, 3 N.E.3d at 17 (quoting *be2 LLC v. Ivanov*, 642 F.3d 555, 559 (7th Cir. 2011)). Further, the "unilateral activity of ... a third person" is not a basis for specific jurisdiction. *LinkAmerica Corp.*, 857 N.E.2d at 967 (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. at 475). In *Wolf's Marine*, the Court of Appeals explained that the defendant's "possible advertising in the Indiana Yellow Pages" did not "have any relevance to a specific jurisdiction analysis because [the plaintiff] is not making any claim that any such advertising was false or misleading . . . ." 3 N.E.3d at 18. Here, there is no allegation or evidence that TikTok has targeted Indiana regarding the matter alleged to be false or deceptive, which is TikTok's "Infrequent/Mild" responses to the App Store's questionnaire. The Court agrees with TikTok in this regard, as this allegedly deceptive conduct is directed to Apple, a California corporation, and no aspect of the age rating process takes place in Indiana. This suit-related conduct is not related to and does not arise out of TikTok's conduct within or directed to Indiana.

In *Johnson v. TheHuffingtonPost.com, Inc.*, 21 F.4th 314, 321 (5th Cir. 2021), the U.S. Court of Appeals for the Fifth Circuit considered whether geographic targeting of advertising by an online platform was sufficient to support specific jurisdiction. The plaintiff in that action accused the defendant of libel, and brought suit in Texas, claiming among other things, that personal jurisdiction existed because the defendant geographically targeted ads to Texas. *Id.* at 317. The Fifth Circuit rejected the argument, reasoning that

"what matters is whether HuffPost aimed *the alleged libel* at Texas." *Id.* at 321. Here, there is no evidence that TikTok aimed its allegedly deceptive "Infrequent/Mild" statements at Indiana.

As the Seventh Circuit observed in *Advanced Tactical Ordnance Sys., LLC v. Real Action Paintball, Inc.*, 751 F.3d 796, 803 (7th Cir. 2014), "if having an interactive website were enough in situations like this one, there is no limiting principle—a plaintiff could sue everywhere." The Court concludes that TikTok operating an online service that is available in Indiana and all other states is not sufficient to establish specific jurisdiction, when it is being sued over responses made to the App Store's questionnaire.

## Reasonable Likelihood Of Success on the Merits: Indiana Deceptive Consumer Sales Act

Even though the Court has determined that it lacks personal jurisdiction over TikTok, the Court addresses whether the State has shown a likelihood of success on the merits of its claim. The State seeks a preliminary injunction to enjoin TikTok from alleged deceptive practices relating to Apple's age rating. Again, at the heart of the State's case is the State's allegation that TikTok engaged in deceptive consumer practices by indicating that the TikTok app contains "Infrequent/Mild" instances of these four specific subject matter categories: "Profanity or Crude Humor"; "Mature/Suggestive Themes"; "Alcohol, Tobacco, or Drug Use or References"; and "Sexual Content or Nudity." The State claims TikTok thereby deceives Indiana consumers when Hoosiers download the TikTok app from the App Store.

The grant or denial of a preliminary injunction rests with the equitable discretion of the trial court. *Unger v. FFW Corp.*, 771 N.E. 2d 1240, 1243 (Ind. Ct. App. 2002). "An injunction is an extraordinary remedy that should be granted only with caution." *Abercrombie & Fitch Stores, Inc. v. Simon Prop. Grp., L.P.*, 160 N.E.3d 1103, 1108 (Ind. Ct. App. 2020). The power to issue an injunction should be used sparingly, and such relief should not be granted unless the law and facts are clearly in the moving party's favor. *Unger*, 771 N.E. 2d at 1243.

In addressing the showing required to obtain a preliminary injunction, the Indiana Court of Appeals observed in *Vickery v. Ardagh Glass, Inc.*:

> To obtain a preliminary injunction, the movant must show (1) a reasonable likelihood of success on the merits; (2) the remedies at law are inadequate and there will be irreparable harm during the pendency of the action; (3) the threatened injury to the movant from denying the motion outweighs the potential harm to the nonmovant from granting the motion; and (4) the public interest would not be disserved by granting the injunction.

85 N.E.3d 582, 859-60 (Ind. Ct. App. 2017) (citing *Hannum Wagle & Cline Eng'g, Inc. v. Am. Consulting, Inc.*, 64 N.E.3d 863, 873 (Ind. Ct. App. 2016)); *see also Apple Glen Crossing, LLC v. Trademark Retail, Inc.*, 784 N.E.2d 484, 487 (Ind. 2003); *and see* Ind. Code § 36-26-1-5. If the moving party fails on any one of these requirements, the motion or a preliminary injunction must be denied. *Clark's Sales and Service, Inc. v. John D. Smith & Ferguson Enters.*, 4 N.E.3d 772, 780 (Ind. Ct. App. 2014).

Additionally, "[i]njunctions must be narrowly tailored, and never more extensive in scope than is reasonably necessary to protect the interests of

the aggrieved parties." *U.S. Land Servs., Inc. v. U.S. Surveyor, Inc.*, 826 N.E. 2d 49, 64 (Ind. Ct. App. 2005). "Moreover, the injunction should not be so broad as to prevent the enjoined party from exercising his rights." *Id.* at 65; *see also Groff v. City of Butler*, 794 N.E.2d 528, 535 (Ind. Ct. App. 2003).

Preliminary injunctions act to prevent irreparable harm (to the moving party) by maintaining the "status quo" during the pendency of an underlying claim. *Kuntz v. EVI, LLC*, 999 N.E.2d 425, 432 (Ind. Ct. App. 2013). In other words, preliminary injunctions function to protect the property and rights of parties from injury until the issues and equities in a case can be determined after a full examination and hearing. *Barlow v. Sipes*, 744 N.E.2d 1, 6 (Ind. Ct. App. 2001). Consequently, preliminary injunctions are prefatory to a hearing on the merits. A mandatory injunction is defined as an injunction that orders an affirmative act or mandates a specified course of conduct. *City of Gary v. Majestic Star Casino, LLC*, 905 N.E.2d 1076, n.6 (Ind. Ct. App. 2009) (citing BLACK'S LAW DICTIONARY 800 (8th ed. 2004). Preliminary injunctions, like the preliminary injunction sought by the State, are typically "prohibitory," and act to forbid an action in order to maintain the status quo. *Crossman Cmtys., v. Dean*, 767 N.E.2d 1035, 1040 (Ind. Ct. App. 2002). To establish that a party has a reasonable likelihood of success on the merits, the party must establish a *prima facie* case. *Northern Electric Co., Inc. v. Torma*, 819 N.E.2d 417, 431 (Ind. Ct. App. 2004).

The State has brought this suit on its theory that TikTok has violated Indiana's Deceptive Consumer Sales Act ("DCSA"). The DCSA states that "[a] supplier may not commit an unfair, abusive, or deceptive act, omission,

or practice in connection with a consumer transaction." I.C. § 24-5-0.5-3(a).

Section 2(3)(A) of the DCSA defines "supplier" to mean, in relevant part:

A seller, lessor, assignor, or other person who regularly engages in or solicits consumer transactions, including soliciting a consumer transaction by using a telephone facsimile machine to transmit an unsolicited advertisement. The term includes a manufacturer, wholesaler, or retailer, whether or not the person deals directly with the consumer.

In turn, Section 2(1) of the DCSA defines "consumer transaction" as:

"Consumer transaction" means a sale, lease, assignment, award by chance, or other disposition of an item of personal property, real property, a service, or an intangible, except securities and policies or contracts of insurance issued by corporations authorized to transact an insurance business under the laws of the state of Indiana, with or without an extension of credit, to a person for purposes that are primarily personal, familial, charitable, agricultural, or household, or a solicitation to supply any of these things.

The DCSA also indicates: "This chapter shall be liberally construed and applied to promote its purposes and policies." I.C. § 24-5-0.5-1(a). The DCSA's stated purposes are to:

(1) simplify, clarify, and modernize the law governing deceptive and unconscionable consumer sales practices; (2) protect consumers from suppliers who commit deceptive and unconscionable sales acts; and (3) encourage the development of fair consumer sales practices.

I.C. § 24-5-0.5-1(b); see also Kluger v. J.J.P. Enter., Inc., 159 N.E.3d 82, 88 (Ind. Ct. App. 2020).

TikTok contends that its representations to the App Store are not a violation of the DCSA. The State contends that TikTok committed actionable

misrepresentations when TikTok selected the "Infrequent/Mild" option instead of "Frequent/Intense" on the App Store questionnaire for the four relevant content categories: "Sexual Content and Nudity," "Mature/Suggestive Themes," "Profanity or Crude Humor," and "Alcohol, Tobacco, and Drug References." TikTok argues that both the App Store content categories and the questionnaire selections are too general and too subjective to qualify as "representations of fact," and are therefore not actionable under the DCSA.

Our Indiana Supreme Court has held that subjective assertions of "opinion" are not actionable under the DCSA, because such opinions are not "representations of fact." *Kesling v. Hubler Nissan, Inc.*, 997 N.E.2d 327, 332-33 (Ind. 2013). Similarily, District Court Judge DeGuilio held that statements which are "too general" cannot support a claim under Indiana's DCSA. *Castagna v. Newmar Corp.*, 340 F. Supp. 3d 728, 741 (N.D. Ind. 2018). In *Kesling*, our Supreme Court held that representing a car as "sporty" was not actionable, because "whether a car is 'sporty' is a subjective assertion of opinion, not fact." 997 N.E.2d at 333.

The Seventh Circuit's decision in *Entertainment Software Association v. Blagojevich*, 469 F.3d 641 (7th Cir. 2006), is instructive. There, the State of Illinois sued video game manufacturers and retailers, alleging the defendants' video games endangered the health of Illinois teenage gamers. *Id.* That case involved a state statute that required the number "18" (pertaining to age 18) be placed on a label on video games that met the statute's definition of "sexually explicit." *Id.* at 643. There, the Seventh Circuit ruled that the term "sexually explicit" is opinion-based. *Id.* at 652. The ruling

explained that requiring video game retailers to place an age "18" sticker on video games would communicate a "subjective and highly controversial message—that the game's content is sexually explicit." *Id.*

The testimony presented in this case regarding the meaning of the App Store content categories and TikTok's "Infrequent/Mild" responses demonstrates that the relevant terms are subjective, and vary from person to person. In terms of the content discussed during the hearing, the State identified no instances of nudity or graphic sex available on TikTok. Dr. Elizabeth testified that Mr. Byorni was able to find pornography only by linking away from TikTok to an external browser. Dr. O'Bryan discussed TikTok videos of people pole-dancing, which she regarded as equivalent in intensity to a PG-13 film. Dr. O'Bryan testified that different people would understand the terms "sexual content" and "mature/suggestive themes" differently, with some people viewing a video of people kissing as having "sexual content" or as having a "mature theme," and yet other people would reasonably differ in that opinion, and not believe the video contains sexual or mature content. Given the subjectivity of the App Store content category, the Court concludes that the App Store questionnaire inherently solicits non-actionable statements of opinion, not objectively verifiable "representations of fact." TikTok's responses to the App Store questionnaire are not actionable under the DCSA because those responses are subjective statements of opinion.

Furthermore, concerning the conduct at issue, the App Store asks about the "frequency" of certain video content. The App Store's question specifically requires app developers to select between "infrequent" and "frequent." The term "frequency" is defined to mean "the number, proportion, or percentage

of items in a particular category in a set of data." *Frequency*, Webster's Dictionary, https://tinyurl.com/45kx6a84. Here, the App Store questionnaire asks about the "level of frequency for each content description." Thus, Apple's question asks about the relative share of the content among all of the videos on TikTok. The State argues that a video appears on TikTok "frequently" if one child sees the relevant content on TikTok once a month. The State's expert, Dr. Allem testified that substance use content on TikTok was "prevalent," and he defined "prevalent" as occurring to such a degree that he would "take note" of it. TikTok's expert, Dr. Cowan, disagreed with Dr. Allem, testifying that "prevalence" means happening more than 50 percent of the time. These varying understandings of the terms "frequent" and "infrequent" underscore the inherent subjectivity of the terms. Thus, these complained-of subjective responses, again, are not "representations of fact," and are therefore, not actionable under the DCSA.

TikTok further argues that other aspects of the App Store's relevant multiple-choice selection choices, such as "mild" and "intense" are also subjective, and not actionable under the DCSA. TikTok's Dr. Elizabeth testified that she viewed the terms "mild" and "intense" as subjective. The State's witnesses did not disagree. Dr. O'Bryan testified that most everyone would have their own definition of the difference between a "mild" and "intense" depiction of alcohol content. Dr. Allem testified that it would be difficult to categorize tobacco or alcohol use as "mild" or "intense" without additional definitions. Mr. Byorni also testified that there could be differences of opinion on whether content is "mild" or "intense."

The Court agrees. The App Store's questionnaire and TikTok's responses thereto involve subjective opinion-based terminology, which mean different things to different people. App developers, like TikTok, who respond to the App Store content questions by responding "None," "Infrequent/Mild," or "Frequent/Intense" are therefore making non-actionable statements of "unverifiable opinion." See Kesling, 997 N.E.2d at 332. Accordingly, the Court concludes that TikTok's representation that content on the app was "Infrequent/Mild" is a subjective assertion of opinion, which is not actionable under the DCSA.

TikTok also argues that even if the Court concludes that the relevant terms at issue regarding the App Store age rating questionnaire were sufficiently objective and factual to constitute a violation of the DCSA, the State has not met its burden of establishing that TikTok's statements were false or misleading. The State alleges that TikTok had "falsely reported" to the App Store that the relevant content categories were "Infrequent/Mild" as opposed to "Frequent/Intense." As noted, the App Store questionnaire asks developers to "select the level of frequency for each content description that best describes your app." Apple's question asks TikTok about the relative amount of content in each of the four relevant categories as compared with the total amount of TikTok content.

The State did present evidence to show that certain types of content are available on TikTok. On cross examination of Dr. Elizabeth, the State presented several videos set to rap music that contained profane and sexualized lyrics. Mr. Byorni identified specific videos based on search instructions provided to him by the Indiana Attorney General. Dr. Allem

testified regarding the 194 substance use videos that he identified by searching particular parameters. The State argues that 15 million videos per quarter should have been removed by TikTok for violation of TikTok's Community Guidelines, but were not. The State also argues that 11 million videos per quarter, or 88 million over a two-year period, were removed after they had already been viewed at least once. But, the State's evidence does not establish the level of frequency for any particular content category.

Dr. Elizabeth testified that between January 1, 2021, and January 8, 2023, more than 8 billion videos were uploaded in the United States, and that there were more than 21 trillion views of these videos. The most favorable view of the State's evidence is that only 2.6% of the 8 billion videos uploaded during this two year period violated TikTok's Community Guidelines. Further, the State's evidence also failed to take into account the ways TikTok users typically view content on the platform. The unrebutted evidence is that more than 75% of video content on TikTok is accessed and viewed through the For You feed, as opposed to searching for specific videos and hashtags in the manner employed by Mr. Byorni and Dr. Allem.

The Court concludes that the State has failed to establish that TikTok made a false or otherwise deceptive representation when it identified the relevant content categories as "infrequent" in response to the App Store's question regarding their "level of frequency." The State has not carried its burden to show the falsity of TikTok's representation that the content categories appear "infrequently," especially when comparing the relatively small amount of allegedly suspect content to all of the content appearing on TikTok.

TikTok also argues that the term "consumer transaction" as used in the DCSA is limited to exchanges for money, and does not encompass downloads of free apps like TikTok. No exchange of money is involved in accessing the free TikTok app. Whether the DCSA covers free apps has not yet been addressed in Indiana. The DCSA has historically been used for consumer transactions involving exchanges for money. *See, e.g., Lawson v. Hale*, 902 N.E.2d 267, 269–71 (Ind. Ct. App. 2009) (the claimed violation of DCSA was based on the sale of a tractor for $8500, when that tractor allegedly leaked oil). Courts in other states have construed their similar consumer protection statutes as not applying to free goods and free services. *See, e.g., In re Facebook Privacy Litigation*, 791 F. Supp. 2d 705, 715–18 (N.D. Cal. 2011) (construing California law); *Dobson v. Milton Hershey School*, 356 F. Supp. 3d 428, 435 (M.D. Pa. 2018) (construing Pennsylvania law).

Specifically, TikTok argues that the term "consumer transaction," defined by the terms in the DCSA to apply only to exchanges involving a "sale, lease, assignment, award by chance or other disposition" of property or a service, generally means transactions involving an exchange of money. *See* I.C. § 24-5-0.5-2(1). In this argument, TikTok relies on *ejusdem generis*, to argue that the phrase "or other disposition" as used in the definition of "consumer transaction" must also involve the exchange of money or other valuable consideration. *Ejusdem generis* is an interpretive canon in the law, meaning "of the same kind." *O'Bryant v. Adams*, 123 N.E.3d 689, 693 (Ind. 2019). The State argues that both "sales" and "other dispositions" can occur for consideration other than money. The Court concludes that in the DCSA, the term "consumer transaction" does not stretch so far as to include the

download of a free app. Consumers in Indiana and across America have clearly not exchanged money for their use of TikTok. Consumers download TikTok for free. TikTok's representations about its conduct, which representations were made to the App Store, fall outside the scope of the DCSA. If the Indiana legislature wants the DCSA to apply to such a common activity as downloading free apps,[1] it can easily do so by amending the definition of "consumer transaction" to include the act of downloading a free app.

## Other Considerations

Having concluded the State cannot show a reasonable likelihood of success on the merits, the Court need not address the other three required showings for a preliminary injunction. *See Vickery,* 85 N.E.2d at 859-60. However, considering the "inadequate remedies/irreparable harm" component of these three requirements, the Court first concludes that the State's remedies at law would be inadequate. Money damages alone might not change TikTok's responses to the App Store, if these responses were actionable under the DCSA. However, the "irreparable harm during the pendency of this case" component does not as strongly favor the State, because the alleged harm has been ongoing for the several years that TikTok has been available.

With regard to the "threatened injury to the movant" component, the Court concludes that the threatened injury to the State does not outweigh the potential harm to the non-movant, TikTok. The threatened injury to the State

---

[1] *BusinessofApps,* an app industry service, reported that in 2021, more than 100 billion apps were downloaded for the first time, with more than 140 billion total downloads in 2022. www.businessofapps.com/data/app-statistics/.

is that Indiana teenagers will continue to have the same access to TikTok that all other American teenagers enjoy/suffer. However, the evidence demonstrates the disruptive and harmful financial impact that a preliminary injunction would cause TikTok; a preliminary injunction would cause significant harm to TikTok's business reputation, and no Indiana specific version of TikTok exists, which means such an injunction would disrupt TikTok's business operations in all 50 states. Therefore, the balance of harm component further weighs against issuing a preliminary injunction.

As to the public interest factor, the Court concludes that by 2023, it is now self-evident that the impact of certain aspects of social media, including the TikTok app, are not always consistent with our national best interests. A fair question exists as to whether the TikTok app is good for Hoosiers and other Americans. However, a significant body of case law does exist regarding social media First Amendment Constitutional protections that would be offended if a preliminary injunction were issued. *See Packingham v. North Carolina*, 582 U.S. 98, 107 (2017). Presently lacking is a body of law that attempts to reign in the harmful effects that are caused by social media.

When discussing the impact of social media in the context of the First Amendment right to free speech, the United States Supreme Court, in 2017, observed:

> A fundamental principle of the First Amendment is that all persons have access to places where they can speak and listen, and then, after reflection, speak and listen once more. The Court has sought to protect the right to speak in this spatial context. A basic rule, for example, is that a street or a park is a quintessential forum for the exercise of First Amendment rights. *See Ward v. Rock Against Racism*, 491 U. S. 781, 796, 109 S.

Ct. 2746, 105 L. Ed. 2d 661 (1989). Even in the modern era, these places are still essential venues for public gatherings to celebrate some views, to protest others, or simply to learn and inquire.

While in the past there may have been difficulty in identifying the most important places (in a spatial sense) for the exchange of views, today the answer is clear. It is cyberspace—the "vast democratic forums of the Internet" in general, *Reno v. American Civil Liberties Union,* 521 U. S. 844, 868, 117 S. Ct. 2329, 138 L. Ed. 2d 874 (1997), and social media in particular.

*Packingham* 582 U.S. at 104. There, Justice Kennedy's opinion, in which all the participating justices either joined or concurred, went on to state that social media apps, like Facebook (and TikTok), "can provide perhaps the most powerful mechanisms available to a private citizen to make his or her voice heard. They allow a person with an Internet connection to 'become a town crier with a voice that resonates farther than it could from any soapbox.'" *Id.* at 107 (quoting *Reno,* 521 U. S. at 868). Accordingly, the "public interest" factor does not weigh in the State's favor.

## CONCLUSION

The State is not likely to prevail in its attempt to enjoin the Defendants from making the complained-of representations regarding the TikTok app. The Court lacks personal jurisdiction over the Defendants. Additionally, the State of has not shown a reasonable likelihood of success on the merits at trial. Thus, the State of Indiana is not entitled to a preliminary injunction against Defendants. For all of the above-stated reasons, the State of Indiana's Motion for Preliminary Injunction is DENIED.

Pursuant to Ind. Appellate Rule 14(A), appeal from this Order may be taken as a matter of right.

May____4____, 2023

_____
JUDGE CRAIG J. BOBAY