United States District Court
Northern District of California

1

2

3

4

UNITED STATES DISTRICT COURT

5

NORTHERN DISTRICT OF CALIFORNIA

6

SAN JOSE DIVISION

7

8

JOANN BOGARD, et al.,

Plaintiffs,

9

10

v.

11

TIKTOK INC., et al.,

Defendants.

12

Case No.  24-cv-03131-VKD

**ORDER GRANTING DEFENDANTS'
MOTION TO DISMISS THE
COMPLAINT WITH LEAVE TO
AMEND**

Re: Dkt. No. 76

13

14      Plaintiffs Joann Bogard, Annie McGrath, Jane Doe, and the Becca Schmill Foundation

15  ("Foundation") (collectively, "Plaintiffs") bring this action against defendants Alphabet Inc.,

16  Google LLC, YouTube LLC, and XXVI Holdings Inc. (together, "Google Defendants") and

17  TikTok Inc. and ByteDance Inc. (together, "TikTok Defendants") (collectively, "Defendants"),

18  asserting tort claims of strict products liability, negligence, fraudulent misrepresentation, and

19  negligent misrepresentation, as well as violations of Indiana, Wisconsin, Oregon, and California

20  law regarding unfair and deceptive trade practices.  Dkt. No. 1 ¶¶ 161-247.  Defendants move to

21  dismiss all claims in the complaint on the grounds that: (1) Plaintiffs' claims are barred by Section

22  230 of the Communications Decency Act (CDA) or alternatively the First Amendment; (2)

23  Plaintiffs fail to allege fraud with particularity as required by Federal Rule of Civil Procedure 9(b);

24  and (3) Plaintiffs otherwise fail to state a claim upon which relief can be granted pursuant to Rule

25  12(b)(6) of the Federal Rules of Civil Procedure.  Dkt. No. 76 at 1-2.  Plaintiffs oppose

26  Defendants' motion.  Dkt. No. 82.  The Court held oral argument on October 22, 2024.  Dkt. No.

27  97.

28      Upon consideration of the moving and responding papers, and the parties' arguments at the

hearing, the Court grants Defendants' motion to dismiss with leave to amend.

## I.     BACKGROUND

### A.     Parties

#### 1.     Plaintiffs

Plaintiff Joann Bogard is a resident of Indiana.  Dkt. No. 1 ¶ 43.  Her son died in 2019 when he participated in a "choking challenge" after viewing videos regarding this challenge on YouTube.  *Id.* ¶¶ 59, 62, 64.

Plaintiff Annie McGrath is a resident of Wisconsin.  *Id.* ¶ 44.  Her son died in 2018 when he participated in a "choking challenge" after viewing videos regarding this challenge on YouTube.  *Id.* ¶ 80.

Plaintiff Jane Doe (proceeding anonymously) is a resident of Oregon.  *Id.* ¶ 45.  Ms. Doe's son H.F. was the victim of verbal harassment and bullying in a video promoted on the TikTok platform in 2022.  *Id.* ¶ 90.

Plaintiff Becca Schmill Foundation is a 501(c)(3) nonprofit registered in Massachusetts. *Id.* ¶ 46.  It was founded by the parents of Becca Schmill who died after overdosing on fentanyl she obtained via a social media platform.  *Id.* ¶ 105.  The Foundation seeks to protect children and young adults from harm associated with social media through research, community programming, and advocacy.  *Id.*

Plaintiffs describe themselves as "modern-day champions and vigilantes."  *Id.* ¶ 7.  They allege that, having all suffered loss or harm due to, or influenced by, content posted on social media, they now regularly seek out and report harmful content found on the YouTube and TikTok platforms for which Defendants are responsible.  *Id.* ¶ 8.  Plaintiffs assert that their "good-faith efforts to report harm" have been "unheeded, ignored, and arbitrarily dismissed" by Defendants. *Id.*  Plaintiffs bring this action on behalf of a putative class of "[a]ll people who used TikTok and YouTube and who made safety reports through the process set forth by Defendants from January 2020 through the date of dispositive judgment made in this action."  *Id.* ¶ 144.

2

United States District Court
Northern District of California

2.    **TikTok Defendants**

Defendant TikTok Inc. ("TikTok") is a California corporation with its principal place of business in Culver City, California.  *Id.* ¶ 47.  TikTok is the provider of the popular TikTok social media platform that permits third-party users to create, share and stream videos.  *See* Dkt. No. 76 at 3.

Defendant ByteDance Inc. is a Delaware corporation with its principal place of business in Mountain View, California.  Dkt. No. 1 ¶ 48.  It is the parent company of TikTok.

3.    **Google Defendants**

Defendant YouTube LLC("YouTube") is a limited liability company organized under the laws of the state of Delaware and is a wholly owned subsidiary of Google LLC.  *Id.* ¶ 52.  Its principal place of business is in San Bruno, California.  *Id.*  YouTube is the provider of the popular YouTube social media platform that, similar to TikTok, permits third-party users to post and view videos.  Dkt. No. 76 at 3.

Defendant Google LLC is a limited liability company organized under the laws of the state of Delaware and the managing member of YouTube, LLC.  *Id.* ¶ 51.  Its principal place of business is in Mountain View, California.  *Id.*

Defendant XXVI Holdings Inc. is a Delaware corporation with its principal place of business in Mountain View, California.  *Id.* ¶ 50.  It is the managing member of Google LLC.  *Id.*

Defendant Alphabet Inc. is a Delaware corporation with its principal place of business in Mountain View, California.  Dkt. No. 1 ¶ 49.  It is the sole stockholder of XXVI Holdings Inc.  *Id.*

B.    **Defendants' Content Moderation**

TikTok's Reporting Process and Content Moderation: According to the complaint, TikTok employs 40,000 human moderators who review approximately 1,000 videos a day.  *Id.* ¶ 110.  The videos are first screened by software that "is intended to automatically remove anything that would violate a community guideline."  *Id.*  If the software cannot determine whether a video does or does not violate a community guideline, the video is forwarded to a human moderator.  *Id.*

3

1    Videos with a number of views in excess of a certain threshold[1] are also sent to a human

2    moderator for review.  *Id.*

3        TikTok permits users to report videos that they believe violate TikTok's community

4    guidelines.  *Id.* ¶ 111.  To make a report, a user must have a TikTok account and be logged in to

5    the platform.  *Id.*  If the user holds a finger to the screen displaying the video, a menu pops up, and

6    the user may select "Report."  *Id.* ¶ 112.  The user is then presented with an opportunity to identify

7    the issue that he or she believes constitutes a violation, such as "Dangerous acts and challenges."

8    *Id.* ¶ 113.  If a user selects "Dangerous acts and challenges," a page displays describing TikTok's

9    rules regarding challenges.[2]  *Id.* ¶ 114.

10       After a user submits a report, he or she "receive[s] a confirmation message stating:

11   'Thanks for reporting. We'll review your report and take action if there is a violation of our

12   Community Guidelines.'"  *Id.* ¶ 115.  The user can check on the status of removal.  *Id.* ¶ 116.  If

13   TikTok determines the reported video does not violate its guidelines, the user will receive the

14   following message: "We found that the reported content doesn't violate our Community

15   Guidelines.  We understand that you may not want to see this type of content, and you have the

16   option to block the account that posted it."  *Id.* ¶ 117.  TikTok provides no option for the user to

17   appeal its decision regarding the reported violation.  *Id.*

18       <u>YouTube's Reporting Process and Content Moderation</u>: According to the complaint,

19   YouTube uses a similar combination of automated review and review by human moderators to

20   police content posted on its platform.  *Id.* ¶ 122.  YouTube also permits users to report videos that

21   they believe violate community guidelines.  *Id.* ¶ 131.  To make a report, the user selects the

22   reporting option from a menu.  *Id.*  The user may select a reason for the report from a list, and

23

24   ───────────────

25   [1] The threshold number of views for a video to be sent to a human moderator varies depending on
     the country.  *Id.*

26   [2] A "challenge" "typically involve[s] people recording themselves doing something difficult,
     which they share online to encourage others to respond."  Dkt. No. 89-3, Ex. B.  Some challenges,
27   however, encourage "harmful behavior, including the risk of serious injury" and are classified by
     TikTok and YouTube as dangerous challenges.  *Id.*; *see also* Dkt. No. 89-4, Ex. C.

28

United States District Court
Northern District of California

receives a "confirmation banner" confirming the submission of the report. *Id.* ¶¶ 132-33. The user can manually track his or her report using the "'Report History' section" of the user's account on the platform. *Id.* ¶ 133. If YouTube determines a video violates its community guidelines, "it will either remove the content from its platform or restrict the content to mature audiences." *Id.* ¶ 134. If YouTube determines a video does not violate its community guidelines, it takes no action and does not notify the reporting user. *Id.* YouTube provides no option for the user to appeal its decision regarding the reported violation. *Id.* ¶¶ 134-35.

### C.    Plaintiffs' Claims

Plaintiff Joann Bogard: Since the loss of her son in 2019, Ms. Bogard "has been reporting numerous 'choking challenge' videos" to YouTube and TikTok. *Id.* ¶¶ 60-61, 66, 73. In doing so, she alleges that she relied on YouTube's and TikTok's policies prohibiting harmful or dangerous content, such as "asphyxiation: any activity that prevents breathing or can lead to suffocation like: Choking, drowning, or hanging games." *Id.* ¶ 68. However, although the content she reported "featured choking challenge videos for minor audiences," she alleges that neither YouTube nor TikTok removed the majority of the reported videos and that she received responses from TikTok that the reported videos were deemed "not to violate TikTok's community guidelines." *Id.* ¶¶ 69-75.

Plaintiff Annie McGrath: Since the loss of her son in 2018, Ms. McGrath has "reported several choking challenge videos (a.k.a. SpaceMonkey Challenge videos) to YouTube as harmful content." *Id.* ¶¶ 81-82. In making these reports, she relied on YouTube's policies against posting harmful or dangerous content. *Id.* ¶ 84. Ms. McGrath alleges that YouTube has not removed the videos she reported. *Id.* ¶ 85.

Plaintiff Jane Doe: Ms. Doe alleges that in May of 2022, she was informed that a "video containing verbal harassment and bullying against her son H.F.[] was being promoted in the 'For You' feed of certain TikTok users." *Id.* ¶ 90. Both the "informant" and Ms. Doe reported the video to TikTok and received an automated response that the video "did not violate community guidelines." *Id.* ¶¶ 91-94. She alleges that "[t]here was no option in the reporting process . . . to

United States District Court
Northern District of California

United States District Court
Northern District of California

1  escalate the video review for re-consideration by a human reviewer." *Id.* ¶ 95.  She further alleges

2  that she brought the video to "the attention of TikTok's executives" who ultimately determined

3  that "the video was violative of community guidelines." *Id.* ¶ 98.  Her other son, M.F., has also

4  reported a number of videos.  *Id.* ¶ 100.  Ms. Doe alleges that "TikTok's automated response [to

5  these videos] would arbitrarily determine that one of the videos posted by a user is violative of the

6  community guidelines, while the same video posted by another user is not." *Id.* ¶¶ 100-101.

7        <u>Becca Schmill Foundation</u>: The Becca Schmill Foundation's mission is to "protect . . .

8  teenagers and young adults from online harms" and "to fund research, sponsor community

9  programming, and advocate for polices that promote and safeguard the emotional wellbeing of

10  adolescents and young adults."  *Id.* ¶ 105.  In 2022, the Foundation hired researchers at the

11  Alliance to Counter Crime Online (ACCO) to "research [] the report and response processes of

12  harmful and illegal content on social media prevalently used by minor children," including the

13  choking challenge.  *Id.* ¶¶ 107-108.  As part of the research, they identified choking challenge

14  videos and reported them to social media platforms, including YouTube and TikTok, in order to

15  record the response.  *Id.* ¶ 108.  The Foundation determined that there were numerous choking

16  challenge videos that YouTube and TikTok had determined did not violate their policies and

17  guidelines.  *Id.*

18        Plaintiffs assert eight claims.  Four claims are based in common law tort: strict products

19  liability against YouTube and TikTok (claim 1); negligence against YouTube and TikTok (claim

20  2); fraudulent misrepresentation against YouTube and TikTok (claim 3); and negligent

21  misrepresentation against YouTube and TikTok (claim 4).  The remaining four claims are based

22  on state statutes: a claim by Ms. Bogard against YouTube and TikTok for violations of the Indiana

23  Deceptive Consumer Sales Act (IDCSA), Ind. Code § 24-5-0.5 *et seq.* (claim 5); a claim by Ms.

24  McGrath against YouTube[3] for violations of the Wisconsin Deceptive Trade Practices Act

25

26  ───────────────

27  [3] The complaint states that this claim is brought against TikTok on behalf of an Oregon subclass
   but as all of the subsequent allegations reference YouTube and Wisconsin, the Court assumes the
   TikTok/Oregon references were included in error.

28                                   6

(WDTPA), Wis. Stat. § 100.18 *et seq.* (claim 6); a claim by Ms. Doe against TikTok for violations of the Oregon Unlawful Trade Practices Act (OUTPA), ORS § 646.605 *et seq.* (claim 7); and claims by Ms. Bogard, Ms. McGrath, and the Foundation against YouTube, and by Ms. Bogard, Ms. Doe, and the Foundation against TikTok for violations of the California Business and Professions Code §§17200 and 17500 *et seq.* (claim 8).  Plaintiffs allege that the failure of YouTube and TikTok to remove these videos despite their reporting has caused "emotional distress, anxiety, helplessness, invalidation, grief, re-traumatization, and frustration."  *Id.* ¶¶ 75, 86-87, 103.  Plaintiffs seek compensatory and punitive damages, as well as declaratory relief, injunctive relief, attorneys' fees, and costs.  Dkt. No. 1 at 52-55.

> ### D.    Procedural History

On February 1, 2023, Plaintiffs filed this action against Defendants in the Southern District of Indiana.  Dkt. No. 1.  On April 14, 2023, Defendants moved to dismiss Plaintiffs' complaint for lack of jurisdiction and failure to state a claim or, in the alternative, to transfer the case to the Northern District of California.  Dkt. Nos. 38-41.  The Southern District of Indiana granted Defendants' request to transfer on March 25, 2024, but did not address any of Defendants' other motions or arguments.  Dkt. No. 62.  Defendants filed the present motion to dismiss on July 12, 2024.

## II.    LEGAL STANDARD

A motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6) tests the legal sufficiency of the claims in the complaint.  *Navarro v. Block*, 250 F.3d 729, 732 (9th Cir. 2001).  Dismissal is appropriate where there is no cognizable legal theory or an absence of sufficient facts alleged to support a cognizable legal theory.  *Id.* (citing *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1990)).  In such a motion, all material allegations in the complaint must be taken as true and construed in the light most favorable to the claimant.  *Id.*

However, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice," *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009), and "[f]actual allegations must be enough to raise a right to relief above the speculative level," *Bell Atl. Corp. v.*

*Twombly*, 550 U.S. 544, 555 (2007) (citations omitted).  Moreover, the Court is not required to "'assume the truth of legal conclusions merely because they are cast in the form of factual allegations.'"  *Prager Univ. v. Google LLC* ("Prager I"), No. 17-cv-06064-LHK, 2018 WL 1471939, at *3 (N.D. Cal. Mar. 26, 2018) (quoting *Fayer v. Vaughn*, 649 F.3d 1061, 1064 (9th Cir. 2011) (per curiam)).  Nor does the Court accept "allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences."  *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1055 (9th Cir. 2008).

Rule 8(a)(2) requires only "a short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  This means that the "[f]actual allegations must be enough to raise a right to relief above the speculative level."  *Twombly*, 550 U.S. at 555 (citations omitted).  However, only plausible claims for relief will survive a motion to dismiss. *Iqbal*, 556 U.S. at 679.  A claim is plausible if the facts pled permit the court to draw a reasonable inference that the defendant is liable for the alleged misconduct.  *Id.*  A plaintiff does not have to provide detailed facts, but the pleading must include "more than an unadorned, the-defendant-unlawfully-harmed-me accusation."  *Id.* at 678.

Under Rule 9(b), allegations of fraud or mistake must be pled "with particularity."  Fed R. Civ. P. 9(b).  "A pleading is sufficient under Rule 9(b) if it identifies the circumstances constituting fraud so that the defendant can prepare an adequate answer from the allegations." *Neubronner v. Milken*, 6 F.3d 666, 671-72 (9th Cir. 1993) (citations and quotations omitted).  This includes pleading "the who, what, when, where, and how of the misconduct charged."  *Whiteside v. Kimberly Clark Corp.*, 108 F.4th 771, 785 (9th Cir. 2024) (citation and quotations omitted).

## III.    DISCUSSION

### A.    Standing for Becca Schmill Foundation

The Court first addresses Defendants' argument that the Becca Schmill Foundation lacks standing to pursue any of its claims.  Dkt. No. 76 at 32-33.  Plaintiffs do not disagree that the Foundation lacks associational standing, but they argue that it has standing on its own behalf.  Dkt. No. 82 at 27-28.

United States District Court
Northern District of California

8

United States District Court
Northern District of California

1    According to recent Ninth Circuit authority, an organization does not have Article III

2    standing unless it meets the traditional standing requirements: (1) injury-in-fact; (2) causation; and

3    (3) redressability.  *Arizona All. for Retired Americans v. Mayes*, 117 F.4th 1165, 1178 (9th Cir.

4    2024) (citing *Food & Drug Admin. v. All. for Hippocratic Med.*, 602 U.S. 367, 393-94 (2024)).

5    As relevant here, an organization must show that the defendant's action "directly harms its

6    *already-existing* core activities," and may not rely on allegations that the defendant's action

7    caused it to divert resources in response.  *Id.* at 1177-78 (recognizing that Ninth Circuit precedents

8    on organizational standing are "irreconcilable with *Hippocratic Medicine* and thus overruled.").

9    The Foundation's mission is to "fund research, sponsor community programming, and

10    advocate for policies that promote and safeguard the emotional wellbeing of adolescents and

11    young adults."  Dkt. No. 1 ¶ 105.  In support of this mission, the Foundation "conducts research

12    and promotes advocacy in the areas of social media accountability and online safety."  *Id.* ¶ 106.

13    Plaintiffs allege that, in 2022, the Foundation hired researchers to examine "the report and

14    response process of harmful and illegal content on social media prevalently used by minor

15    children."  *Id.* ¶ 107.  They assert that part of this study focused on the reporting of choking

16    challenge videos specifically.  *Id.* ¶ 108.

17    Defendants argue that Plaintiffs' own allegations make clear that any research the

18    Foundation says it did was *part of* the Foundation's normal activities in aid of its mission and,

19    therefore, cannot support standing.  Dkt. No. 89 at 20.  Plaintiffs counter that the Foundation took

20    on "substantial costs associated with research and investigation efforts" and that its mission was

21    "frustrated" as its ability to protect minors from online harms was "threatened by Defendants'

22    defective reporting tools."  Dkt. No. 82 at 28.  However, the question for standing is whether

23    Defendants' conduct "directly harmed" the Foundation's "core activities."  The Foundation does

24    not plausibly allege that conducting the research described in the complaint harms its core

25    activities; rather, conducting such research is described as one of its core activities.

26    The Court grants Defendants' motion to dismiss the Foundation's claims for lack of

27    standing.  If Plaintiffs believe they can plead facts sufficient to satisfy the Ninth Circuit's current

28

1    test for organizational standing, they may amend their complaint to include these allegations with

2    respect to the Foundation.

3         **B.    Dismissal of XXVI Holdings Inc. and Alphabet Inc.**

4         Defendants argue that the Court should dismiss all claims against defendants XXVI

5    Holdings Inc. and Alphabet Inc. because the only allegations against them are that they are parent

6    companies of Google and YouTube.  Dkt. No. 76 at 33.  Plaintiffs do not respond to this argument

7    in their opposition.  Dkt. No. 82.  At the hearing, Plaintiffs confirmed that they can plead no other

8    allegations against these entities.  Dkt. No. 102 at 72:9-16.

9         The Court agrees with Defendants that a parent company is not generally liable for the acts

10   of its subsidiaries merely by virtue of the parent-subsidiary corporate relationship.  *United States*

11   *v. Bestfoods*, 524 U.S. 51, 61-62 (1998).  For this reason, the Court grants Defendants' motion to

12   dismiss all claims against XXVI Holdings Inc. and Alphabet Inc. without leave to amend.

13        **C.    Plaintiffs' Common Law Tort Claims**

14        Defendants argue that Plaintiffs fail to state any claim for relief under state common law

15   tort theories because they owe no duty to prevent harm to any Plaintiffs and because Plaintiffs'

16   alleged harms are not a reasonably foreseeable result of any actions by Defendants.  Dkt. No. 76 at

17   2.  Defendants argue that California law applies to Plaintiffs' claims,[4] although they insist that the

18   Court may resolve their motion without deciding which state's law—Indiana or California—

19   applies, as the tort law principles in question apply equally in both jurisdictions.  Dkt. No. 76 at

20   15 n.8.  As Plaintiffs do not dispute that California law applies, *see* Dkt. No. 82 at 15, 17, the

21   Court assumes for purposes of this motion that California law governs Plaintiffs' common law tort

22

23   _____

24   [4] According to Defendants, the Southern District of Indiana, as the transferring court, would apply
     Indiana law choice of law rules, and those rules dictate that California law governs Plaintiffs' tort
25   claims.  *See* Dkt. No. 76 at 15 n.8; *see also Enigma Software Grp. USA, LLC v. Malwarebytes,*
     *Inc.*, 69 F.4th 665, 674 (9th Cir. 2023) ("Generally, diversity cases transferred under 28 U.S.C.
26   § 1404(a) require that the transferee district court apply the state law, including the choice-of-law
     rules, of the original transferor court.");  *Simon v. United States*, 805 N.E.2d 798, 805 (Ind. 2004)
27   (citations and quotations omitted) (Under Indiana choice of law rules, if there is a conflict, the law
     of "the state where the last event necessary to make an actor liable for the alleged wrong takes
28   place" applies unless "the place of the tort 'bears little connection' to this legal action.").

United States District Court
Northern District of California

1    claims.

2        **1.    Claim 1: Strict Products Liability – Design Defect**

3        Plaintiffs allege that Defendants "created a reporting feature in their platforms" which was

4    defectively designed, and that Defendants knew or should have known that "[the reporting feature]

5    would pose a serious danger of emotional and physical harm if their purported reporting process

6    were ineffective." Dkt. No. 1 ¶¶ 165, 167. Defendants argue that this claim fails because

7    "Defendants' content moderation processes are not a 'product' subject to product liability law"

8    and because Plaintiffs allege no physical injury. Dkt. No. 76 at 2.

9        "A design defect . . . exists when the product is built in accordance with its intended

10   specifications, but the design itself is inherently defective." *McCabe v. Am. Honda Motor Co.*,

11   100 Cal. App. 4th 1111, 1120 (Ct. App. 2002). A design defect may be shown in two ways: (1)

12   that the product did not perform "as safely as an ordinary consumer would expect"; or (2) that "the

13   risk of danger inherent in the challenged design outweigh[ed] the benefits of such design." *Soule*

14   *v. Gen. Motors Corp.*, 8 Cal. 4th 548, 562 (Cal. 1994) (citation omitted). However, as a threshold

15   matter, such a claim may only proceed if the allegedly defective item qualifies as a "product," a

16   "question of law" to be resolved by the trial court. *Brooks v. Eugene Burger Mgmt. Corp.*, 215

17   Cal. App. 3d 1611, 1626 (Ct. App. 1989).

18       "A 'product' is broadly defined to include any 'tangible personal property distributed

19   commercially for use or consumption.'" *Johnson v. United States Steel Corp.*, 240 Cal. App. 4th

20   22, 31 (Ct. App. 2015) (citing Restatement (Third) of Torts: Prods. Liab. § 19 (1998)); *see also In*

21   *re Uber Techs., Inc., Passenger Sexual Assault Litig.*, No. MDL 3084 CRB, 2024 WL 4211217, at

22   *22 (N.D. Cal. Aug. 15, 2024) ("The parties agree that, in California and Texas, the Restatement

23   (Third) of Torts: Prods. Liab. § 19 provides the applicable definition of a 'product.'"). Where the

24   tangible nature of an item is not clear, courts consider whether the "'context of [the item's]

25   distribution and use is sufficiently analogous to the distribution and use of tangible personal

26   property that it is appropriate to apply the rules' of strict liability." *In re Uber,* 2024 WL 4211217,

27   at *22 (quoting Restatement (Third) of Torts: Prods. Liab. § 19 (1998)); *see also id.* at *24-25

28

United States District Court
Northern District of California

1    (concluding Uber could be liable for defects in the "design or functionality of" its ride-sharing

2    mobile application); *In re Soc. Media Adolescent Addiction/Pers. Inj. Prods. Liab. Litig.*, 702 F.

3    Supp. 3d 809, 848-49 (N.D. Cal. 2023), *motion to certify appeal denied*, No. 4:22-MD-03047-

4    YGR, 2024 WL 1205486 (N.D. Cal. Feb. 2, 2024) (finding that social media platforms as a whole

5    were not necessarily products but that individual functionalities of the platforms could be

6    products).

7          Here, Plaintiffs do not clearly identify the "product" at issue or the "design defect" it

8    allegedly contains.  Plaintiffs argue that Defendants' "reporting tools" are defective, but they also

9    argue that they were harmed when Defendants did not remove the videos they reported for having

10   harmful content.  Dkt. No. 82 at 14-15; Dkt. No. 102 at 41:5-42:4, 46:2-5; Dkt. No. 1 ¶ 75.

11   Defendants argue that Plaintiffs' products liability claim concerns Defendants' "content

12   moderation processes" and reporting practices, and that such processes and practices are not

13   products.  Dkt. No. 76 at 16.  Moreover, Defendants argue that the purported "defect" on which

14   Plaintiffs rely is merely their own disagreement with Defendants' content moderation decisions,

15   i.e., not removing all videos Plaintiffs reported.  *Id.* at 16-17.

16         While the Court agrees that in certain circumstances a "reporting tool" could be a defective

17   product and could plausibly support a products liability theory of relief, *see In re Social Media*

18   *Adolescent Addiction*, 702 F. Supp. 3d at 853 (finding plaintiffs' allegations that social media

19   platforms failed to implement sexual abuse reporting tools that could be used without an account

20   alleged a plausible design defect for purposes of products liability claims), Plaintiffs have not

21   alleged any such theory.  Plaintiffs do not challenge Defendants' reporting tools *per se*.  Indeed,

22   Plaintiffs allege that they make frequent use of the tools to report videos containing harmful

23   content.  They argue that the tools are ineffective because Defendants do not always remove the

24   videos they report.  But this is an objection to Defendants' decisions, after receiving Plaintiffs'

25   reports, to remove or not remove certain videos; it is not an objection to the functionality of the

26   reporting tool itself.  *Cf. Lemmon v. Snap, Inc.*, 995 F.3d 1085, 1092 (9th Cir. 2021) ("[Plaintiffs']

27   negligent design lawsuit treats Snap as a products manufacturer, accusing it of negligently

28   

United States District Court
Northern District of California

designing a product (Snapchat) with a defect (the interplay between Snapchat's reward system and the Speed Filter) . . . .").  As framed by Plaintiffs, the alleged "defect" is not "content-agnostic," but instead reflects a disagreement about "ideas, content, and free expression upon which products liability claims cannot be based."  *In re Soc. Media Adolescent Addiction*, 702 F. Supp. 3d at 851; *see also Winter v. G.P. Putnam's Sons*, 938 F.2d 1033, 1036 (9th Cir. 1991) ("[W]e decline to expand products liability law to embrace the ideas and expression in a book.").  The crux of Plaintiffs' allegations is that the Defendants' reporting systems are defective because Plaintiffs' reports do not produce the outcomes that Plaintiffs believe they should—i.e. removal of the reported videos.  Thus, to remedy the alleged defect, Defendants would have to change the content posted on their platforms.  *Cf. Lemmon*, 995 F.3d at 1092 (defect not content-related as "Snap could have satisfied its 'alleged obligation'—to take reasonable measures to design a product more useful than it was foreseeably dangerous—without altering the content that Snapchat's users generate.").  Such allegations fail to state a claim under products liability law.

In addition, Defendants argue that Plaintiffs do not state a claim for strict products liability because they have not alleged physical injury.  Defendants rely principally on *Jimenez v. Superior Court*, which holds, in relevant part, that "recovery under the doctrine of strict liability is limited solely to 'physical harm to person or property.'"  29 Cal. 4th 473, 482 (2002) (citation omitted).  Plaintiffs respond that "'loss of . . . general health, strength and vitality' and 'emotional distress'" are cognizable as physical harms under California law and that the case law Defendants cite is not directly on point.  Dkt. No. 82 at 15 (citing *Ziencik v. Snap, Inc.*, No. 21-cv-7292-DMG (PDX), 2023 WL 2638314, at *11 (C.D. Cal. Feb. 3, 2023)).

The Court agrees with Plaintiffs that *Jimenez*, which considered only whether allegations of economic harm were sufficient to support a claim for strict products liability, did not address whether *emotional harm* could support such a claim.  *Id.* at 15 (emphasis added); *see also Hughes v. Apple, Inc.*, 723 F. Supp. 3d 693, 710 (N.D. Cal. 2024) ("Apple is invoking a doctrine that draws a distinction between economic harm and physical harm to argue that there must also be a distinction between emotional harm and physical harm.  One does not follow from the other.");

*Ziencik*, 2023 WL 2638314, at *4 ("[T]he distinction elucidated in *Jimenez* is between physical and economic harms, not between physical and emotional harms.").  However, even assuming that California law recognizes emotional harm as sufficient injury for a products liability claim, Plaintiffs do not allege any harm caused by Defendants' purportedly defective reporting tools. Instead, they allege they suffered emotional harm when Defendants decided not to remove the videos they reported.  *See, e.g.*, Dkt. No. 1 ¶ 32 ("Upon repeatedly receiving these responses where Defendants' platforms upheld the harmful contents that Plaintiffs report, Plaintiffs felt helpless, retraumatized, invalidated, frustrated, insulated, and deceived."); ¶ 75 ("YouTube and TikTok's repeated arbitrary determinations, failure to enforce their guidelines, and ultimate invalidation of her voluntary efforts to report harmful content, caused [Ms. Bogard] to feel emotional distress, anxiety, helplessness, invalidation, grief, re-traumatization, and frustration."); ¶ 103 (Ms. Doe "feels betrayed that the platform would uphold the posting of harassing content while ignoring her pleas to take it down.").  Plaintiffs' allegations of harm are not tethered to a product defect, and thus, Plaintiffs have not alleged actionable harm for their products liability claim.

Because Plaintiffs fail to state a claim for strict products liability based on a design defect, the Court dismisses claim 1.

### 2.    Claim 2: Negligence

Plaintiffs assert that Defendants were negligent because they "had a duty . . . to protect users from an unreasonable risk of harm arising out of the use of their apps" and that, in offering a reporting system, "Defendants put users in a worse position of feeling frustrated, helpless and anxious about the reporting process, retraumatizing those whose reports are invalidated, and wasting valuable time and resources of users . . . ."  Dkt. No. 1 ¶¶ 177-178.  Defendants respond that this claim fails because they owe no legal duty of care "to remove content or protect against 'harmful' videos uploaded by third parties" and that they have assumed no particular responsibility to Plaintiffs by providing a reporting system.  Dkt. No. 76 at 2; Dkt. No. 89 at 12-13.

United States District Court
Northern District of California

To state a claim for negligence under California law, a plaintiff must plausibly allege "(1) the existence of a duty to exercise due care, (2) breach of that duty, (3) causation, and (4) damages." *Dyroff v. Ultimate Software Grp., Inc.*, No. 17-cv-05359-LB, 2017 WL 5665670, at *12 (N.D. Cal. Nov. 26, 2017), *aff'd*, 934 F.3d 1093 (9th Cir. 2019).  With respect to the duty to exercise due care, there is a general duty to not "create an unreasonable risk of injury to others." *Zelig v. Cnty. of Los Angeles*, 27 Cal. 4th 1112, 1128 (Cal. 2002) (citation omitted).  However, "if a person has not created a danger, then generally he [or she] has no duty to come to the aid of another person (a victim) absent a relationship that gives rise to a duty to protect." *Dyroff*, 2017 WL 5665670, at *12.

Plaintiffs argue that by offering a means to report videos for violating Defendants' policies or guidelines, Defendants created a special relationship between Defendants and Plaintiffs.  Dkt. No. 82 at 16-17.  Plaintiffs assert that Defendants "positioned themselves as a first-response hotline" and, in doing so, "assumed the duty to undertake responses to the reports" that would be made.  *Id.* at 17.  Defendants respond that they "never undertook a duty to remove all reported content" but rather "explain[ed] that not every report results in removal of content."  Dkt. No. 89 at 12.  They assert that any other interpretation would result in "limitless and arbitrary duties on any company that offers reporting tools to customers . . . ."  Dkt. No. 76 at 20.

The Court is not persuaded that Plaintiffs have plausibly alleged any Defendant assumed the obligation of a "first response hotline," such as 911 dispatcher or suicide prevention hotline, and thereby assumed a corresponding duty of care.  The allegations in the complaint, summarized above, reflect that Defendants merely offer an opportunity for users to report videos that users believe violate Defendants' policies or guidelines to Defendants for review.  Plaintiffs plead no facts suggesting that Defendants have undertaken an obligation to remove immediately any video Plaintiffs or other users report.  These circumstances distinguish this case from *Barnes*, the sole authority on which Plaintiffs rely, in which the Ninth Circuit concluded that Yahoo! was bound by a specific promise its representative made to the plaintiff to remove specific content.  *See Barnes v. Yahoo!, Inc.*, 570 F.3d 1096, 1107-09 (9th Cir. 2009) (finding plaintiff stated a claim for

15

promissory estoppel).  Likewise, the Court is not persuaded that by offering a reporting system Defendants have put Plaintiffs in a "worse position" by "hinder[ing] [them], and other users, from contacting adult guardians or law enforcement."  Dkt. No. 82 at 17.  Plaintiffs do not plausibly allege, let alone explain, how the existence of Defendants' reporting system prevents them from taking any other action, including reporting videos they believe are harmful to law enforcement.

Plaintiffs also fail to plausibly allege that Defendants assumed a special duty of care because Plaintiffs' reports concern videos they believe are harmful to children.  Plaintiffs are adults who assert claims on their own behalf, not on behalf of children, and their claims are based on their own interactions with Defendants' platforms.  Plaintiffs cite no authority to support their theory that Defendants have a special duty of care in these circumstances.  *See In re Soc. Media Adolescent Addiction*, 702 F. Supp. 3d at 855 n.63 (rejecting argument that defendants operating social media platforms have an "elevated" duty because of the involvement of minors); *see also Dyroff*, 2017 WL 5665670, at *14 (as a general matter, there is no special relationship between a social media platform and its users).

Because Plaintiffs fail to state a claim of negligence, the Court dismisses claim 2.

### 3.    Claim 3 and 4: Misrepresentation

Plaintiffs assert claims of fraudulent and negligent misrepresentation, alleging that Defendants made material, false representations regarding prohibited content on their platforms and the process for reporting such content, and that Plaintiffs reasonably relied on these representations to their detriment.  Dkt. No. 1 ¶¶ 192, 196, 199-200.[5]  Defendants argue that both claims sound in fraud, and neither is pled with particularity, as required by Rule 9(b).  Dkt. No. 76 at 24-25.  In addition, Defendants argue that Plaintiffs have not identified any actionable statement on which they could have reasonably relied.  *Id.* at 26-27.  Although there is a question whether

---

[5] Plaintiffs also assert that "Defendants made material representations by setting forth concrete features on their platforms for users to report harms."  Dkt. No. 1 ¶ 192.  To the extent Plaintiffs mean to suggest that the mere fact of creating a reporting system is in itself a misrepresentation that the system is effective, they have cited no support for such a proposition.

United States District Court
Northern District of California

1    Rule 9(b)'s heightened pleading standard applies to a claim of negligent misrepresentation, *see*

2    *Villegas v. Wells Fargo Bank, N.A.*, No. 12-cv-02004 LB, 2012 WL 4097747, at \*7 (N.D. Cal.

3    Sept. 17, 2012) (observing that the Ninth Circuit has not yet decided this question), Plaintiffs do

4    not disagree that their pleading must meet this standard for purposes of this motion.[6]  *See*

5    *generally* Dkt. No. 82 at 19-20.

6            To state a claim of negligent misrepresentation, a plaintiff must plausibly allege: "(1) a

7    misrepresentation of a past or existing material fact, (2) made without reasonable ground for

8    believing it to be true, (3) made with the intent to induce another's reliance on the fact

9    misrepresented, (4) justifiable reliance on the misrepresentation, and (5) resulting damage."  *Alafi*

10   *v. Cohen*, 106 Cal. App. 5th 46, 65 (Ct. App. 2024) (quoting *Ragland v. U.S. Bank Nat'l Assn.*,

11   209 Cal. App. 4th 182, 196 (Ct. App. 2012)).  A claim of fraudulent misrepresentation requires

12   similar allegations, except that a plaintiff must also allege that the defendant knew "the

13   representation was false when the defendant made it, or the defendant made the representation

14   recklessly and without regard for its truth."  *Graham v. Bank of Am., N.A.*, 226 Cal. App. 4th 594,

15   605-06 (Ct. App. 2014).  A plaintiff must allege precisely "*what* is false or misleading about [the

16   alleged misrepresentation], and *why* it is false."  *In re GlenFed, Inc. Sec. Litig.*, 42 F.3d 1541,

17   1548 (9th Cir. 1994), *superseded by statute on other grounds* (emphasis added).  "To satisfy Rule

18   9(b), allegations of fraud 'must be accompanied by the who, what, when, where, and how of the

19   misconduct charged.'"  *In re Uber*, 2024 WL 4211217, at \*19 (quoting *Kearns v. Ford Motor Co.*,

20   567 F.3d 1120, 1125 (9th Cir. 2009)).

21           Plaintiffs identify the following statements by YouTube as the misrepresentations at issue:

22   (1) **YouTube Policies**: "YouTube doesn't allow content that encourages
         dangerous or illegal activities that risk serious physical harm or death.
23       If you find content that violates this policy, report it. Instructions for
         reporting violations of our Community Guidelines are available here.
24       When content is reported, it's not automatically taken down. Reported
         content is reviewed along these guidelines: Content that violates our

United States District Court
Northern District of California

---

[6] The Court would reach the same conclusion even if the heightened pleading standard did not apply.

17

Community Guidelines is removed from YouTube."

    (2) **YouTube Guidelines**: We enforce these Community Guidelines using a combination of human reviewers and machine learning, and apply them to everyone equally—regardless of the subject or the creator's background, political viewpoint, position, or affiliation.

    (3) **YouTube Policies**: The following types of content are not allowed on YouTube. This isn't a complete list. Asphyxiation: Any activity that prevents breathing or can lead to suffocation like: Choking, drowning, or hanging games."

Dkt. No. 1 ¶¶ 17, 68; Dkt. No. 102 at 66:3-14.  Plaintiffs identify the following statements by TikTok as the misrepresentations at issue:

    (4) **TikTok Guidelines:** We don't allow: Content that shows or suggests inappropriate use of dangerous tools or objects. Content that shows dangerous driving behavior. Content that shows or promotes ingesting substances that are not meant for consumption and could lead to severe harm. Content that describes or provides instructions on how to perform a dangerous activity. Dangerous games, dares, challenges or stunts that might lead to injury or property damage.

    (5) **TikTok Statement at Senate Hearing:** Senator we have not been able to find any evidence of a black out challenge on TikTok at all. And again it would violate our guidelines but it's something that we would proactively search [for] both with AI and Human Moderators. We have found absolutely no evidence of it.

    (6) **TikTok's self-created public campaign and content, "#safertogether" in November 2021:** TikTok claims in their "Learn How Reporting Works" video that "every report that is sent to TikTok is checked."

    (7) **TikTok's statement in the Safety Page:** We remove content that features dangerous, harmful or criminal behaviors. We will also remove videos that discuss dangerous challenges if they contain unfounded warnings which seek to spread fear and panic, or include instructions or depictions of harmful behavior. If you're not sure whether a video is potentially harmful, report it to us and we'll take a look.

Dkt. No. 1 ¶ 17; Dkt. No. 102 at 66:3-14.

    Plaintiffs contend that these seven statements essentially convey the following representations:  (1) that Defendants "review and act upon harms that violate their policies" (2) in

18

a way that is meaningful and "accurate enough to respond to a majority of harms," (3) such that their platforms will be free of certain content. *Id.* ¶¶ 187-209; Dkt. No. 82 at 19. They assert that Defendants' statements are false because the reporting processes did not, in Plaintiffs' experience, result in the removal of content that violated Defendants' policies or guidelines. Dkt. No. 82 at 18 ("Defendants' reporting systems do not work as Defendants represented, as demonstrated by Plaintiffs' own experiences."), 19 (videos were removed "for 'violating YouTube's community guidelines' after the filing of the Complaint"), 20 ("Defendants' statements that the reporting tool would trigger or result in a review and response per Defendants' guidelines . . . . were false.").

The Court agrees with Defendants that Plaintiffs largely fail to plead what is false about each challenged statement or why each is false. Dkt. No. 89 at 15. Many of the statements simply describe what content is allowed on the platforms. Dkt. No. 82 at 19. Indeed, it is difficult to imagine how such statements of policy could be considered "false" for purposes of Plaintiffs' claims**.** *See Doe v. Grindr Inc.*, No. 24-475, 2025 WL 517817, at *4 (9th Cir. Feb. 18, 2025) ("[T]he statement that an interactive computer service provider will create a safe and secure environment is too general to be enforced."); *Lloyd v. Facebook, Inc.*, No. 21-cv-10075-EMC, 2022 WL 4913347, at *9 (N.D. Cal. Oct. 3, 2022) ("[M]erely stating that Facebook does not allow users to post harmful content and that they will remove them is mere 'a general monitoring policy' that the Ninth Circuit noted was insufficient [to establish an obligation]."). The Court is not persuaded that such "not allowed" statements of policy are equivalent to a representation that Defendants' platforms *do not have* content that violates Defendants' policies or guidelines.

Other statements present a closer question. For example, statements such as "Content that violates our Community Guidelines is removed" (YouTube) or "We will . . . remove videos that discuss dangerous challenges if they contain unfounded warnings which seek to spread fear and panic, or include instructions or depictions of harmful behavior" (TikTok) may be understood as affirmative statements that Defendants take a specific action (i.e. remove a video from their platforms), if the video contains specific prohibited content. Defendants argue that these statements constitute future-looking promises, i.e. that Defendants will remove violative content,

1    and that such statements are not actionable misrepresentations under California law, which

2    requires a statement about a "past or existing material fact."  Dkt. No. 76 at 26-27.  Plaintiffs do

3    not address this argument.  The Court agrees that future statements are generally not actionable as

4    negligent misrepresentations.  *See Aton Ctr., Inc. v. United Healthcare Ins. Co.*, 93 Cal. App. 5th

5    1214, 1245-46 (Ct. App. 2023).  However, California law suggests that certain species of

6    *intentionally* fraudulent misrepresentations, wherein a defendant makes a promise that he or she

7    has no intention of performing, are actionable.  *See Lazar v. Superior Ct.*, 12 Cal. 4th 631, 638

8    (Cal. 1996); *see also Tarmann v. State Farm Mut. Auto. Ins. Co.*, 2 Cal. App. 4th 153, 158 (Ct.

9    App. 1991) ("Certain broken promises of future conduct may, however, be actionable.").

10        Regardless, the complaint does not identify any specific video that contained prohibited

11   conduct and was not removed once it was determined to violate a Defendant's guidelines.

12   Moreover, to the extent determination of whether a video violates a policy or guideline or contains

13   specific prohibited content requires a subjective determination that must be made by Defendants,

14   even these affirmative "we remove" statements may not be susceptible of being "true" or "false."

15   *See Humphrey v. J.M. Smucker Co.*, No. 22-cv-06913-WHO, 2023 WL 3592093, at *7 (N.D. Cal.

16   May 22, 2023) ("A representation of fact is one which makes a specific and measurable claim,

17   capable of being proved false or of being reasonably interpreted as a statement of objective fact.")

18   (internal citations and quotations omitted).  Plaintiffs appear to concede as much in framing the

19   alleged misrepresentations as statements that Defendants will review and act upon reports in a way

20   that is "meaningful" and "accurate enough to respond to a majority of harms."  Dkt. No. 1 ¶¶ 20-

21   21, 192.  It is difficult to imagine standards more subjective than "meaningful" and "accurate

22   enough."  *See Dena' Nena' Henash, Inc. v. Oracle Corp.*, No. 07-cv-0633 CW, 2007 WL 1455905,

23   at *6 (N.D. Cal. May 16, 2007) ("The concept of 'almost complete' is too vague to support a

24   claim of fraud, and it is not clear that the statement was knowingly false when made. Plaintiff's

25   allegation that there remained 'substantial work' is itself a subjective statement.").

26        In any event, as to all seven statements in question, Plaintiffs do not plead with the

27   necessary specificity the elements of justifiable reliance on a particular statement or statements

United States District Court
Northern District of California

20

and the resulting damages.

Because Plaintiffs fail to adequately plead their claims of negligent misrepresentation and fraudulent misrepresentation, including with the specificity required by Rule 9(b), the Court dismisses claims 3 and 4.

### D.    State Statutory Claims

Defendants argue that Plaintiffs fail to state any claim for relief under the state statutes identified in their complaint because all such claims rely on the same alleged misrepresentations asserted in claims 3 and 4. As the Court has found that these common law claims are not adequately pled, most of the same deficiencies apply equally to Plaintiffs' claims 5-8, which are also dismissed for the same reasons. However, the Court will also consider the additional challenges Defendants raise to each of claims 5-8.

### 1.    Claim 5: Indiana Deceptive Consumer Sales Act (IDCSA)

Plaintiff Joann Bogard asserts that Defendants "engaged in 'unfair, abusive, or deceptive act[s] or practice[s] in connection with a consumer transaction' [citation omitted] when they set forth representations and a reporting process which they knew to be defective and ineffective" in violation of the Indiana Deceptive Consumer Sales Act (IDCSA), Ind. Code § 24-5-0.5 *et seq.* Dkt. No. 1 ¶ 214. Defendants argue that the IDCSA does not apply because the free downloading of the YouTube or TikTok applications is not a consumer transaction within the meaning of the statute. Dkt. No. 76 at 27. They also assert that the IDCSA applies only to "transactions" made for personal purposes and not for purposes of educating and protecting the public or advocating for children's safety. *Id.* at 28. Finally, they assert that the emotional injury Ms. Bogard alleges is not cognizable because it does not have "physical impact" as required by the statute. *Id.*

The IDSCA states in relevant part:

> A supplier may not commit an unfair, abusive, or deceptive act, omission, or practice in connection with a consumer transaction. Such an act, omission, or practice by a supplier is a violation of this chapter whether it occurs before, during, or after the transaction. An act, omission, or practice prohibited by this section includes both implicit and explicit misrepresentations.

United States District Court
Northern District of California

1    Ind. Code Ann. § 24-5-0.5-3(a).  The statute defines consumer transaction as:

> a sale, lease, assignment, award by chance, or other disposition of an
> item of personal property, real property, a service, or an intangible,
> except securities and policies or contracts of insurance issued by
> corporations authorized to transact an insurance business under the
> laws of the state of Indiana, with or without an extension of credit,
> to a person for purposes that are primarily personal, familial,
> charitable, agricultural, or household, or a solicitation to supply any
> of these things.

*Id.* § 24-5-0.5-2(a)(1).  A recent decision by the Indiana Court of Appeals holds that a consumer transaction is not limited to an "exchange for money" and that TikTok's exchange of "access to its app's content library for end-user personal data" is a consumer transaction within the meaning of the statute.  *State v. TikTok Inc.*, 245 N.E.3d 681, 693 (Ind. Ct. App. 2024).

Here, Ms. Bogard does not clearly identify the "consumer transaction" at issue.  The complaint generally alleges that Ms. Bogard was induced to use Defendants' reporting system by means of deceptive practices (presumably, the alleged misrepresentations described above) which allegedly caused her emotional harm.  However, Ms. Bogard does not appear to argue that Defendants' alleged misrepresentations induced her to use the TikTok or YouTube applications in the first place.  Thus, it is not clear that Ms. Bogard's use of Defendants' reporting systems— functionalities available on their respective platforms—qualify as "consumer transactions" within the scope of the IDSCA.  *See State*, 245 N.E.3d at 693 ("Thus, the plain and ordinary definition of the word 'sale,' which is not otherwise defined in the DCSA, includes any *consideration* to effectuate the transfer of property, not only an exchange for money.") (emphasis added).

Even assuming that Ms. Bogard's use of Defendants' reporting systems satisfies the "consumer transaction" requirement of the IDSCA, Plaintiffs do not disagree that the IDSCA requires allegations of physical impact or harm.  Dkt. No. 82 at 22.  Plaintiffs fail to state a claim for relief under this statute because they plead no such allegations.

Because Plaintiffs fail to state a claim for violation of the IDSCA, the Court dismisses claim 5.

22

United States District Court
Northern District of California

### 2.    Claim 6: Wisconsin Deceptive Trade Practices Act (WDPTA)

Plaintiff Annie McGrath asserts that YouTube "marketed and placed before the public various statements, representations, and announcements of its safety features" and "made false and material statements to its users about its reporting feature" in violation of the Wisconsin Deceptive Trade Practices Act (WDTPA), Wis. Stat. § 100.18 *et seq.*  Dkt. No. 1 ¶¶ 220-21.  Defendants argue that this claim fails because there is no "commercial transaction" alleged and Ms. McGrath has not shown an "economic injury" as required by the WDPTA.  Dkt. No. 76 at 28-29.

The WDPTA states in relevant part:

> No person, firm, corporation or association, or agent or employee thereof, with intent to sell, distribute, increase the consumption of or in any wise dispose of any real estate, merchandise, securities, employment, service, or anything offered by such person, firm, corporation or association, or agent or employee thereof, directly or indirectly, to the public for sale, hire, use or other distribution, or with intent to induce the public in any manner to enter into any contract or obligation relating to the purchase, sale, hire, use or lease of any real estate, merchandise, securities, employment or service, shall make, publish, disseminate, circulate, or place before the public, or cause, directly or indirectly, to be made, published, disseminated, circulated, or placed before the public . . . an advertisement, announcement, statement or representation of any kind to the public  . . . which . . . contains any assertion, representation or statement of fact which is untrue, deceptive or misleading.

Wis. Stat. Ann. § 100.18(1).  To establish a violation of this statute, a plaintiff must plausibly allege that: (1) "with the intent to induce an obligation, the defendant made a representation to 'the public'"; (2) "the representation was untrue, deceptive or misleading"; and (3) "the representation caused the plaintiff a pecuniary loss."  *K & S Tool & Die Corp. v. Perfection Mach. Sales, Inc.*, 301 Wis. 2d 109, 122 (Wis. 2007).

Ms. McGrath asserts that the WDPTA applies because Defendants made certain misrepresentations "in order to promote the engagement of users so they may increase the volume of data collected and revenue earned through advertisements."  Dkt. No. 82 at 22-23.  While she does not cite any case law in support of this theory, this argument is not dissimilar to the view

endorsed by the Indiana Court of Appeals—i.e. that a transaction occurs when Defendants exchange access to their platform for user data.  The cases Defendants cite do not foreclose this result.  In *Slane v. Emoto*, the court determined that that the books at issue were not written with the intent "to induce readers to purchase [an item]'"; it did not, however, discuss whether a commercial transaction must always involve an exchange of money.  582 F. Supp. 2d 1067, 182-83 (W.D. Wis. 2008).  In *Hydraulics Int'l, Inc. v. Amalga Composites, Inc.*, the primary question before the court was whether the statute could apply to consumers outside Wisconsin, not what constitutes a commercial transaction.  No. 20-cv-371, 2022 WL 4273475, at *10 (E.D. Wis. Sept. 15, 2022).  Similarly, in *T&M Farms v. CNH Indus. Am., LLC*, the WDPTA claim ultimately turned on whether the deceptive representation would "reach and induce action by a purchaser in Wisconsin."  488 F. Supp. 3d 756, 763 (E.D. Wis. 2020).  While these cases generally support Defendants' argument that the primary purpose of the statute is to prevent false advertising in commercial transactions, they do not define the outer boundaries of what constitutes a "commercial transaction" under the WDPTA.  On this record, the Court cannot conclude that Plaintiffs' claim fails as a matter of law with respect to this element.

In terms of pecuniary loss, Ms. McGrath argues that she "suffered loss due to her prolonged leave from work before and after she discovered the extent of Defendants' defective reporting systems."  Dkt. No. 82 at 23; *see also* Dkt. No. 1 ¶ 87 ("Because of the tragedy that happened to Griffin, Annie could not return to work for three years.  In part, Defendants' failure to respond to Annie's reports exacerbated feelings of helplessness, anxiety, and lack of closure.").  As presently alleged, the connection between Ms. McGrath's pecuniary loss and Defendants' flawed reporting systems is not adequately pled.  Rather, the allegations contradict this element of the claim to the extent they indicate that Ms. Griffin was unable to work primarily due to the experience of losing her son, rather than her use of Defendants' reporting systems.  *Hackel v. National Feeds, Inc*. does not suggest a contrary conclusion.  In that case, the plaintiff suffered the loss of his mink herd as a direct consequence of the defendant's false representation that the mink feed it supplied was not defective, a representation on which the plaintiff relied in continuing to

24

1  provide the feed to his mink herd.  986 F. Supp. 2d 963, 980-81 (W.D. Wis. 2013).  The

2  connection between Ms. McGrath's pecuniary loss and her alleged reliance on Defendants'

3  reporting system is far more attenuated.

4         Because Plaintiffs fail to state a claim for violation of the WDPTA, the Court dismisses

5  claim 6.

6                        **3.     Claim 7: Oregon Unfair Trade Practices Act (OUTPA)**

7         Plaintiff Jane Doe asserts that TikTok "made false and material statements to its users,

8  including Jane Doe about its reporting feature" in violation of the Oregon Unlawful Trade

9  Practices Act (OUTPA), Or. Rev. Stat. Ann. § 646.605 *et seq.*  Dkt. No. 1 ¶ 231.  Defendants

10  argue that in addition to identifying no "actionable misrepresentation," the complaint pleads no

11  "ascertainable loss of money or property."  Dkt. No. 76 at 29 (citing *Egbukichi v. Wells Fargo*

12  *Bank, NA*, 184 F. Supp. 3d 971, 978 (D. Or. 2016)).

13         The OUTPA states in relevant part:

14                  (1) A person engages in an unlawful practice if in the course of the
                   person's business, vocation or occupation the person does any of the
15                  following . . . .

16                          (e) Represents that real estate, goods or services have
17                          sponsorship, approval, characteristics, ingredients, uses,
                           benefits, quantities or qualities that the real estate, goods or
18                          services do not have or that a person has a sponsorship,
                           approval, status, qualification, affiliation, or connection that
19                          the person does not have.

20

21  Or. Rev. Stat. Ann. § 646.608(1)(e).  It further states:

22                  (1) Except as provided in subsections (8) and (9) of this section, a
                   person that suffers *an ascertainable loss of money or property*, real
23                  or personal, as a result of another person's willful use or
                   employment of a method, act or practice declared unlawful under
24                  ORS 646.608, may bring an individual action in an appropriate court
                   to recover actual damages or statutory damages of $200, whichever
25                  is greater.

26

27  Or. Rev. Stat. Ann. § 646.638(1) (emphasis added).  "Pleading an ascertainable loss of money or

28                                                    25

property is an essential element of a private UTPA claim." *Egbukichi,* 184 F. Supp. 3d at 978.  A qualifying ascertainable loss must be "objectively verifiable" and "specifically of 'money or property.'"  *Pearson v. Philip Morris, Inc.*, 358 Or. 88, 117 (Or. 2015) (quoting Or. Rev. Stat. Ann. § 646.638(1)).  "[N]oneconomic losses cognizable in a civil action—such as physical pain, emotional distress, or humiliation [citation omitted]—will not satisfy a private UTPA plaintiff's burden."  *Id.*

Here, Ms. Doe argues that she alleges ascertainable loss of money or property because she "lost[] work, time, and sleep" attempting to get the video removed.  Dkt. No. 82 at 24.  She also states that monetary loss can be estimated from how "TikTok values the personal data it collects from its users as well as TikTok's advertising revenue."  *Id.*  At the hearing, Plaintiffs' counsel directed the Court to *Solano v. Kroger Co.*, No. 18-cv-01488-AC, 2020 WL 7028473 (D. Or. Nov. 30, 2020) in support of Ms. Doe's argument that such loss is cognizable.  Dkt. No. 102 at 73:21-74:5.  In *Solano*, the court noted that OUTPA "does not require, for example, *a customer's reliance* on the unlawful trade practice to cause the loss. It simply requires that the unlawful practice caused the loss."  2020 WL 7028473, at *4.  To the extent Ms. Doe suggests that her loss may be untethered to her reliance on Defendants' alleged misrepresentations, the Court finds this argument unpersuasive.  In any event, the complaint contains no allegations regarding how Ms. Doe specifically suffered a loss of money or property as a result of Defendants' misrepresentations.  *Solano* does not excuse the need to plead an ascertainable loss which Ms. Doe fails to do.  The claim fails on this basis.

Because Plaintiffs fail to state a claim for violation of the OUTPA, the Court dismisses claim 7.

### 4.    Claim 8: California Business and Professions Code

Plaintiffs allege that Defendants have made "false and material statements to [their] users, including Plaintiffs," in violation of California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code, §17200 *et seq.* and its False Advertising Law ("FAL"), Cal. Bus. & Prof. Code §17500 *et seq.*  Dkt. No. 1 ¶¶ 240, 242.  Defendants argue that, in addition to asserting no

United States District Court
Northern District of California

1  actionable misrepresentations, Plaintiffs fail to state a UCL or FAL claim for two reasons: (1) they

2  have not established statutory standing because they have not pled they suffered an economic

3  injury or loss; and (2) they have not established their entitlement to restitution or injunctive relief

4  which are the only forms of relief available.  Dkt. No. 76 at 30-32.

5        Section 17200 of the California Business and Professions Code prohibits "any unlawful,

6  unfair or fraudulent business act or practice . . . ." and "unfair, deceptive, untrue or misleading

7  advertising," as well as any act prohibited Section 17500.  Cal. Bus. & Prof. Code § 17200.

8  Section 17500 states in relevant part:

9   

> It is unlawful for any person, firm, corporation or
> association, or any employee thereof with intent directly or
> indirectly to dispose of real or personal property or to perform
> services, professional or otherwise, or anything of any nature
> whatsoever or to induce the public to enter into any obligation
> relating thereto, to make or disseminate . . . any statement,
> concerning that real or personal property or those services,
> professional or otherwise, or concerning any circumstance or matter
> of fact connected with the proposed performance or disposition
> thereof, which is untrue or misleading, and which is known, or
> which by the exercise of reasonable care should be known, to be
> untrue or misleading . . .

17  Cal. Bus. & Prof. Code § 17500.  California courts "ha[ve] recognized that '[a]ny violation of the

18  false advertising law . . . necessarily violates' the UCL.  *Kasky v. Nike, Inc.*, 27 Cal. 4th 939, 950

19  (Ct. App. 2002), *as modified* (May 22, 2002) (citation omitted).

20        To establish standing to sue under the UCL or the FAL, a plaintiff must "(1) establish a

21  loss or deprivation of money or property sufficient to qualify as injury in fact, i.e., *economic*

22  *injury*, and (2) show that that economic injury was the result of, i.e., *caused by*, the unfair business

23  practice or false advertising that is the gravamen of the claim."  *Kwikset Corp. v. Superior Ct.*, 51

24  Cal. 4th 310, 322 (Cal. 2011).  Economic injury may be shown, for example, where a plaintiff "(1)

25  surrender[s] in a transaction more, or acquire[s] in a transaction less, than he or she otherwise

26  would have; (2) ha[s] a present or future property interest diminished; (3) [is] deprived of money

27  or property to which he or she has a cognizable claim; or (4) [is] required to enter into a

28                            27

transaction, costing money or property, that would otherwise have been unnecessary." *Id.* at 323. In addition, "[a]ctions under the UCL and FAL are actions in equity." *Sharpe v. Puritan's Pride, Inc.*, 466 F. Supp. 3d 1066, 1070 (N.D. Cal. 2020). Thus, remedies are "generally limited to injunctive relief and restitution." *Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal. 4th 1134, 1144 (Cal. 2003) (citations and quotations omitted).

Plaintiffs do not dispute that an economic injury is required under the UCL and FAL, but they argue that they have alleged such an injury—"the monetary value of personal data Defendants obtained at least in part by their misrepresentations." Dkt. No. 82 at 25. Plaintiffs do not cite any authority in support of this assertion, nor do they point to any such allegations in the complaint. Other than the above conclusory statement, Plaintiffs do not explain how Defendants' alleged misrepresentations about their reporting system allowed Defendants to obtain, let alone monetize, the Plaintiffs' personal data (or anyone else's).

Plaintiffs also do not dispute that the only remedies available under the UCL and the FAL are restitution and injunctive relief. They assert that they seek injunctive relief "because monetary relief would fall short of repairing the damages asserted in the Complaint." Dkt. No. 82 at 25. To the extent Defendants contend that Plaintiffs are not entitled to injunctive relief because they also seek damages in connection with other claims, the Court is not persuaded that this determination can be made as a matter of law at the pleading stage. However, as Plaintiffs have not pled any harm that is cognizable under the UCL or the FAL, this claim fails.

Because Plaintiffs fail to state a claim for violation of California Business and Professions Code §§ 17200 or 17500, the Court dismisses claim 8.

### E.    Proximate Cause

Defendants argue that all of Plaintiffs' claims fail because Plaintiffs have insufficiently alleged that Defendants' actions are the proximate cause of the harm they suffered. Dkt. No. 76 at 20-21. They argue that it is not reasonably foreseeable that, in providing a means to report videos, Defendants' responses to Plaintiffs' reports would cause the harm Plaintiffs claim. Rather, Defendants argue that Plaintiffs decided to proactively search out videos they believe are harmful

United States District Court
Northern District of California

and report them, and that to the extent Plaintiffs suffered distress when they received Defendants' responses to their reports, Defendants' conduct cannot be considered the legal or proximate cause of that distress.  Dkt. No. 76 at 21-22.  Plaintiffs respond that it was reasonably foreseeable that when Defendants created an inadequate reporting system and made misrepresentations regarding that system, those using the system would be harmed.  Dkt. No. 82 at 26-27.  Plaintiffs further argue that causation is a question of fact that should not be resolved at the pleading stage.  *Id.* at 25.

"At tort, plaintiffs bear the burden of demonstrating that the defendant's conduct caused some harm suffered by the plaintiffs."  *Pac. Shores Properties, LLC v. City of Newport Beach*, 730 F.3d 1142, 1168 (9th Cir. 2013).  "The doctrine of proximate cause limits liability; i.e., in certain situations where the defendant's conduct is an actual cause of the harm, the defendant will nevertheless be absolved because of the manner in which the injury occurred. Thus, where there is an independent intervening act that is not reasonably foreseeable, the defendant's conduct is not deemed the 'legal' or proximate cause."  6 Witkin, Summary of California Law: Torts (11th ed. 2024), § 1335; *see also Riggs v. Apple Inc.*, No. 17CV308219, 2017 WL 4018064, at *2 (Cal. Super. Aug. 24, 2017).

The Court agrees that causation generally is not a matter that can be resolved on the pleadings.  *See Riggs*, 2017 WL 4018064, at *2 ("Causation is a usually a question of fact for the jury, and it ordinarily may not be resolved on demurrer unless there is no room for a reasonable difference of opinion.").  However, Plaintiffs are required to *plead* causation based on plausible allegations of fact.  As explained above, Plaintiffs have generally failed to state cognizable tort claims against Defendants as to the elements of duty, breach, and harm.  Whether Plaintiffs have also failed to satisfy their burden to plead causation is difficult to assess unless and until these other elements of their tort claims are adequately pled.  Defendants may raise the issue of proximate causation again if Plaintiffs amend their pleadings.

**F.    Immunity under the Communications Decency Act**

Defendants argue that all of Plaintiffs' claims are barred by Section 230(c)(1) of the

1    Communications Decency Act (CDA), 47 U.S.C. § 230.  Plaintiffs respond that their claims are

2    not barred by Section 230(c)(1) because they do not challenge Defendants' content moderation

3    decisions *per se*, but instead challenge Defendants' actions in "developing, designing, and offering

4    a product and making representations upon which consumers rely."  Dkt. No. 82 at 12.

5         Section 230(c)(1) states that "[n]o provider or user of an interactive computer service shall

6    be treated as the publisher or speaker of any information provided by another information content

7    provider."  47 U.S.C. § 230(c)(1).  The Ninth Circuit has interpreted this provision to protect from

8    liability: "(1) a provider or user of an interactive computer service (2) whom a plaintiff seeks to

9    treat, under a state law cause of action, as a publisher or speaker (3) of information provided by

10   another information content provider."  *Barnes*, 570 F.3d at 1100-01.  Acting as a publisher

11   includes "reviewing, editing, and deciding whether to publish or to withdraw from publication

12   third-party content."  *Id*. at 1102.  However, "it is not enough that a claim, including its underlying

13   facts, stems from third-party content for Section 230 immunity to apply.  *Calise v. Meta*

14   *Platforms, Inc.*, 103 F.4th 732, 742 (9th Cir. 2024).  Rather, "[t]he proper analysis is to examine

15   closely the duty underlying each cause of action and decide if it 'derives from the defendant's

16   status or conduct as a publisher or speaker.'"  *Est. of Bride by & through Bride v. Yolo Techs.,*

17   *Inc.*, 112 F.4th 1168, 1179 (9th Cir. 2024) (quoting *Barnes*, 570 F.3d at 1107).  As the court in

18   *Bride* explained:

> First, we examine the "right from which the duty springs." Does it
> stem from the platform's status as a publisher (in which case it is
> barred by § 230)? Or does it spring from some other obligation, such
> as a promise or contract (which, under *Barnes*, is distinct from
> publication and not barred by § 230)? Second, we ask what "this
> duty requir[es] the defendant to do." If it *requires* that [defendant]
> moderate content to fulfill its duty, then § 230 immunity attaches.

24   *Id.* at 1177 (internal citations omitted).

25        There is no dispute that Defendants are providers of interactive computer services.  The

26   question is whether Plaintiffs' claims seek to treat Defendants as a publisher or speaker of

27   information provided by others.  Following *Bride*'s two-step approach, the Court considers each of

28                                                     30

United States District Court
Northern District of California

1   Plaintiffs' claims.

2          **1.     Claim 1: Strict Products liability**

3          Plaintiffs contend that Defendants failed to design effective reporting tools and that this

4   claim, therefore, is based on a product manufacturer's duty to not create "an unreasonably

5   dangerous" product.  Dkt. No. ¶¶ 164-65.  On its face, such a duty is not inherently dependent on

6   Defendants' status as a publisher or speaker.  However, considering what this asserted duty

7   "requires [Defendants] to do," the Court concludes that fulfillment of the alleged duty necessarily

8   requires Defendants to moderate content posted by third parties.

9          Plaintiffs' theory of liability is that Defendants designed a reporting tool that is defective

10   because objectionable content persists on their platforms even after it is reported; in other words,

11   the breach of duty alleged is Defendants' failure to remove reported videos.  *See, e.g.*, Dkt. No. 1

12   ¶ 74 ("The majority of the reports to TikTok made by [Ms. Bogard] were deemed not to violate

13   TikTok's community guidelines, even though the videos apparently featured choking challenge

14   videos for minor audiences."); ¶ 101 ("TikTok's automated response would arbitrarily determine

15   that one of the videos posted by a user is violative of the community guidelines, while the same

16   video which is posted by another user is not."); ¶ 141 ("Researchers reported 20 of the videos, but

17   none of them were removed.").  These are precisely the circumstances in which Section 230

18   applies.  *See In re Soc. Media Adolescent Addiction*, 702 F. Supp. 3d at 832 ("Plaintiffs do not

19   explain how such defect could be rectified other than through limitations on Defendants'

20   publication of third-party content.").

21          As currently pled, claim 1 is barred by Section 230(c)(1).

22          **2.     Claim 2: Negligence**

23          To the extent Plaintiffs contend that Defendants have a duty arising from Defendants' role

24   as manufacturers or providers of a product, and a corresponding obligation to remove content, this

25   claim is barred by Section 230(c)(1) for the same reasons Plaintiffs' claim 1 is barred.

26          To the extent Plaintiffs contend that Defendants have a duty to protect others because they

27   assumed responsibility for creating a reporting system that reliably resulted in removal of all

28

United States District Court
Northern District of California

prohibited content, such a claim is also barred under Section 230(c)(1).  *See Bride*, 112 F.4th at 1175-76 ("In short, § 230 protects apps and websites which receive content posted by third-party users (i.e., Facebook, Instagram, Snapchat, LinkedIn, etc.) from liability for any of the content posted on their services, even if they take it upon themselves to establish a moderation or filtering system, *however imperfect it proves to be*.") (emphasis added).

As currently pled, claim 2 is barred by Section 230(c)(1).

### 3.    Claims 3 and 4: Misrepresentation

It is well-established in this Circuit that Section 230(c)(1) "does not immunize [Defendants] from breaking their promises . . . . [e]ven if those promises regard content moderation  . . . ."  *Bride*, 112 F.4th at 1182; *see also Barnes*, 570 F.3d at 1107 ("[W]hereas one cannot undertake to do something without simultaneously doing it, one can, and often does, promise to do something without actually doing it at the same time.").  Here, Plaintiffs assert that Defendants "falsely represented that [they] had a system in place to respond to users' complaints about violations of [their] policies" and that Plaintiffs suffered harm as a result of this representation.  *See* Dkt. No. 1 ¶ 198.  In other words, the duty at issue arises from Defendants' alleged promises about how they handle prohibited content on their platforms, including prohibited content reported to them.  However, considering what this asserted duty "requires [Defendants] to do," it appears that fulfillment of the duty Plaintiffs say Defendants undertook in making the alleged representations would necessarily require Defendants to change how they moderate content posted by third parties—i.e. to remove all reported videos.  Unlike *Bride*, where the representations at issue involved *banning or unmasking users* who posted objectionable content—implicating duties other than those of a publisher—it is difficult to see how Plaintiffs' misrepresentation claims treat Defendants as anything other than a publisher or speaker of third-party content.  *Cf. Bride*, 112 F.4th at 1178-1179.

As currently pled, claims 3 and 4 are barred by Section 230(c)(1).

### 4.    Claims 5-8:  State Statutory Claims

As Defendants observe, Plaintiffs' state statutory claims rely on the same alleged

United States District Court
Northern District of California

misrepresentations asserted in support of Plaintiffs' common law misrepresentation claims.  *See*

Dkt. No. 1 ¶ 214 (alleging liability under IDSCA for "false representations"); ¶ 221 (liability

under WDTPA for "false and material statements"); ¶ 231 (liability under OUTPA for "false and

material statements"); ¶ 242 (liability under California Business and Professions Code for "false

and material statements").  However, it is not clear that the statutory claims implicate the same

duties for purposes of the Section 230 immunity analysis.  Because the Court will permit Plaintiffs

to amend their complaint, the Court does not reach this question here.

### G.    First Amendment Defense

Defendants argue that "Plaintiffs' claims target Defendants' 'decisions' about published

content—including whether the content should have been published at all, whether to remove it

from publication, or whether instead to continue to make it available to users" and are thus barred

by the protections of the First Amendment.  Dkt. No. 76 at 13-14.  Plaintiffs argue that they are

merely seeking to hold Defendants accountable for their misrepresentations and for designing

defective tools, and that any statements implicated by their claims constitute commercial speech

that is not protected by the First Amendment.  Dkt. No. 82 at 12-13.

"The Free Speech Clause of the First Amendment . . . can serve as a defense in state tort

suits . . . ."  *Snyder v. Phelps*, 562 U.S. 443, 451 (2011).  Content moderation by social media

platforms is generally considered expressive activity and is protected under the First Amendment.

*See Moody v. NetChoice, LLC*, 603 U.S. 707, 731 (2024) ("Deciding on the third-party speech that

will be included in or excluded from a compilation—and then organizing and presenting the

included items—is expressive activity of its own.");  *O'Handley v. Padilla*, 579 F. Supp. 3d 1163,

1186-87 (N.D. Cal. 2022) ("Like a newspaper or a news network, Twitter makes decisions about

what content to include, exclude, moderate, filter, label, restrict, or promote, and those decisions

are protected by the First Amendment.").  However, "[t]he Supreme Court has recognized a

'distinction between speech proposing a commercial transaction, which occurs in an area

traditionally subject to government regulation, and other varieties of speech.'"  *Kellman v. Spokeo,*

*Inc.*, 599 F. Supp. 3d 877, 899 (N.D. Cal. 2022) (quoting *Bolger v. Youngs Drug Prods. Corp.*,

United States District Court
Northern District of California

463 U.S. 60, 64 (1983)).  Thus, "[t]he Constitution accords less protection to commercial speech than to other constitutionally safeguarded forms of expression."  *Bolger*, 463 U.S. at 64-65. "Where the facts present a close question, 'strong support' that the speech should be characterized as commercial speech is found where [1] the speech is an advertisement, [2] the speech refers to a particular product, and [3] the speaker has an economic motivation."  *X Corp. v. Bonta*, 116 F.4th 888, 900 (9th Cir. 2024) (citations and quotations omitted).

Defendants' First Amendment arguments largely mirror their arguments in support of Section 230 immunity.  However, having concluded that Plaintiffs fail to state any claim for relief, the Court does not reach Defendants' First Amendment arguments at this time.

## IV.    LEAVE TO AMEND

Rule 15(a) provides that leave to amend "should be freely given when justice so requires," and "the court must remain guided by the underlying purpose of Rule 15 . . . to facilitate decision on the merits, rather than on the pleadings or technicalities."  *Lopez v. Smith*, 203 F.3d 1122, 1127 (9th Cir. 2000) (en banc) (quotations and citations omitted).  "The decision of whether to grant leave to amend nevertheless remains within the discretion of the district court," which may deny leave to amend if allowing amendment would unduly prejudice the opposing party, cause undue delay, or be futile, or if the party seeking amendment has acted in bad faith.  *Leadsinger, Inc. v. BMG Music Publ'g*, 512 F.3d 522, 532 (9th Cir. 2008) (citing *Foman v. Davis*, 371 U.S. 178, 182 (1962)).

Because it is possible that Plaintiffs may be able amend their complaint to plead plausible claims for relief that are not barred by Section 230(c)(1) of the CDA, the Court will permit them to amend those claims to address the deficiencies discussed in this order.

## V.    CONCLUSION

For the reasons explained above, the Court grants Defendants' motion to dismiss and dismisses claims 1-8 with leave to amend.  Defendants Alphabet Inc. and XXVI Holdings Inc. are dismissed from this action with prejudice.  Plaintiff Becca Schmill Foundation is also dismissed for lack of standing without prejudice to repleading standing in an amended complaint.

United States District Court
Northern District of California

1

Plaintiffs may file any amended complaint no later than **March 24, 2025**.

2

The initial case management conference scheduled for February 25, 2025 is continued to

3

**April 15, 2025**.

4

**IT IS SO ORDERED.**

5

Dated: February 24, 2025

6

7

8

Virginia K. DeMarchi
United States Magistrate Judge

9

10

11

12

13

14

15

16

17

18

United States District Court
Northern District of California

19

20

21

22

23

24

25

26

27

28

35