Juyoun Han (*pro hac vice*)
Eric Baum (*pro hac vice* to be filed)
EISENBERG & BAUM, LLP
24 Union Square East, PH
New York, NY 10003
Tel: (212) 353-8700
Fax: (212) 353-1708

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
### SAN JOSE DIVISION

| | |
|---|---|
| BOGARD, MCGRATH, JANE DOE, BECCA SCHMILL FOUNDATION, *Individually and on behalf of all others similarly situated*,<br><br>Plaintiffs,<br><br>v.<br><br>TIKTOK, INC., BYTEDANCE, INC., ALPHABET INC., XXVI HOLDINGS INC., GOOGLE LLC, YOUTUBE, LLC,<br><br>Defendants. | **Case No. 5:24-cv-03131-VKD**<br><br>**AMENDED COMPLAINT**<br><br>**[CLASS ACTION]**<br><br>**DEMAND FOR JURY TRIAL** |

**PRELIMINARY STATEMENT**

1.  On May 1, 2019, Mason Bogard, a kind, fun, generous 15-year-old in Indiana, mimicked the choking challenge videos that he saw on social media and streaming platforms. No one thought this would cause his death by accidental strangulation.

2.  On February 4, 2018, Griffin McGrath, a gifted musician and science whiz who lived in Wisconsin was found dead in his bedroom. Griffin was only 13 years-old at the time when he saw the choking challenge tutorials on YouTube and decided to try it while video-chatting with his friends. No one thought that this would lead to his death.

3.  Mason and Griffin's unthinkable deaths are only two of more than one hundred children's deaths across the country and worldwide. The organization Erik's Cause created a comprehensive database showing a map of all known victims of the choking challenge worldwide, and as of January 26, 2023, 1,227 deaths and 144 injuries caused by the choking challenge have been counted by the organization.[1] According to the US Centers for Disease Control and Prevention's findings, in 2008, the choking challenge killed 82 minors. At least 20 more children's deaths were linked to the challenge in the past 18 months. Some of the children were only nine years-old when they died.

4.  On May 22, 2022, Jane Doe was struggling to sleep. She was exhausted and tormented. Earlier that day, she had been informed by a friend that a video containing harassment and bullying messages against her son was going viral on TikTok among school kids. She had made every attempt to ask TikTok to take down the video, but TikTok responded with an automatic message saying that it would not be removed as it did not violate any of its platform's guidelines or policies.

---

[1] *Victims of Pass Out Games (aka Choking Game) Across the Globe*, Erik's Cause, https://public.tableau.com/app/profile/judy.rogg/viz/EriksCauseVictimsMap/Dashboard1 (last accessed, February 1, 2023).

5. The Becca Schmill Foundation was formed in memory of Rebecca (Becca) Mann Schmill. Becca Schmill passed away on September 16, 2020 from a fentanyl poisoning, from drugs she purchased with the assistance of a social media platform. She was only 18 years old.

6. Plaintiffs in this action are parents and advocates who are grieving the death and/or harm suffered by their children after being exposed to harmful contents on Video Streaming Platforms.

7. All of the Plaintiffs are modern-day champions and vigilantes. They have turned their grief to advocate for children's safety online by educating members of the public and urging lawmakers to regulate tech platforms to prevent harm to children.

8. Plaintiffs' advocacy methods were straightforward: They would go on the platforms of Defendants, Youtube and TikTok where the harmful videos are fed to young children. They would rely on the platform's own reporting tool which was designed to allow users to input information about harmful content, and power by an algorithmic mechanism that was promised to review and respond to the user input information. Plaintiffs believed that this was the only way to reach the attention of the Defendants since there were no hotlines or person-to-person reporting mechanism available. For Plaintiffs, this has been their way of wanting to help the social media companies identify the material immediately and respond before more children are inadvertently exposed to harm.

9. While Plaintiffs' desired outcome of reporting harmful videos was to make the Defendants clean up the digital environment filled with harmful content, Defendants' failure to remove content is not at the core of this complaint. Plaintiffs are asserting claims about the defects inherent in the Defendants' reporting tools that were offered to users, which turned out  to be completely useless. Despite Plaintiff's diligent reporting of videos that explicitly violated the Defendants' Community Guidelines in reliance of Defendants' promise to review and

AMENDED COMPLAINT
CASE NO. 5:24-CV-03131-VKD

respond to the users, the common response Plaintiffs received was either a non-response or a canned message stating this video "does not violate community guidelines" which showed that the tool was not capable of conducting a review of the user reports and the videos that were reported.

10. Plaintiffs bring this lawsuit after being ignored and re-victimized by TikTok and YouTube after they had made reports through their faulty reporting tools. Plaintiffs voluntarily contributed labor and resources to help TikTok and YouTube's content moderation teams to identify toxic, fatal, and dangerous content that had taken the lives of their own children and many others. In response, all they received was a canned response stating that the clearly harmful videos that were not allowed per Defendants' own policies – e.g. , choking challenge videos, harassing contents, and child pornography – does not violate their community guidelines. There was no chance for Plaintiffs to obtain a meaningful review. Defendants' actions and inactions made plaintiffs re-experience trauma and grief.

11. Plaintiffs do not take issue with any third-party users on YouTube or TikTok. Rather, they are calling into question the reporting tools that Defendants created, designed, and marketed to members of the public. When tested, the reporting features yielded arbitrary and contradictory decisions which shows that the reporting tools were incapable of reviewing and responding to the user reports. These retraumatized the Plaintiffs who proactively sought to report harmful materials, so that no other children would suffer the harms that their children had.

12. Plaintiffs allege that YouTube and TikTok's reporting tool was misrepresented because it was offered to users without being able to serve the purpose of reviewing the user reports and applying its own policy:

AMENDED COMPLAINT
CASE NO. 5:24-cv-03131-VKD

**A.** A swimming pool facility would be held accountable if it told members that it would have a 24/7 lifeguard at the pool, when it knew that the lifeguard could barely swim.

**B.** A municipal authority who held itself out to keep the safety of a highway but failed to timely respond to a report about a dangerous pothole would be held accountable for any harms that occur from its inaction.

**C.** A health clinic who markets and provides COVID-19 testing would be held accountable if it stated that its COVID-19 tests are effective, when it knew that a majority of the tests would yield a false result.

13.     This case raises a similar issue. TikTok and YouTube, the most popular video streaming applications used by minors, have set forth reporting tools and stated that they would review reports from users regarding dangerous content and users.

14.     TikTok and YouTube's developed and deployed an automated tool for reviewing user reports after both Defendants were sued by content moderation workers because the moderators were traumatized by the amount of harmful contents they had to endure each day, in addition to working under poor, understaffed, and untrained environments.[2]

15.     Despite the cost-effectiveness and scalability, Tiktok and Youtube's automated reporting tools were defective because was not capable of reviewing harmful content as Defendants stated it to be. For example, it was reported that the automated tools would often mistakenly block contents related to LGBTQIA+ communities, human rights organizations in

---

[2] Daniel Wiessner, *YouTube Settles Moderators' Case Over Graphic Videos for $4.3 mln*, Reuters (Jul. 13, 2022, 2:19 PM), https://www.reuters.com/legal/transactional/youtube-settles-moderators-case-over-graphic-videos-43-mln-2022-07-13/; Bobby Allyn, *Former TikTok Moderators Sue Over Emotional Toll of 'Extremely Disturbing' Videos*, NPR (Mar. 24, 2022), https://www.npr.org/2022/03/24/1088343332/tiktok-lawsuit-content-moderators.

**AMENDED COMPLAINT**
**CASE NO. 5:24-CV-03131-VKD**

conflict regions, and breast-feeding advocates, failing to distinguish these from sexually explicit content and terrorist propaganda.[3]

16.    Upon information and belief, the defective reporting tools may have the opposite effect of amplifying the content that are harmful. According to Guillaume Chaslot, a former engineer for Google who worked on the algorithm for YouTube, explained that 90– 95 percent of the content users see on TikTok is based on its algorithm.[4] According to a news interview, Chaslot stated: "[T]he algorithm is able to find the piece of content that you're vulnerable to. That will make you click, that will make you watch but it doesn't mean you really like it. And that it's the content that you enjoy the most. It's just the content that's most likely to make you stay on the platform."

17.    Upon information and belief, based on the above mechanism of automation, when a person who is watching a video pauses and hovers on the video or rewatches a video, then the algorithm would recalibrate to bring more similar content to the user. Hence, when a user reports harmful content, and watches it until the end or hovers for a long time to make a report, and rewatches it to check its status of removal, then the user may be subject to more recommendations similar to the harmful content because of the frequency of rewatching the video. This creates a new type of harm because those making user reports like Plaintiffs would potentially be involved in the amplification and targeting of the harmful videos due to the defective algorithms inherent in the platform's reporting tools and recommendation tools.

18.    Even though Defendants could have made their harms reporting process robust, democratic, and intelligent, they chose not to invest in safety. Contrast YouTube's flawed harms

---

[3] Sebnem Kenis, *Human Rights and AI-Powered Content Moderation and Curation in Social Media*, Raoul Wallenberg Institute; The Human Righter (Aug. 19, 2021), https://rwi.lu.se/blog/sebnem-kenis-human-rights-and-ai-powered-content-moderation-and-curation-in-social-media/.
[4] *Inside TikTok's Algorithm: A WSJ Video Investigation*, Wall St. J. (July 21, 2021), https://www.wsj.com/articles/tiktok-algorithm-video-investigation-11626877477

AMENDED COMPLAINT
CASE NO. 5:24-CV-03131-VKD

reporting process with its robust copyright report.[5] YouTube established a copyright claim resolution process that allows a claimant to report a copyright infringement, which notifies the potential infringer to remove the content in 7 days. If not, after the 7th day, YouTube would remove the material. The alleged infringer has the right to submit a counter-notification to reinstate the content, by providing explanation of rationale to YouTube as to why the uploaded content does not infringe the rights of the person making the report. YouTube will review all of these materials to make an informed decision. YouTube developed this process for copyright violations because it may be penalized (or lose its safe harbor) if it keeps copyright infringing content on their websites.

19.    Instead of adopting a robust and maintained procedure to respond to reports of harm, TikTok and YouTube blatantly hid behind misrepresentations about their efforts to curb harmful contents.

Defendants' misrepresentations before lawmakers and the public include the following:

- **TikTok Guidelines**: "We don't allow: Content that shows or suggests inappropriate use of dangerous tools or objects. Content that shows dangerous driving behavior. Content that shows or promotes ingesting substances that are not meant for consumption and could lead to severe harm. Content that describes or provides instructions on how to perform a dangerous activity. Dangerous games, dares, challenges or stunts that might lead to injury or property damage."

- **TikTok Statement at Senate Hearing:** "Senator we have not been able to find any evidence of a black out challenge on TikTok at all. And again it would violate our guidelines but it's something that we would proactively search both with AI and Human Moderators. We have found absolutely no evidence of it."

- **TikTok's self-created public campaign and content, "#safertogether" in November 2021**: TikTok claim in their 'Learn

---

[5] *Learn about scheduled copyright takedown requests*, YouTube Help, https://support.google.com/youtube/answer/9167045?hl=en&ref_topic=9282614

How Reporting Works' video that "every report that is sent to TikTok is checked."[6]

- **TikTok's statement in the Safety Page:** "We remove content that features dangerous, harmful or criminal behaviors. We will also remove videos that discuss dangerous challenges if they contain unfounded warnings which seek to spread fear and panic, or include instructions or depictions of harmful behavior. If you're not sure whether a video is potentially harmful, report it to us and we'll take a look."[7]

- **YouTube Policies**: "YouTube doesn't allow content that encourages dangerous or illegal activities that risk serious physical harm or death. If you find content that violates this policy, report it. Instructions for reporting violations of our Community Guidelines are available here."[8] "When content is reported, it's not automatically taken down. Reported content is reviewed along these guidelines: Content that violates our Community Guidelines is removed from YouTube."[9]

- "We enforce these Community Guidelines using a combination of human reviewers and machine learning, and apply them to everyone equally—regardless of the subject or the creator's background, political viewpoint, position, or affiliation."[10]

20.    These statements were false to begin with, because the Defendants' reporting tools were not capable of reviewing the user reports and comparing them with the Defendants' community guidelines to render a removal decision. To be clear, the misrepresentation claim is based on the fact that the reporting tool itself was defective because it was incapable of providing a review, not that Plaintiffs disagree with the outcome of the review.

---

[6] TikTok_uk, *Let's Be #safertogether*, TikTok (Oct. 21, 2021), https://www.tiktok.com/@tiktok_uk/video/7021467791328890113?is_copy_url=1&is_from_webapp=v1&item_id=7021467791328890113.
[7] *Online Challenges*, TikTok, https://www.tiktok.com/safety/en-us/online-challenges/ (last visited Jan. 25, 2023).
[8] *Harmful or Dangerous Content Policies*, YouTube Policies, https://support.google.com/youtube/answer/2801964?hl=en (last visited Jan. 25, 2023).
[9] *Report Inappropriate Videos, Channels, and Other Content on YouTube*, YouTube Help: Reporting and Enforcement, https://support.google.com/youtube/answer/2802027 (last visited Jan. 25, 2023).
[10] *Community Guidelines*, Rules and Policies, https://www.youtube.com/howyoutubeworks/policies/community-guidelines/#community-guidelines (last visited Jan. 25, 2023).

AMENDED COMPLAINT
CASE NO. 5:24-CV-03131-VKD

21.     The videos that Plaintiffs reported were prime examples of choking challenges depicting asphyxiation, sexual conduct involving obvious underaged children, graphic portrayals of nudity, and overt sales of illicit drugs. These were very clear examples that violated Defendants' own community guidelines. However, according to the automated responses of the Defendants' reporting tools, less than 5% of these were deemed violative of the Community Guidelines. This leaves only one possibility: the review process of the reporting tool is defective.

22.     Defendants' misrepresentation and defective reporting tools also create helplessness that discourages reporting by users. According to a report by an organization, "This report lays bare how young people are at increased risk of coming across harmful content but feel unsupported on social media and either do not know how to report it or feel platforms simply won't take action when they do."[11]

23.     These reporting tools were an abject failure and are obviously defective. In a study commissioned by Becca Schmill Foundation, it was found that less than 5% of the Defendants' reporting features effectively addressed the reporting users' concerns.

24.     Plaintiff Jane Doe reported content that contained targeted harassment toward her son, but all she received in response was an automated message stating that it *did not* violate community guidelines. Later on, she was able to get a TikTok representative to review the content at issue only through a connection of a private contact. That-= TikTok representative deemed that the video *did* violate guidelines. This discrepancy shows that the automated reporting tool provided for users are not capable of reviewing the reported contact with the Community Guidelines.

---

[11] Dan Milmo, *Young People Must Report Harmful Online Content, Says UK Watchdog*, The Guardian (Jun. 26, 2022, 7:01 PM), https://www.theguardian.com/media/2022/jun/27/young-people-must-report-harmful-online-content-says-uk-watchdog.

AMENDED COMPLAINT
CASE NO. 5:24-CV-03131-VKD

25.    Plaintiffs Joann Bogard and Annie McGrath's numerous reports were unheeded by YouTube, and materials containing obvious violations of YouTube's policy have remained up for years despite their reporting.

26.    The Becca Schmill Foundation launched a study about the various harms reported on social media platforms. Surprisingly, the study found that more than 19 of 20 "choking challenge" videos that were found and reported to Defendants were deemed not to violate their stated policies. Defendants gave no opportunity for follow-up or appeal, and the harmful videos remain on their platforms, available to view by thousands of people (including minors) every day.

27.    Plaintiffs proactively took the role of reporting harmful contents to TikTok and YouTube. Plaintiffs reasonably relied upon TikTok and YouTube's promise to review the reports and respond to them.

28.    Defendants' misrepresentations and inactions caused and created new harms to Plaintiffs. By sending automated messages to users who report harmful content and taking the position that the reported material is "not against community guidelines," Defendants harmed users in a distinct way. Parents, like Plaintiffs who are already suffering from their children's harm, are retraumatized by Defendants' arbitrary response. Plaintiffs also felt that their concerns were invalidated and disregarded, causing confusion, feelings of helplessness, anxiety, and frustration. Defendants betrayed Plaintiffs' trust and reliance by failing to meaningfully respond to reports of harmful contents that violate Defendant's Policies.  Also, Defendants' failure to provide meaningful review and its misrepresentations to the Plaintiffs caused Plaintiffs to waste their time and resources.

29.    Plaintiffs in this class action lawsuit bring claims on behalf of their children, three of whom are deceased. Plaintiffs now seek to hold accountable the companies (collectively,

**AMENDED COMPLAINT**
CASE NO. 5:24-CV-03131-VKD

"Defendants") that develop and operate TikTok and YouTube, two of the most popular online video platforms among teens for developing defective reporting tools and making misrepresentations about the tools.

30.      Two of these plaintiffs have lost their children due to harmful and dangerous audio-visual contents suggested to minor children by Defendants, including content promoting the "choking challenge," harassing and sexually explicit material, and unlawful drugs and drug use.

31.      Upon repeatedly receiving defective responses from Defendants' reporting tools, Plaintiffs felt helpless, retraumatized, invalidated, frustrated, insulted, and deceived. They also suffered anxiety over the possibility that the harmful contents would continue to harm minor users in the way that it had harmed their children.

32.      Defendants' actions, inactions, and misrepresentations deceived Plaintiffs who relied upon Defendants' reporting tools in reporting harmful and harassing content and enforcing review of their own Community Guidelines.

33.      Because of Defendants' conduct, Plaintiffs suffer from helplessness, frustration, compounded grief of their children who have been fatally harmed, and palpable anxiety about other children and users who are at risk of harm by using Defendants' platforms.

34.      Accordingly, Plaintiffs assert claims against Defendants for products liability, fraudulent misrepresentation, and negligence claims, as well as consumer protection claims to address the false, misleading, and deceptive statements Defendants made about their products that are belied by their actions.

35.      Plaintiffs bring this class action on behalf of all people who made reports to YouTube or TikTok from February 1, 2019 to Present, regarding content that violates the respective platform's policies, but whose efforts were frustrated by Defendants' actions or inactions.

36.    Defendants are not entitled to any defense or immunity under Section 230 of the Communications Decency Act. In this action, Plaintiffs do not seek to hold Defendants liable as the publisher or speaker of the content provided by their parties within the meaning of Section 230. Instead, Plaintiffs seek to hold Defendants liable for their own conduct, namely their defective reporting tools and misrepresentations about the same. Ultimately, Plaintiffs' claims are not predicated by contents of a third-party. Rather, Plaintiffs' claim rests upon Defendants' conduct which has resulted in harm to Plaintiffs by defect in their product and process, as well as their misrepresentations that Plaintiffs relied upon.

37.    One of the duties that Defendants have violated springs from their duty to develop a reporting tool that is reasonably safe.

38.    Much like the public expects a lifeguard hired by a swimming pool facility to know how to detect and respond to children drowning, and much like a COVID-19 test that is marketed to the public and expected to yield a consistent response, so too should the Defendants' reporting process be designed to reasonably perform its role which it held out to the public to do.

39.    Defendants also had a special duty to respond to Plaintiffs' reports, because they ostensibly designed, maintained, offered, and held out their reporting processes as a way to address user reports of harmful content.

40.    Defendants could also have complied with their duties under common law and state statutory law not to make false, deceptive, or misleading statements by not having a reporting tool at all, or by accurately letting consumers know that child pornography or the choking challenge would not be removed from the platforms.

41.    Plaintiffs seek maximum compensatory and injunctive relief allowed under the law, individually and on behalf of their class of similarly situated consumers.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**<u>PARTIES</u>**

42.    At all relevant times, Plaintiff Joann Bogard was a resident and a citizen of Indiana. Plaintiff Joann Bogard brings this class action on behalf of herself and all other similarly situated, against each and all of the Defendants.

43.    At all relevant times, Plaintiff Annie McGrath was a resident and a citizen of Wisconsin. Plaintiff Annie McGrath brings this class action on behalf of herself and all other similarly situated, against each and all of the Defendants.

44.    At all relevant times, Plaintiff Jane Doe was a resident and a citizen of Oregon. Plaintiff Jane Doe brings this class action, and all other similarly situated, against each and all of the Defendants. Plaintiff Jane Doe requests that this Court permit her to proceed under a pseudonym ("Jane Doe"). If required by the Court, she will seek permission to proceed under the pseudonyms. The use of pseudonym is necessary to preserve privacy in a matter of sensitive and highly personal nature regarding her minor son, given that some of the background allegations relate to her son's private experience as a victim of harassment. Plaintiff's sensitive and personal experiences were not the result of any voluntary undertaking on her part, and neither the public, nor the Defendants, will be prejudiced by Plaintiff's identity remaining private.

45.    At all relevant times, Plaintiff Becca Schmill Foundation is a bona fide 501(c)(3) organization registered in Massachusetts. The Becca Schmill Foundation's stated mission is "to fund research, sponsor community programming, and advocate for policies that promote and safeguard the emotional wellbeing of adolescents and young adults."   Becca Schmill Foundation's core activities include legislative advocacy that includes provisions that require online social media platforms to implement proper harms reporting tools. The Foundation also educations the public on model social media user behavior which includes making reports of

12

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

harmful content.  Becca Schmill Foundation brings this action on behalf of itself and its members.

**TikTok**

46.    Defendant TikTok Inc. was incorporated in California on April 30, 2015, with its principal place of business in Culver City, California. TikTok Inc. transacts or has transacted business in this District and throughout the United States. At all times material to this Complaint, acting alone or in concert with others, TikTok Inc. has advertised, marketed, and distributed the TikTok social media platform to consumers throughout the United States. At all times material to this Complaint, acting alone or in concert with ByteDance Inc., TikTok Inc. formulated, directed, controlled, had the authority to control, or participated in the acts and practices set forth in this Complaint.

47.    Defendant ByteDance Inc. ("ByteDance") is a Delaware corporation with its principal place of business in Mountain View, California. ByteDance transacts or has transacted business in this District and throughout the United States. At all times material to this Complaint, acting alone or in concert with others, ByteDance has advertised, marketed, and distributed the TikTok social media platform to consumers throughout the United States. At all times material to this Complaint, acting alone or in concert with TikTok Inc., ByteDance formulated, directed, controlled, had the authority to control, or participated in the acts and practices set forth in this Complaint.

**YouTube**

48.    Defendant Google is a limited liability company organized under the laws of the state of Delaware, and its principal place of business is in Mountain View, California. Google LLC is a managing member of YouTube, LLC. Google LLC transacts or has transacted business in this District and throughout the United States. At all times material to this Complaint, acting alone or in concert with others, Google LLC has advertised, marketed, and distributed its

YouTube video sharing platform to consumers throughout the United States. At all times material to this Complaint, acting alone or in concert with YouTube, LLC, Google LLC formulated, directed, controlled, had the authority to control, or participated in the acts and practices set forth in this Complaint.

49.     Defendant YouTube, LLC is a limited liability company organized under the laws of the state of Delaware, and its principal place of business is in San Bruno, California. YouTube, LLC is a wholly owned subsidiary of Google LLC. YouTube, LLC transacts or has transacted business in this District and throughout the United States. At all times material to this Complaint, acting alone or in concert with Defendant Google LLC, YouTube, LLC has advertised, marketed, and distributed its YouTube social media platform to consumers throughout the United States. At all times material to this Complaint, acting alone or in concert with Google LLC, YouTube, LLC formulated, directed, controlled, had the authority to control, or participated in the acts and practices set forth in this Complaint.

## JURISDICTION AND VENUE

50.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(d)(2), because the matter in controversy, exclusive of interest and costs, exceeds $5,000,000, and is a class action in which some members of the class are citizens of states different from the states where Defendants are citizens. All of the named Plaintiffs in this action are citizens of a different state than the Defendants.

51.     In addition, as to each of the named plaintiffs, there is subject matter jurisdiction under 28 U.S.C. § 1332(a), because the value of each named plaintiff's claims exceeds $75,000, and there is complete diversity between each named plaintiff, on the one hand, and the Defendants, on the other hand.

52.     The Court has personal jurisdiction over Defendants because they do business in the this District and have sufficient minimum contacts with the District. Defendants intentionally

avail themselves of the markets in this State through the promotion, marketing, and operations of their platforms at issue in this lawsuit, and by retaining the profits and proceeds from these activities, to render the exercise of jurisdiction by this Court permissible.

53.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) and (3) because a substantial part of the events or omissions giving rise to one of the Plaintiffs' claims arose in this District and Defendants are subject to the Court's personal jurisdiction with respect to this action.

## FACTUAL ALLEGATIONS

**A.    Mason Bogard and Joann Bogard**

54.    This action is brought by Joann Bogard, the mother of Mason Bogard, who passed away at age 15 from the "choking challenge."

55.    Mason was a kind-hearted, generous teenager who always wanted to help others. After his tragic death, Mason's family donated his organs to five people, because his family knew that it was what he would have wanted.

56.    On May 1, 2019, Mason was found unresponsive and emergency responders were called to his home. County officials' investigation into Mason's cause of death was inconclusive at the time, but the coroner announced his review of the investigation, and later ruled that Mason's death was an accidental strangulation – choking.

57.    Shortly after Mason's death, Mason's family discovered that Mason had taken a video on his phone prior to his death where he filmed himself trying the "choking challenge." In the video, it was clear that Mason did not think the challenge was deadly, or even dangerous.

58.    Upon information and belief, Mason passed away in a fatal accident in attempting this "choking challenge."

59.    Although Mason and his mother regularly had conversations about certain dangerous trends and contents on YouTube videos, upon information and belief, Mason, like

most teenagers, held the attitude that something that many teens seemed to be doing and sharing for fun would not severely harm him.

60.    The normalization and persistent viral spread of dangerous videos on platforms like YouTube is not new. A research study from the University of Wisconsin from 2015 found evidence of widespread normalization of the choking game. They also found a 400% increase in videos of the choking challenge in five years which were viewed then by about 22 million viewers.[12]

61.    From her son's experience of harm on YouTube, Joann Bogard believes that by permitting tutorial videos on the choking game on YouTube, the website encourages young children to participate in dangerous, deadly challenges.

62.    Since Mason's death, his family has worked hard to advocate against the spread of dangerous online challenges like the choking game.

63.    Since May 11, 2019, Joann Bogard has been reporting numerous "choking challenge" videos (a.k.a., blackout challenge, pass out challenge, space monkey challenge videos) to YouTube as harmful content and requesting that they be taken down.

64.    For example, Joann reported several YouTube videos to YouTube for featuring "Harmful and Dangerous Acts" in which a teenager or several teenagers film themselves doing the choking challenge that has been uploaded and viewed by tens and thousands of users.

65.    Joann relied on YouTube's own statement in its policies which categorized the choking challenge as a "depiction of dangerous acts" and 'Extremely dangerous challenges:"[13]

---

[12] Ellen K. Defenderfer, MS et al., The Choking Game on YouTube: An *Update*, Global Pediatric Health, Dec. 2015, at 4.
[13] *Harmful or Dangerous Content Policies*, YouTube Policies, https://support.google.com/youtube/answer/2801964#zippy=%2Cextremely-dangerous-challenges (last visited, Jan. 25, 2023).

AMENDED COMPLAINT
CASE NO. 5:24-CV-03131-VKD

1

2

"The following types of content are not allowed on YouTube. This isn't a complete list. Asphyxiation: Any activity that prevents breathing or can lead to suffocation like: Choking, drowning, or hanging games." (YouTube's Policy)[14]

3

4

66.    One example of the videos that Joann reported to YouTube which depicted clear

5

asphyxiation by a choking challenge had been watched by more than 16,000 viewers and has

6

remained on YouTube for 11 years.[15]

7

8

9

10

11

12

13

14

15

16

17



18

*[Joann Bogard's reporting and response on YouTube [16]]*

19

67.    The above reporting form causes unreasonable difficulties for users to report

20

harmful contents because it requires that the reports are made from a person who has a Google

21

account (pre-registration and account requirement), the report form provides a limited and

22

confusing set of options and categories (for example, choking challenge videos may be

23

considered violent or repulsive content and harmful acts), the report form does not provide a

24

means for the user to track the status of the harms report and therefore a user is required to

25

26

27

28

[14] *Harmful or Dangerous Content Policies*, YouTube Policies, https://support.google.com/youtube/answer/2801964#zippy=%2Cextremely-dangerous-challenges (last visited, Jan. 25, 2023).
[15] https://www.youtube.com/shorts/6feCGPUh3KY (last accessed 10/5/2022)
[16] https://www.youtube.com/shorts/MB7PZoOUY8g (last accessed 10/5/2022)

**AMENDED COMPLAINT**
**CASE NO. 5:24-CV-03131-VKD**

access the video again in the future to confirm whether it has been removed, and reporting tool

does not provide an appeal process.

68.    Each time Joann Bogard reports the videos, she saw the following automated

message pop up:

> "Thanks for reporting Issue Harmful dangerous acts. If we find this
> content to be in violation of our Community Guidelines, we will
> remove it."

69.    Contrary to its own representations and policies, upon information and belief,

YouTube's reporting tool is defective, and it does not afford a review of the potential violations

of the community guidelines.

70.    Joann Bogard believes that YouTube's misrepresentation and its failure to follow

its own policies are misleading and deceiving to consumers, who rely upon YouTube's

reporting tool to report the harms online.

71.    In addition to YouTube, Joann has continuously found and reported numerous

choking challenge videos on Defendant TikTok's app.

72.    Upon information and belief, the harms reports sent to TikTok made by Joann were

reviewed by the automated reporting tool developed by TikTok which did not have the ability

to review the video for potential violations of TikTok's Community Guidelines. Even though

the videos that Joann reported clearly featured choking challenges that include asphyxiation

and intended to challenge minors to participate in the choking, the reporting tool failed to treat

it as a violation of Community Guidelines.

73.    TikTok's reporting tool were defective and difficult to use because the report button

is hidden within a three dotted button in the corner of the video or within the "share" button

which may not be intuitive for anyone who wishes to report harmful content.

74.    YouTube and TikTok's repeated arbitrary determinations through their defective tools which failed to review Joann's reports, and ultimately resulted in invalidation of her voluntary efforts to report harmful content, caused Joann to feel emotional distress, anxiety, helplessness, invalidation, grief, re-traumatization, and frustration. She also feels deceived by YouTube and TikTok's numerous statements to the public about their commitment to respond to reports by users regarding harms that spawn on its platform.

75.    In Joann's own words: "As a mom who lost her young son to a deadly social media content of choking challenge, I now spend my own time searching for this deadly challenge on all social media platforms. I report every video that I can find (and there are many) as "harmful content" relying on the social media companies' promise to remove them based on their own guidelines. Yet, these videos remain posted and viewable to many young users. This literally brings me to tears as I feel ignored. I am trying to help the social media platforms identify this dangerous content so they can make their online environments safer for children. Yet, time and time again, they ignore my plea to remove it. I feel anxious that another child may see the challenge and attempt it, causing harm to themselves. I also feel retraumatized when I see my response being ignored, wondering if my son would still be alive had someone taken action about the video prior to his exposure. I feel betrayed by the companies' blithe lies about reviewing user reports and their commitment to remove choking challenge videos and other harmful materials."

**B.    Annie McGrath and Griffin McGrath**

76.    This action is also brought by Annie McGrath, the mother of Griffin McGrath, who passed away from the "choking challenge."

77.    In and out of school, Griffin was a well-rounded leader. He was a talented speedcuber (those who solve Rubik's Cube puzzles competitively) who organized competitions

AMENDED COMPLAINT
CASE NO. 5:24-cv-03131-VKD

for his classmates. His many accomplishments include placing 3rd in the National Science Bowl. He was brilliant and kind.

78.     Griffin had a YouTube channel that he used to watch videos about his interests like baseball, jazz, solving Rubik's Cubes, and drumming.

79.     Upon information and belief, Griffin was exposed to choking challenge videos through his YouTube channel. Then, on February 4th, 2018, Griffin attempted the choking challenge for the first time, and again attempted the challenge on February 14th, 2018. The second attempt led to a fatal accident which caused Griffin's death.

80.     Since Griffin's death, his mother has made consistent efforts to alert YouTube of the dangers of the platform's many choking challenge videos. From her son's experience of harm on YouTube, Annie believes that by permitting tutorial videos on the choking game on YouTube, the platform encourages young children to participate in dangerous, deadly challenges.

81.     From 2018 to present, Annie McGrath reported several choking challenge videos (a.k.a., Space Monkey Challenge videos) to YouTube as harmful content. These include videos that have been uploaded and viewed by thousands of users since they were first uploaded in 2012 and 2018 clearly depicting asphyxiation and choking, targeting minors in a dare to do the same.[17]

82.     Each time that Annie McGrath reports the videos to YouTube, she saw the following automated message pop up: "Thanks for reporting Issue Harmful dangerous acts. If we find this content to be in violation of our Community Guidelines, we will remove it."

---

[17] Krandor, *Space Monkey Challenge [Do not try this at HOME!!!!!!!!!!!]*, YouTube (Jan. 7, 2018), https://youtu.be/BvyBDOeagGg.; TacoSpankers, *Space monkey. Pimpin*, YouTube (Jan. 12, 2012), https://www.youtube.com/watch?v=hbFVqD9XSrQ.

AMENDED COMPLAINT
CASE NO. 5:24-CV-03131-VKD

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

83.     Annie McGrath relied on YouTube's own statement in its policies which categorize the choking challenge as a "depiction of dangerous acts" and "Extremely dangerous challenges":

> "The following types of content are not allowed on YouTube. This isn't a complete list. Asphyxiation: Any activity that prevents breathing or can lead to suffocation like: Choking, drowning, or hanging games." (YouTube's Policy)[18]

84.     Contrary to its own representations and policies, upon information and belief, YouTube has not taken adequate action to remove those videos on its platform. As of the date of this Complaint, Videos 1 and 2 are both accruing viewers as more children continue to participate in the dangerous challenge.  These videos have since gained thousands more views and clicks on YouTube. Annie McGrath believes that YouTube's misrepresentation and failure to follow their own policies are misleading and deceptive to consumers.

85.     YouTube's repeated failure to review the reported content against its own Community Guidelines, failure to enforce its guidelines, and ultimate invalidation of her voluntary efforts to report harmful content, caused Annie to feel emotional distress, anxiety, helplessness, invalidation, grief, re-traumatization, and frustration. She also feels deceived by YouTube's numerous statements to the public about its commitment to respond to reports by users regarding harms that spawn on its platform.

86.     Defendants' failure to review Annie's reports exacerbated feelings of helplessness, anxiety, and lack of closure because of the concern that other children are exposed to the fatal harms that took her son away. This has caused both emotional and financial injury to Annie due to the loss of health, time, and having to take time off  her work.

---

[18] *Harmful or Dangerous Content Policies*, YouTube Policies, https://support.google.com/youtube/answer/2801964#zippy=%2Cextremely-dangerous-challenges (last visited, Jan. 25, 2023).

**AMENDED COMPLAINT**
**CASE NO. 5:24-CV-03131-VKD**

87.     In Annie's own words: "We never got to say good bye. The world stopped for us the day that Griffin died. We know that if social media had kept their promise, my son would be here. That's not ok. Social media companies need to share their research and change their algorithms for content moderation and reporting to not allow these harms to affect another innocent child. If a dangerous challenge or harmful content is found and reported by parents or guardians, they need to take it down immediately. Otherwise, it is only an insult in the face of, and a re-traumatization of what we, forever-sad parents, have to endure each day."

**C.     M.F.'s and Jane Doe's Experience on TikTok**

88.     This action is further brought by Jane Doe, the mother of M.F., a minor who resides in the state of Oregon and who uses the social media platform TikTok.

89.     On or about May 22, 2022, M.F.'s mother was informed by a family friend that a video containing verbal harassment and bullying against her son H.F. (M.F.'s older brother) was being promoted in the "For You" feed of certain TikTok users. The video featured bullying, harassing comments against H.F. and depicted underage teens consuming alcohol.

90.     The informant, who is an acquaintance of H.F.'s and M.F.'s family, reported the video to TikTok for containing bullying content on the TikTok app.

91.     However, TikTok's automated response back to the informant stated that the video did not violate community guidelines.

92.     Ms. Doe also viewed the video on TikTok, and with the help of M.F., reported the video for cyberbullying and minor safety.

93.     The automated response from TikTok again stated that the video would not be removed because it did not violate community guidelines.

94.     At this time, there was no option in the reporting process that allowed users like Jane Doe to escalate the video review for re-consideration by a human reviewer.

95.    During these times, Ms. Doe was unable to sleep, out of fear that the video would resurface on H.F.'s feed. She felt ignored, anxious, and helpless about lacking any means to ask TikTok to take down this video that would harm her children. As a result of Defendants' actions described above, she suffered emotional harm and monetary loss.

96.    When a third party advocate asked TikTok about the lack of such procedure to escalate an issue to a human reviewer, TikTok responded:

> "We <u>do not</u> have a dedicated 1-800 number in the US or an equivalent service . . . we do have reporting channels for selected NGOs to escalate issues to our Trust and Safety team in some countries <u>but not currently in the US</u>."

97.    On or about May 24, 2022, M.F.'s mother–through a third-party advocate–brought the subject video to the attention of TikTok's executives and asked whether the video violated TikTok's community guidelines. Once TikTok's executives reviewed the video, they determined that the video was violative of community guidelines and stated: "Our Minor Safety Team has reviewed the video and confirmed the video violates our Community Guidelines."

98.    TikTok's executives did not explain why the automated reporting tool did not reach the conclusion that the video violated the community guidelines. Upon belief, the reporting tool is defective and is unable to conduct a review of the reported content against the Community Guidelines.

99.    Since these events occurred to his brother, M.F. has been reporting various types of videos that he believes are harmful, inappropriate, and violative of community guidelines including sexually explicit material. Examples include:

| Content | Reported Category | TikTok's Response |
|---|---|---|
| • A pornographic depiction of a man, fully nude, performing oral sex on himself. Multiple | Sexual Content | Multiple reports returned with TikTok's "Does not violate community guidelines." Only one identical content |

| postings of identical content posted by different users. | | posted by a different user was reported and removed. |
|---|---|---|
| • An image of an erect penis in a man's hand. | Sexual Content | Does not violate community guidelines. |
| • Collage of nude genitalia which combines in to a "trick-eye" image of Putin. | Sexual Content | Does not violate community guidelines. |
| • Child Pornography depicted in video. | Sexual Content | Does not violate community guidelines. |

100.     M.F. has reported several different users who posted identical videos containing harmful and sexually explicit content. However, TikTok's automated response would arbitrarily determine that one of the videos posted by a user is violative of the community guidelines, while the same video which is posted by another user is not. Upon belief, TikTok's reporting tool is defective and does not conduct a review of the reported content against the Community Guidelines.

101.     As a result, users are harmed by the lack of options, and misleading and deceptive statements regarding the reporting tool.

102.     TikTok's defective reporting tool, failure to review the reported content against its guidelines, and ultimate invalidation of her voluntary efforts to report harmful content, caused Jane Doe to feel emotional distress, anxiety, helplessness, and frustration. She also feels deceived by TikTok's numerous statements to the public about its commitment to respond to reports by users regarding harms that spawn on its platform. She feels betrayed that the platform would uphold the posting of harassing content while ignoring her pleas to take it down. She is also enraged that her son M.F. is routinely exposed to and reporting sexually explicit content including ones that depict child pornography, but that TikTok defective reporting tool merely sends a "non-violation" automated response rather than conducting a review of the content.

**D.**    **Becca Schmill Foundation**

103.    Finally, this action is brought by the Becca Schmill Foundation (the "Foundation").

104.    Becca Schmill was 18 years old when she passed away due to fatal and accidental consumption of Fentanyl. These illegal drugs were sold to Becca from the time when she was still a minor over social media platforms. Following Becca's passing, her parents created the Becca Schmill Foundation, a non-profit organization founded upon the mission to honor Becca's memory and to protect other teenagers and young adults from online harms. Becca Schmill Foundation's stated mission is to fund research, sponsor community programming, and advocate for policies that promote and safeguard the emotional wellbeing of adolescents and young adults.

105.    The Foundation conducts research and promotes advocacy in the areas of social media accountability and online safety. The Foundation aims to educate the public and lawmakers to enact laws that foster accountability and safety on tech platforms.

106.    The Foundation's core activities include legislative advocacy which includes the Kids Online Safety Act (KOSA), a bipartisan legislation that aims to protect children online. One of the major provisions of KOSA has been to require social media platforms to implement easy-to-use reporting tools and establish dedicated harms-report-channel for users.[19]

107.    Defendants' conduct of developing defective reporting tools the Defendants' misrepresentations about the tools and commitment to remove harmful videos in Senate Hearings directly cause harm to the core activities of the Becca Schmill Foundation who have been advocating tirelessly in Congress to show the deficiencies of the Defendants' conduct and the need for regulation.

---

[19] S.1409 Kids Online Safety Act (118th Congress, 2023-24), CONGRESS.GOV, https://www.congress.gov/bill/118th-congress/senate-bill/1409

**AMENDED COMPLAINT**
**CASE NO. 5:24-CV-03131-VKD**

108.    In 2022, the Foundation retained researchers at the Alliance to Counter Crime Online (ACCO) to conduct research on the report and response processes of harmful and illegal content on social media prevalently used by minor children.

109.    One of these research topics is related to the accessibility and reporting process of the choking challenge, and is referred to herein as the "Becca Schmill Foundation – ACCO Study." The research used key words popularly used to search for the choking challenge on various social media platforms including YouTube and TikTok and found search results containing choking challenge videos. It then made reports to the respective platforms regarding their violative content and recorded the platforms' responses, determinations, response time, and number of viewers accrued. The study concluded that "choking challenge" videos are easy to find, and that the platforms deem almost all of the content to be non-violative of their stated policies, rendering the reporting process ineffective.

i.    **TikTok And YouTube's  Misrepresentations and Defective Reporting Tools.**

110.    As a platform primarily used by minor children, TikTok has a responsibility to prevent dangerous and fatal trends from thriving on its platform. TikTok does not disclose information about the age of its users, but internal data leaked to the New York Times[20] showed that in 2020 as many as one-third of its users were under the age of 14. In July 2020, TikTok classified more than a third of its 49 million daily users in the United States as being 14 years old or younger, according to internal company data and documents that were reviewed by the New York Times.[21]

---

[20] Raymond Zhong et al., *A Third of TikTok's U.S. Users May Be 14 or Under, Raising Safety Questions*, N.Y. Times (Aug. 14, 2020), https://www.nytimes.com/2020/08/14/technology/tiktok-underage-users-ftc.html.
[21] Raymond Zhong et al., *A Third of TikTok's U.S. Users May Be 14 or Under, Raising Safety Questions*, N.Y. Times (Aug. 14, 2020), https://www.nytimes.com/2020/08/14/technology/tiktok-underage-users-ftc.html.

**AMENDED COMPLAINT**
**CASE NO. 5:24-CV-03131-VKD**

111.    At all relevant times of the Plaintiffs' allegations, according to TikTok, 40,000 human moderators are responsible for reviewing videos, three-quarters of whom are contracted. Each moderator reviews approximately 1,000 videos a day, taking around 20 seconds to review each one, according to former employees. Reviews are prompted by artificial intelligence software that scans uploaded videos and is intended to automatically remove anything that would violate a community guideline, such as nudity or violence. If the software is uncertain, it sends the material to a human moderator to assess. Videos with more than approximately 3,000 views–depending on the country–are also reportedly sent to a moderator.[22]

112.    At all relevant times of the Plaintiffs' allegations, TikTok set forth a process for a user to report videos that they believe to be harmful. First, a user who wishes to report a video must sign up for a TikTok account and be logged in. Even though one can view TikTok videos without having an account or being logged in, anyone who wishes to report a video is required to first sign up.

113.    A user can then hold their finger on the screen until a menu of choices appears where they can select to "Report" the video. In other versions of the app, TikTok's reporting tool are defective and difficult to use because the report button is hidden within a three dotted button in the corner of the video or within the "share" button which may not be intuitive for anyone who wishes to report harmful content.

114.    After selecting "Report," users are directed to a menu of reasons for reporting the video at issue such as Minor Safety, Dangerous Acts and Challenges, Suicide, Self-harm and Disordered Eating, Adult Nudity and Sexual Activities, Bullying and Harassment, Hateful Behavior, Violent Extremism, Spam and Fake Engagement, Harmful Misinformation, Illegal

---

[22] Olivia Carville, *TikTok's Viral Challenges Keep Luring Young Kids to Their Deaths*, Bloomberg (Nov. 30, 2022 12:01 AM),  https://www.bloomberg.com/news/features/2022-11-30/is-tiktok-responsible-if-kids-die-doing-dangerous-viral-challenges.

AMENDED COMPLAINT
CASE NO. 5:24-CV-03131-VKD

Activities and Regulated Goods, Violent and Graphic Content, Intellectual Property Infringement, and Other.

115.    If a user were to select "Dangerous acts and challenges," to report a choking challenge video, users are then directed to a page that shows TikTok's rules about dangerous acts and challenges: "We don't allow: Content that shows or suggests inappropriate use of dangerous tools or objects. Content that shows dangerous driving behavior. Content that shows or promotes ingesting substances that are not meant for consumption and could lead to severe harm. Content that describes or provides instructions on how to perform a dangerous activity. Dangerous games, dares, challenges or stunts that might lead to injury or property damage."

116.    Once the user reports a video, they receive a confirmation message for their report stating: "Thanks for reporting. We'll review your report and take action if there is a violation of our Community Guidelines."

117.    Next, users can go to the "Reports" archive to view active reports and their status. If TikTok deems the reported content to violate its guidelines, the following message appears: "We removed [reported video]. We removed the video you reported for violating our Community Guidelines. Thank you for helping us keep TikTok safe."

118.    Alternatively, if a reported content is deemed not in violation of guidelines, the following message appears: "We found that the reported content doesn't violate our Community Guidelines. We understand that you may not want to see this type of content, and you have the option to block the account that posted it."  There is no option to appeal the report and resend it to be reviewed by TikTok's content moderators. On the opposite side of the spectrum, if a video is taken down due to community guidelines, the creator can file a report for it to be re-uploaded onto their account.

119.    On October 26, 2021, TikTok's representative, Beckerman, testified at a Senate Subcommittee on Consumer Protection, Product Safety, and Data Security hearing on the impact of social media platforms on children. There, TikTok misled lawmakers and the public to believe that there is absolutely no evidence of choking challenge videos on TikTok's platform.

> **TikTok (Beckerman):** "As it relates to TikTok, this is not content that we've been able to find on our platform. It's not content that we allow on our platform. Independent fact-checkers have looked . . ."
>
> **Senator Blumenthal**: But this content existed on your platform.
>
> **TikTok (Beckerman**): Senator we have not been able to find any evidence of a black out challenge on TikTok at all. And again it would violate our guidelines but it's something that we would proactively search both with AI and Human Moderators. We have found absolutely no evidence of it
> . . .
> As our transparency report show, over 94% of content that violates our guidelines are remove automatically. These challenges have no place on TikTok.
> . . .
> Unfortunately, we have seen recently press reports about alleged challenges that when our fact checkers like snopes and other independent organizations look into them, they find that these never existed on TikTok in the First place. They were hoaxes that originated on other platforms. So we need to look at the facts and see what content actually exists [on TikTok] than spreading rumors about alleged challenges . . .
>
> **Senator Blumenthal:** Well, I just have to tell you Mr. Beckerman, we found pass out videos. We found them. So I have a lot of trouble crediting your response on that . . .[23]

120.    According to news reports, on February 8, 2022, TikTok's Head of U.S. Safety stated in an interview: "Our moderation teams work very diligently to swiftly and expeditiously remove that violative content and redirect hashtags when someone might be searching for it in

---

[23] *Online Protection for Children: Hearing Before the Subcomm. on Consumer Protection, Product Safety, and Data Security,* 117th Cong. (2021) (Statement of Michael Beckerman, Vice Pres. & Head of Public Policy at TikTok).

AMENDED COMPLAINT
CASE NO. 5:24-cv-03131-VKD

our search page. For example, if you search for something that we've determined is a dangerous challenge, you won't find content around that."[24]

121.    TikTok's statements are debunked by the study commissioned by the Becca Schmill Foundation which found that dangerous choking-related challenges remain easy to find through simple searches on TikTok, and user reports of such content on these platforms resulted in few removals or restrictions of such content. According to the findings of this report, the automatic responses of the reporting tools appear defective and incapable of assessing the contents of the reported videos against the Community Guidelines of TikTok.

122.    The Becca Schmill Foundation Study also concluded: TikTok currently blocks English-language search results for terms including: "choking challenge," 'blackout challenge," "pass-out" and "space monkey," instead returning a warning message about the general dangers of online challenges. However, once researchers scrolled through the top results, they found ample choking content still up on TikTok's platform. Researchers reported 20 videos that they found, including those pictured below. After 24 hours, 19 of the 20 reported videos were deemed not in violation of the community guidelines, and only one video was deemed to be in violation.

**ii.    YouTube's Reporting Process and Arbitrary Enforcement**

123.    YouTube has set forth a process for users to report and flag content that is harmful. A user who wishes to report a video content on YouTube can select the three dots for a menu of actions. Next, a menu of choices will appear. Users can then select "Report." After selecting "Report," users are directed to a menu of reasons for reporting the video at issue.

---

[24] Jennifer Korn, *TikTok Says it Will Strengthen Policies in Effort to Prevent Spread of Hoaxes and Dangerous Challenges*, CNN Business (Feb. 8, 2022, 4:58 PM), https://www.cnn.com/2022/02/08/tech/tiktok-hoax-policies/index.html.

AMENDED COMPLAINT
CASE NO. 5:24-CV-03131-VKD

124.    Upon selecting a reason such as "Harmful or dangerous acts," which represents the harmful nature of the choking challenge, users are given a banner at the bottom of their screen stating: "Thanks for reporting."

125.    Once users report a YouTube video, they receive a confirmation banner which quickly disappears, and no updates are proactively provided to the users about the report. Users have the burden to track the status of the report on their own by going to the "Report History" section.

126.    If YouTube determines that a reported content violates their guidelines, it will either remove the content from its platform or restrict the content to mature audiences. Alternatively, if YouTube determines that a reported content does not violate guidelines, users who reported the content would receive no response, no proactive updates on the status of review, no explanation about their determination regarding the report, and no recourse for those making reports to pursue and appeal or to talk to a human moderator.

127.    On YouTube, only the content poster whose content is flagged and removed has an opportunity to appeal YouTube's decision. The same appeal process does not exist for users who make reports.

128.    YouTube states that it implements a hybrid approach of content moderation between humans and machines. YouTube's algorithm is based on machine learning which "identifies potentially violative content at scale and nominates for review content that may be against our Community Guidelines. Content moderators then help confirm or deny whether the content should be removed."[25]

129.    YouTube's Chief Product Officer was quoted in an article stating that automated content moderation has its limits, and that trained human evaluators are able to "make decisions

---

[25] Matt Halprin et al., *Inside YouTube: On Policy Development at YouTube*, YouTube Official Blog (Dec. 1, 2022), https://blog.youtube/inside-youtube/policy-development-at-youtube/.

AMENDED COMPLAINT
CASE NO. 5:24-CV-03131-VKD

that tend to be more nuanced, especially in areas like hate speech, or medical misinformation or harassment."[26]

130.    However, during COVID-19, YouTube sharply reduced the number of human content moderators, leaving the content moderation team understaffed and ineffective.[27]

131.    Once realizing that the reliance on automated content moderation was causing inaccurate moderation, the company hired more human content moderators.[28]

132.    Then, human content moderators filed a lawsuit against YouTube alleging that content moderation team was chronically understaffed, and that YouTube failed to provide resources or training and caused moderators to suffer mental harm from prolonged exposure to harmful content.[29]

133.    YouTube no longer allows individuals to be part of the Trusted Flagger system, a volunteer-based system that allowed vetted individual users to flag violative content which were prioritized for review. Instead, YouTube relies upon select NGOs and governmental agencies to become trusted flaggers.[30]

134.    YouTube made statements which were relied upon by Plaintiffs and other users who reported harmful contents on YouTube: "YouTube doesn't allow content that encourages dangerous or illegal activities that risk serious physical harm or death. If you find content that

---

[26] Matt g. Souther, *YouTube Removed Twice As Many Videos Between April and June*, Search Engine Journal (Sept. 21, 2020), https://www.searchenginejournal.com/youtube-removed-twice-as-many-videos-after-switch-to-ai-moderation/381619/#close
[27] Issie Lapowsky, *After Sending Content Moderators home, YouTube Doubled its Video Removals*, Protocol (Aug. 25, 2020), https://www.protocol.com/youtube-content-moderation-covid-19.
[28] Barker et al., "YouTube reverts to human moderators in the fight against misinformation, (Sept. 20, 2021) https://www.ft.com/content/e54737c5-8488-4e66-b087-d1ad426ac9fa
[29] Jennifer Elias, *Former YouTube Content Moderator Describes Horrors of the Job in New Lawsuit*, CNBC (Sept. 22, 2020, 8:28 AM), https://www.cnbc.com/2020/09/22/former-youtube-content-moderator-describes-horrors-of-the-job-in-lawsuit.html.
[30] James Hale, *YouTube is Axing All Individual Volunteers From its Trusted Flagger Program*, Tubefilter (Apr 29, 2022), https://www.tubefilter.com/2022/04/29/youtube-trusted-flagger-program-individuals-organizations/.

**AMENDED COMPLAINT**
**CASE NO. 5:24-CV-03131-VKD**

violates this policy, report it. Instructions for reporting violations of our Community Guidelines are available here."[31]

135.    YouTube also misled users who make reports to believe that their reports would be reviewed against the Community Guidelines: "When content is reported, it's not automatically taken down. Reported content is reviewed along these guidelines: Content that violates our Community Guidelines is removed from YouTube."[32]

136.    Although YouTube's reporting tool asks users to report and flag content, the utterly inconsistent results of the review as shown in the Plaintiffs' allegations indicates that the reporting tool is incapable of assessing the harmful content against its own Guidelines.

137.    In addition, an independent research firm also conducted a study on YouTube's Policy Violations found that "flagrant platform violations went unchecked" on YouTube, including contents that monetize misogyny, racism, homophobia, transphobia, and targeted harassment.[33]

138.    According to a press article, the research firm's founder had identified harmful videos and "reported the videos multiple times to both YouTube and an individual at Google but the videos have remained up."[34] But within just half an hour of the press company reaching out to YouTube about its failure to respond to the content report, "YouTube pulled at least two

---

[31] *Harmful or Dangerous Content Policies*, YouTube Policies, https://support.google.com/youtube/answer/2801964#zippy=%2Cextremely-dangerous-challenges (last visited, Jan. 25, 2023).
[32] *Report Inappropriate Videos, Channels, and Other Content on YouTube*, YouTube Help: Reporting and Enforcement,  https://support.google.com/youtube/answer/2802027 (last visited Jan. 25, 2023).
[33] Bot Sentinel INC., *YouTube Policy Violations: How Hate Speech, Misogyny, Racism, Homophobia, Transphobia, Xenophobia, Targeted Harassment, and Widespread Copyright Infringement Goes Unchecked.* (Sept. 13, 2022), https://botsentinel.com/reports/documents/youtube/report-09-13-22.pdf.
[34] CT Jones, *New Report Claims YouTube is Caching in on Misogyny, Racism, and Targeted Harassment*, Rollingstone (Sept. 13, 2022), https://www.rollingstone.com/culture/culture-news/youtube-hate-speech-targeted-harassment-study-bot-sentinel-1234590813/.

AMENDED COMPLAINT
CASE NO. 5:24-CV-03131-VKD

videos down for violating the site's policy on harassment and bullying."[35] The discrepancy of removal decision between the reporting tool's review and the human review (after press media had reached out to YouTube) indicates that the automated reporting tool is defective.

139.    According to the Becca Schmill Foundation - ACCO Study, researchers found choking challenge videos using search terms "choking challenge," "space monkey," and "choking game." YouTube's search results returned contents featuring kids explicitly displaying asphyxiation in the top ten results from three different accounts that researchers utilized for this study and was therefore the easiest platform for locating choking game content. Researchers reported 20 of the videos, but none of them were removed. When they checked days later, only four had warning labels added to them but remained available. Several videos, in particular, YouTube shorts, exhibited kids in physical distress as a result of their activities, including one boy who was clearly seizing, and another who appeared to crack his skull and/or have a concussion as a result of falling. One video, entitled "How the choking game kills demonstrated," films a woman being put into and hung from a noose until she begins seizing. This video remained on YouTube with no warning label days after researchers reported it and had been viewed more than 164,000 times.

140.    These studies show the defects in the automated tools developed and deployed by Defendant YouTube. Specifically related to this action, YouTube's automated reporting tool is defective and it misleads consumers to believe that their reporting of harms would be reviewed. It is plain that YouTube's reporting tool cannot conduct a review of the reported content against the Community Guidelines.

---

[35] CT Jones, *New Report Claims YouTube is Caching in on Misogyny, Racism, and Targeted Harassment*, Rollingstone (Sept. 13, 2022), https://www.rollingstone.com/culture/culture-news/youtube-hate-speech-targeted-harassment-study-bot-sentinel-1234590813/.

**AMENDED COMPLAINT**
**CASE NO. 5:24-CV-03131-VKD**

141.    Upon belief, both Defendants' defective reporting tools create new harms. When a person who is watching a video pauses and hovers on the video or rewatches a video, then the algorithm would recalibrate to bring more similar content to the user. Hence, when a user reports harmful content, and watches it until the end or hovers for a long time in order to make a report, and rewatches it to check its status of removal, then the user may be subject to more recommendations similar to the harmful content because of the frequency of rewatching the video. This creates a new type of harm because those making user reports like Plaintiffs would potentially be involved in the amplification and targeting of the harmful videos due to the defective algorithms inherent in the platform's reporting tools and recommendation tools.

142.    Plaintiffs reserve the right to supplement these factual allegations after discovery.

## CLASS ALLEGATIONS

143.    The plaintiffs bring this action as a class action under Rule 23 of the Federal Rules of Civil Procedure and seek to certify the following National Class under Rule 23(a) and (b)(3):

All people who used TikTok and YouTube and who made safety reports through the process set forth by Defendants from January 2020 through the date of dispositive judgment made in this action.

144.    Excluded from the class are the defendants, the defendants' officers, directors, and employees, and the children of such people, the defendants' subsidiaries, the Judge to which this case is assigned, and the immediate family of the Judge to which this case is assigned.

145.    Membership in the class shall be determined based on TikTok and YouTube's own records of persons who used their reporting tools for reporting harmful contents during the class period.

146.    Plaintiff Joann Bogard seeks to represent an Indiana Subclass comprised of members of the National Class who resided in Indiana when they used TikTok or YouTube.

147.    Plaintiff Annie McGrath seeks to represent a Wisconsin Subclass comprised of members of the National Class who resided in Wisconsin when they used YouTube.

148.    Plaintiff Jane Doe seeks to represent an Oregon Subclass comprised of members of the National Class who resided in Oregon when they used TikTok or YouTube.

**Rule 23(a)**

149.    The proposed National Class and Subclasses satisfy the requirements of Rule 23(a).

150.    The proposed National Class and Subclass are so numerous that the individual joinder of all its members, in this or any action, is impracticable. There are at least hundreds of thousands of members of the National Class who are located throughout the nation, and at least thousands of members of each Subclass, thereby making joinder impractical.

151.    Common questions of fact and law exist as to all Class Members. These include, but are not limited to, the following:

(a)    Whether TikTok and YouTube owed a duty of care to its users when it set forth a process for making reports that produced arbitrary results, creating an unreasonable risk of injury or harm to consumers?

(b)    Whether TikTok and YouTube had misrepresented that the reports would be reviewed and responded to in accordance with its policy?

    a.    Whether these representations were material?

    b.    Whether these representations were false, misleading, or deceptive?

    c.    Whether these representations caused harm to the members of the National Class; and

    d.    Whether the plaintiffs and members of the National Class are entitled to an injunction, damages, restitution, equitable relief, and other relief deemed appropriate, and the amount and nature of such relief.

AMENDED COMPLAINT
CASE NO. 5:24-CV-03131-VKD

152.    The plaintiffs' claims are typical of the claims of the putative class members. The plaintiffs and all putative Class Members were subjected to the same design defects of TikTok and YouTube, and the same false and misleading representations that TikTok and YouTube made. The plaintiffs and all putative Class Members bring the same types of legal claims, based on the common pattern or practice of TikTok and YouTube, and they assert the same legal theories against the defendants.

153.    The plaintiffs and their counsel satisfy the adequacy requirement. The plaintiffs will be adequate representatives of the proposed class because they are putative class members and they do not have interests that conflict with the interests of the putative Class Members.

154.    The plaintiffs' counsel are experienced in class action litigation and have litigated lawsuits of this complexity. They intend to prosecute this action vigorously for the benefit of the proposed Class.

**Rule 23(b)(3)**

155.    This action satisfies Rule 23(b)(3)'s predominance requirement. The central factual and legal questions regarding whether TikTok and YouTube's maintenance of a report system were designed to serve its purpose and whether their misrepresentations caused harm predominate over any individual questions in this litigation.

156.    This action also satisfies Rule 23(b)(3)'s superiority requirement. A class action is the superior method available for the efficient adjudication of this litigation, because the claims of the individual National Class members are relatively small compared to the burden and expense that would be required to individually litigate their claims against the defendants. Thus, it would be impracticable for the members of the Class to individually seek redress for the defendants' wrongful conduct. Class action treatment avoids the waste and duplication inherent in potentially thousands of individual actions and conserves the resources of the courts. In

AMENDED COMPLAINT
CASE NO. 5:24-cv-03131-VKD

addition, the prosecution of separate actions by individual members of the Class would create a foreseeable risk of inconsistent or varying adjudications for Defendants.

157.    This is the only action of which the plaintiffs are aware in which TikTok and YouTube users are bringing claims against Defendants concerning the defects and misrepresentations surrounding Defendants' reporting processes.

158.    It is desirable to concentrate the litigation against Defendants because there is jurisdiction over Defendants and there is proper venue in this District, and a single class action here will be more efficient than pursuing separate actions in other jurisdictions.

159.    This action is manageable as a class action.

## CLAIMS
## COUNT I -  STRICT PRODUCT LIABILITY (Design Defect)
Joann Bogard, Annie McGrath and Becca Schmill Foundation against YouTube
Joann Bogard, Jane Doe and Becca Schmill Foundation against TikTok
On behalf of National Class

160.    The plaintiffs adopt and incorporate by reference all allegations contained in the foregoing paragraphs as though fully set forth herein.

161.    Plaintiffs Joann Bogard, Annie McGrath, and Becca Schmill Foundation bring this claim against YouTube; and Joann Bogard, Jane Doe and Becca Schmill Foundation bring this claim against TikTok.

162.    Plaintiffs bring this claim for strict liability-design defect against Defendants on behalf of themselves and the National Class.

163.    Under Restatement (Second) of Torts § 402(a), "One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property, if (a) the seller is engaged in the business of selling such a product, and (b) it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold."

164.   As described above, Defendants created an automated reporting tool in their platforms which they developed, designed, and distributed least millions of users, but the reporting tool was defective because it was not capable of conducting a review of the harmful content against the Defendants' Community Guidelines.

165.   In a strict liability action based on defective design, a product is considered defective when the benefits of the challenged design do not outweigh the risk of danger inherent in such design.

166.   As described above, when creating and setting forth the reporting tool, the Defendants knew, or in the exercise of reasonable care should have known, that it would pose a serious danger of emotional and physical harm if their purported reporting tool were defective. The defective reporting process and failure to review creates a sense of invalidation, helplessness, futility, discouragement, and emotional agony to the users who make reports on Defendants' platforms. The reporting tool's defects  also wastes valuable time of users who report.

167.   Defendants should have warned users that making reports does not lead to any meaningful review, or they should not have set forth such a defective reporting process at all. By misrepresenting that their reporting tools are intended to prioritize users' safety, it harmed consumers like Plaintiffs who relied on these words to constantly make reports by having to watch the traumatic scenes of childrens' suffering over and over.

168.   In contrast, Defendants failed to exercise the duty of care that they owed to the plaintiffs and other users to design products that are not unreasonably dangerous.

169.   It was near certain that the arbitrary reporting process would cause harm to users who make reports.

170.    As a proximate cause of Defendants' defective reporting process, Plaintiffs and the National Class suffered severe mental harm, leading to emotional distress, pain, and suffering as well as a futile waste of time.

171.    Plaintiffs and members of the National Class are therefore entitled to compensatory damages for emotional pain and distress.

172.    Plaintiffs and the National Class are entitled to punitive damages based on the willful and wanton defective design of their products that were intentionally marketed, sold, and distributed to underage users.

## COUNT II – NEGLIGENCE
Joann Bogard, Annie McGrath and Becca Schmill Foundation against YouTube
Joann Bogard, Jane Doe and Becca Schmill Foundation against TikTok
On behalf of National Class

173.    The plaintiffs adopt and incorporate by reference all allegations contained in the foregoing paragraphs as though fully set forth herein.

174.    Plaintiffs Joann Bogard, Annie McGrath, and Becca Schmill Foundation bring this claim against YouTube; and Joann Bogard, Jane Doe and Becca Schmill Foundation bring this claim against TikTok.

175.    Plaintiffs bring this claim for negligence against Defendants on behalf of themselves and the National Class.

176.    At all relevant times, Defendants had a duty to exercise reasonable care and caution in designing, maintaining, and distributing their product to minors and to protect users from an unreasonable risk of harm arising out of the use of their apps.

177.    In addition, by affirmatively taking on the role of a rescuer or a safety hotline, setting up a policy and protocol for reporting harms and committing to review those reports, Defendants put users in a worse position of feeling frustrated, helpless, and anxious about the reporting process, retraumatizing those whose reports are invalidated, and wasting valuable

time and resources of users who interact with the apps to provide information regarding harmful materials.

178.    Furthermore, by inviting and allowing users to make reports about specific policy violations and harm, Defendants put themselves in a position where they had exclusive control over information about the reported offenses. Even law enforcement would not have access to those records on an immediate basis. Defendants assumed a special duty and relationship to prevent harm to those minors.

179.    However, Defendants' reporting procedures rendered completely arbitrary results to users and failed to review reports against their community guidelines.

180.    Defendants failed to provide adequate warnings to users and those making reports about the dangers associated with their reporting tool.

181.    Defendants could have developed a robust, safe, and democratic reporting/response system with regard to reported harms on their platforms. Alternatively, Defendants could have not created a reporting tool at all and allowed users and other enforcement entities to handle crises.

182.    Defendants were negligent, grossly negligent, reckless, and/or careless in that they failed to exercise ordinary care and caution to users who relied upon the reporting tools to review the harmful contents against Defendants' own community guidelines.

183.    As a proximate cause of Defendants' negligence, Plaintiffs and members of the National Class suffered emotional harm such as invalidation and retraumatization, and their time and efforts were needlessly wasted.

184.    Plaintiffs and members of the National Class are therefore entitled to compensatory damages for physical and emotional pain and distress and punitive damages as applicable, with an amount to be determined by the jury.

185.    The plaintiffs reserve the right to supplement their specifications of negligence as to each defendant after conducting reasonable and necessary discovery.

**COUNT III – FRAUDULENT MISREPRESENTATION**
Joann Bogard, Annie McGrath and Becca Schmill Foundation against YouTube
Joanne Bogard, Jane Doe and Becca Schmill Foundation against TikTok
On behalf of National Class

186.    The plaintiffs adopt and incorporate by reference all allegations contained in the foregoing paragraphs as though fully set forth herein.

187.    Plaintiffs Joann Bogard, Annie McGrath, and Becca Schmill Foundation bring claims against YouTube, Plaintiffs Joann Bogard, Jane Doe and Becca Schmill Foundation bring claims against TikTok.

188.    Plaintiffs bring this claim for misrepresentation against Defendants on behalf of themselves and the National Class.

189.    Defendants engaged in the common law tort of fraud or fraudulent misrepresentation.

190.    A defendant engages in fraudulent representation when it (1) made a false representation, (2) in reference to a material fact, (3) that the defendant made with knowledge of its falsity, (4) with an intent to deceive, and (5) reliance was taken based on the representation.

191.    As described above, Defendants made material representations that they would review reported contents against their Community Guidelines. Defendants made material representations by setting forth concrete features on their platforms for users to report harms. They represented in public that their reporting tools are accurate enough to respond to a majority of harms, both reported and unreported harms.

192.    As described above, those representations were false. Becca Schmill Foundation's study found that Defendants' reporting tools were right less than 5% of the time. Jane Doe was

told by TikTok's app that the reported content did not violate guidelines and then was told by a TikTok representative that it did violate guidelines. Plaintiffs Joann Bogard and Annie McGrath's numerous reports were unheeded and not reviewed against their Community Guidelines by YouTube.

193.    Defendants knew that those representations were false at the time they were made, and when they operated their platforms with the reporting tools. Yet, they made these representations with an intent to deceive the public. In particular, Defendants had to set up some visible features for reporting in response to pressures by regulators, consumers, and media who have exposed the harm caused by unlimited distribution of harmful materials on their platforms including the choking challenge and harassing videos that took the lives of young children or put them at a risk of harm.

194.    Defendants knew that Plaintiffs and members of the National Class would reasonably rely on these false representations in submitting reports of harmful materials. Defendants still induced Plaintiffs by maintaining and setting forth the reporting tools that they knew were defective.

195.    Plaintiffs and members of the National Class reasonably relied on Defendants' false representations in using Defendants' platforms and submitted reports regarding harmful contents.

196.    Plaintiff Becca Schmill Foundation conducted a study on the defective reporting tools and was forced to expend its resources and time to the effort. The Foundation's core activities of advocating for legislation such as KOSA that allows for easy-to-use reporting were directly harmed by Defendants' misrepresentations in the Senate Hearings about online safety.

197.    Defendants also falsely represented that it had a system in place to respond to users' complaints about violations of its policies. In setting up the reporting feature, Defendants

represented to members of the public, consumers, regulators, and the media that they would meaningfully review reports of harmful and harassing materials, for example the choking challenge videos.

198.    Defendants made this representation with knowledge of its falsity and with an intent to deceive users, consumers, regulators, and the media, like Plaintiffs. Plaintiffs reasonably relied upon Defendants' representations when they followed the process set forth by Defendants and made reports on the platform. Defendants did not conduct a meaningful review or response, and they could not do so because their reporting tool was defective.

199.    Plaintiffs submitted harms reports of videos that clearly displayed contents of asphyxiation, child pornography, and illegal drug sales, but none of these were reviewed against the Community Guidelines which yielded arbitrary results.

200.    Defendants' fraudulent misrepresentations proximately caused harm to Plaintiffs and members of the National Class who experience emotional harm, feelings of frustration, helplessness, and anxiety about the reporting process. This has effectively retraumatized those whose reports are invalidated and has wasted the valuable time of users who interact with the apps to provide information regarding harmful materials.

201.    Plaintiffs are entitled to compensatory damages including physical and emotional pain and distress, compensation for frustrated organizational and personal efforts and time for making reports, and punitive damages as appropriate based on Defendants' willful and wanton actions in making these fraudulent misrepresentations.

202.    Plaintiffs reserve the right to supplement these factual allegations after discovery.

## COUNT IV – NEGLIGENT MISREPRESENTATION
Joann Bogard, Annie McGrath and Becca Schmill Foundation against YouTube
Joann Bogard, Jane Doe and Becca Schmill Foundation against TikTok
On behalf of National Class

203.    The plaintiffs adopt and incorporate by reference all allegations contained in the foregoing paragraphs as though fully set forth herein.

204.    Plaintiffs Joann Bogard, Annie McGrath, and Becca Schmill Foundation bring this claim against YouTube; and Plaintiffs Joann Bogard, Jane Doe, and Becca Schmill Foundation bring this claim against TikTok on behalf of themselves and the National Class.

205.    The Defendants committed the tort of negligent misrepresentation, the elements of which claim are that: (1) the defendant made a false statement or omission of a material fact, (2) the defendant was without reasonable grounds for believing the statement to be true, (3) the defendant intended the plaintiff to rely on it, (4) the plaintiff reasonably relied on the false information, and (5) the defendant's challenged conduct proximately caused the plaintiff's harm.

206.    As described in the prior section (Count III), Defendants made false representations that were material to Plaintiffs and the National Class, which the Plaintiffs and National Class reasonably relied on.

207.    Plaintiffs submitted harms reports of videos that clearly displayed contents of asphyxiation, child pornography, and illegal drug sales, but none of these were reviewed against the Community Guidelines and yielded arbitrary results.

208.    Defendants proximately caused harm to Plaintiffs and members of the National Class who experience emotional harm, feelings of frustration, helplessness, and anxiety about the reporting process. This has effectively retraumatized those whose reports are invalidated and has wasted the valuable time of users who interact with the apps to provide information regarding harmful materials.

209.    As described in the prior count, the plaintiffs who bring this count and the National Class are entitled to compensatory and punitive damages based on Defendants' misrepresentations.

210.    Plaintiffs reserve the right to supplement these factual allegations after discovery.

## COUNT V – INDIANA DECEPTIVE CONSUMER SALES ACT (IND. CODE 24-5-0.5 ET SEQ)

Plaintiff Joann Bogard on behalf of the Indiana Subclass against YouTube and TikTok
Plaintiff Joann Bogard adopt and incorporate by reference all allegations contained in the foregoing paragraphs as though fully set forth herein.

211.    Plaintiff Joann Bogard brings this claim against YouTube and TikTok on behalf of herself and the Indiana Subclass.

212.    Indiana's Deceptive Consumer Sales Act provides that a "supplier may not commit an unfair, abusive, or deceptive act, omission, or practice in connection with a consumer transaction." IND. CODE § 24-5-0.5-3(a). The prohibited "act[s], omission[s], or practice[s]" "include[] both implicit and explicit misrepresentations." *Id.*

213.    Indiana's Deceptive Consumer Sales Act provides that a "supplier may not commit an unfair, abusive, or deceptive act, omission, or practice in connection with a consumer transaction." IND. CODE § 24-5-0.5-3(a). The prohibited "act[s], omission[s], or practice[s]" "include[] both implicit and explicit misrepresentations." (*Id.*) and "representations ... made ... by electronic communication ... [t]hat [the] subject of a consumer transaction has ... characteristics ... it does not have which the supplier knows or should reasonably know it does not have." IND. CODE § 24-5-0.5-3(b).

214.    Defendants TikTok and YouTube have engaged in "unfair, abusive, or deceptive act[s] or practice[s] in connection with a consumer transaction," IND. CODE § 24-5-0.5-3(a) when they set forth representations about their reporting tools which they knew to be defective

and ineffective. YouTube knew or should have known that its explicit and implicit representations about reviewing reports of harm were false.

215.    Defendants misrepresented about the reporting tools so that they may continue to upkeep a pretense of safety, while they gained profit such as advertising packages specifically targeting children and minor users. Those advertisements allowed Defendants to purposely derive economic benefits, including ad revenue. Defendants designate a monetary value per each user who are subject to the targeted ads and makes profit out of each user's timed engagement.

216.    Because TikTok and YouTube committed the acts alleged in this Complaint as part of a scheme, artifice, or device with intent to defraud or mislead, they committed incurable deceptive acts. Plaintiff and the Indiana subclass are entitled to compensatory damages, statutory damages, treble damages, heightened damages, injunctive relief, and attorney's fees. IND. CODE 24-5-0.5-4.

217.    Plaintiffs reserve the right to supplement these factual allegations after discovery.

### COUNT VI – WISCONSIN DECEPTIVE TRADE PRACTICES ACT (DTPA)
Plaintiff Annie McGrath on behalf of the Oregon Subclass against TikTok

218.    Plaintiff Annie McGrath adopt and incorporate by reference all allegations contained in the foregoing paragraphs as though fully set forth herein.

219.    Plaintiff Annie McGrath brings this claim under the Wisconsin Deceptive Trade Practices Act (DTPA), Wis. Stat. § 100.18 *et seq*., on behalf of the Wisconsin Subclass against Defendant YouTube.

220.    The Wisconsin DTPA, Wisconsin Stat. § 100.18(1) provides, in relevant part, that "no person, with intent to sell, distribute, increase the consumption of . . . anything . . . shall make, publish, disseminate, circulate, or place before the public . . . an advertisement,

announcement, statement or representation of any kind . . . which . . . contains any assertion, representation or statement of fact which is untrue, deceptive or misleading."

221.    YouTube's product marketed and placed before the public various statements, representations, and announcements of its safety features as they relate to harmful materials online such as choking challenge videos and harassing videos.

222.    As described above, YouTube made false and material statements to its users about its reporting tool. YouTube made misrepresentations that it would review the reported contents against its Community Guideline which it knew it could not do.

223.    Defendants misrepresented about the reporting tools so that they may continue to upkeep a pretense of safety, while they gained profit such as advertising packages specifically targeting children and minor users. Those advertisements allowed Defendants to purposely derive economic benefits, including ad revenue. Defendants designate a monetary value per each user who are subject to the targeted ads and makes profit out of each user's timed engagement.

224.    YouTube's misrepresentation caused Plaintiff and subclass members to rely on their statements about the reporting tool. As a result, Plaintiffs suffer monetary loss, emotional distress, and other forms of harms. Specifically, Annie McGrath took days off from work after making reports and being dismissed, in part due to the anxiety, frustration, re-traumatization, and inability to find closure, in part caused by the Defendant's repeated dismissal and invalidation when they failed to review the harmful contents against their Community Guidelines. This caused financial harm to Annie McGrath.

225.    Plaintiff and each Wisconsin subclass member is entitled to compensatory and statutory damages as applicable, attorneys' fees, injunctive and equitable relief, and any other relief that is appropriate under the DTPA.

226.   Plaintiffs reserve the right to supplement these factual allegations after discovery.

**COUNT VII – OREGON UNLAWFUL TRADE PRACTICES ACT**
Plaintiff Jane Doe on behalf of the Oregon Subclass against TikTok

227.   Plaintiff Jane Doe adopt and incorporate by reference all allegations contained in the foregoing paragraphs as though fully set forth herein.

228.   Plaintiff Jane Doe brings this claim under the Oregon Unlawful Trade Practices Act, Oregon Revised Statute § 646.605, on behalf of the Oregon Subclass against Defendant TikTok.

229.   The Oregon Unlawful Trade Practices Act (UTPA), ORS §646.605 *et seq*., protects persons who obtain real estate, goods, or services primarily for personal, family, or household purposes from fraudulent and unfair business practices.

230.   The UTPA generally prohibits the false representation or false advertising of goods and services, including false representations about the characteristics, uses, benefits, and qualities of good or services. ORS § 646.608(1)(e).

231.   TikTok (including its app's reporting function) is marketed, provided, and sold to customers primarily for personal, family, or household purposes.

232.   As described above, TikTok made false and material statements to its users, including Jane Doe about its reporting feature.

233.   TikTok made the misrepresentations that it would meaningfully review and respond to reported harmful content against its Community Guidelines which it knew or should have known to be untrue.  Plaintiff Jane Doe relied on this misrepresentation and began reporting explicitly and objectively harmful videos per the Community Guidelines. Her reports were dismissed, but when a TikTok representative was contacted through a private contact, the TikTok representative admitted that the videos were violative of the Community Guidelines.

Plaintiff Jane Doe lost time and resources because of the futile efforts she made using the reporting tools relying on TikTok's statements.

234. The unlawful trade practices alleged herein caused an ascertainable loss of injury to Plaintiffs and the subclass, including a loss of money and property.

235. Pursuant to ORS § 646.638(1), the plaintiffs and each Oregon subclass member is entitled to a $200 minimum statutory penalty due to the unlawful trade practices alleged herein.

236. The plaintiffs and the Oregon subclass are entitled to their reasonable attorneys' fees and costs pursuant to ORS § 646.638(3).

237. The plaintiffs and the Oregon subclass are entitled to injunctive and equitable relief, and any other relief that is appropriate under the UTPA.

238. Plaintiffs reserve the right to supplement these factual allegations after discovery.

## COUNT VIII: CALIFORNIA BUSINESS AND PROFESSIONAL CODE §§17200 & 17500 ("UCL & FALSE ADVERTISING" )
Joann Bogard, Annie McGrath and Becca Schmill Foundation against YouTube
Joann Bogard, Jane Doe and Becca Schmill Foundation against TikTok
On behalf of National Class

239. Plaintiffs restate each and every paragraph of this Complaint as if fully rewritten herein.

240. Plaintiffs Joann Bogard, Annie McGrath, and Becca Schmill Foundation bring this claim against YouTube; and Plaintiffs Joann Bogard, Jane Doe, and Becca Schmill Foundation bring this claim against TikTok on behalf of themselves and the National Class, under California Business and Professional Code §§17200 & 17500 *et seq*. ("UCL & False Advertising").

241. The UCL and False Advertising laws prohibit unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising and any act prohibited by California Bus. & Prof. Code §§17200 and 17500 *et seq*.

50

242.    As described in the factual allegations, Defendants YouTube and TikTok's product were marketed, provided, and sold to customers primarily for personal, family, or household purposes.

243.    As described above, Defendants YouTube and TikTok made false and material statements to its users, including Plaintiffs, stating that they would review and act upon harms that violate their policies. Defendants made material representations by setting forth concrete features on their platforms for users to report harms. They misrepresented in public that their reporting processes are accurate enough to respond to a majority of harms, both reported and unreported harms.

244.    As described above, those representations were false. Becca Schmill Foundation's study found that less than 5% of the Defendants' reporting features were effective. Jane Doe was told by TikTok's app that the reported content did not violate guidelines and then was told by a TikTok representative that it did violate guidelines. Plaintiffs Joann Bogard and Annie McGrath's numerous reports were unheeded by YouTube.

245.    Defendants knew that those representations were false at the time they were made, and when they operated their platforms with the reporting feature.

246.    A reasonable user would have relied on Defendants' misrepresentation to the user's detriment.

247.    Defendants misrepresented about the reporting tools so that they may continue to upkeep a pretense of safety, while they gained profit such as advertising packages specifically targeting children and minor users. Those advertisements allowed Defendants to purposely derive economic benefits, including ad revenue. Defendants designate a monetary value per each user who are subject to the targeted ads and makes profit out of each user's timed engagement.

248.    Pursuant to Cal. Bus. & Prof. Code §17200 and 17500 et seq., Plaintiff and the putative Class seek an order enjoining the above-described wrongful acts and practices of the Defendants and for restitution and disgorgement.

249.    Plaintiffs reserve the right to supplement these factual allegations after discovery.

## **PRAYER FOR RELIEF**

WHEREFORE, the putative representative Plaintiffs, on behalf of themselves and the putative members of the class defined herein, pray for judgment against the Defendants as follows:

A.    For an order certifying this action and/or common issues raised herein as a "Class Action" under the appropriate provision of Federal Rule of Civil Procedure 23(a), 23(b)(2) and/or (b)(3); designating Plaintiff as Class Representative; and appointing the undersigned to serve as class counsel.

B.    For notice of class certification and of any relief to be disseminated to all Class Members and for such other further notices as this Court deems appropriated under Fed. R. Civ. P. 23(d)(2);

C.    For an order barring Defendants from destroying or removing any computer or similar records which record evidence related to the claims above.

D.    For an order barring Defendants from attempting, on their own or through their agents, to induce any putative Class Members to sign any documents which in any way releases any of the claims of any Putative Class Members;

E.    For granting declaratory and injunctive relief to Plaintiffs as permitted by law or equity, including: enjoining Defendants from continuing the unlawful practices as set forth herein, and directing Defendants to identify, with Court supervision, victims of their conduct so as to pay them compensatory damages, punitive damages, restitution and/or disgorgement of all monies acquired by Defendants by means of any act or practice declared by the Court to be wrongful;

F.    For an award of compensatory damages in favor of Plaintiffs and Class against all Defendants, jointly and severally, in the amount exceeding $5,000,000, to be determined by

proof of all injuries and damages described herein and to be proven at trial;

G.    Awarding Plaintiffs and the Class punitive damages to the extent allowable by law, in an amount to be proven at trial;

H.    Granting Plaintiffs' requests for injunctive relief including, but not limited to, the following:

    a.    Effectively implement, flagging, reporting, and rating mechanisms, and clarify community guidelines.

    b.    Incentivize, and encourage users to report harmful content and behavior on platforms.

    c.    Establish a user-friendly process of reporting harmful content and behavior that is transparent, interactive, appealable, and explainable and includes a call number that directly connects users to a human representative without having to go through the application.

    d.    Increase transparency regarding the content moderation process, and ensure that all statements and information regarding content moderation by the Defendants can be verified by third-party auditors and/or accessed by researchers.

    e.    Require Defendants to obtain an independent periodic third-party audit by auditors chosen by a neutral panel and allow third-party researchers access to the Defendants' content moderation processes. Auditors should have wide authority to conduct transparency reporting and data sharing while also gaining access to the Defendants' system to review algorithms that are used to moderate content and target content recommendations. The conclusions and recommendations as well as risks found by auditors should be made publicly available, and to the extent any information contained within the auditors' report is a trade secret or proprietary or privileged, it may be redacted before it becomes available to the public.

    f.    Require Defendants to conduct a systemic risk report that is open to the public regarding any emerging risks of Defendants' platform and lay out a mitigation plan that responds to all categories of user-reporting.

g.  Provide ample support, safety, training, and humane conditions of work for human representatives involved in content related complaints.

h.  Apply appropriate access control measures and age verification for users under 18, rather than rely upon self-designation of age in a sign-up process. Stop relying upon controversial and non-transparent facial recognition technology or biometric data for age verification but rely upon photo ID, parental permission and/or certification, school permission and/or certification, or other minimally intrusive measures to assure that a user's age is properly verified for safety.

I.  All other forms of injunctive relief that would bring Defendants into compliance with laws under which causes of actions arise in this Complaint;

J.  Plaintiffs hereby reserve all rights to supplement their request of compensation and injunctive relief after discovery.

K.  Awarding Plaintiffs and the Class reasonable attorney's fees and costs of prosecuting this action, including expert witness fees;

L.  Awarding pre-judgment and post-judgment interest; and providing such other relief as may be just and proper.

## **DEMAND FOR JURY TRIAL**

Plaintiff hereby demands a trial by jury for all issues a jury may properly decide and for all of the requested relief that a jury may award.

Dated: March 25, 2025                    Respectfully submitted,

**By:**    _____
Andrew Rozynski, Esq.
Juyoun Han, Esq. (*pro hac vice*)
Eric Baum, Esq. (*pro hac vice pending*)
**EISENBERG & BAUM, LLP**
24 Union Square East, PH
New York, NY 10003
*Attorneys for Plaintiffs*

54