UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| JOANN BOGARD, et al.,<br><br>             Plaintiffs,<br><br>    v.<br><br>TIKTOK INC., et al.,<br><br>             Defendants. | Case No.  24-cv-03131-VKD<br><br>**ORDER GRANTING DEFENDANTS' JOINT MOTION TO DISMISS AMENDED COMPLAINT**<br><br>Re: Dkt. No. 114 |

Plaintiffs Joann Bogard, Annie McGrath, Jane Doe, and the Becca Schmill Foundation ("Foundation") (collectively, "Plaintiffs") bring this action against defendants Google LLC and YouTube LLC (together, "Google Defendants"), and TikTok Inc. and ByteDance Inc. (together, "TikTok Defendants") (collectively, "Defendants").  On February 24, 2025, the Court granted Defendants' motion to dismiss all claims in the original complaint, with leave to amend.[1]  Dkt. No. 108.  On March 24, 2025, Plaintiffs filed an amended complaint.  Dkt. No. 110.  Defendants now renew their motion to dismiss on the following grounds: (1) Plaintiffs' claims are barred by Section 230 of the Communications Decency Act (CDA), 47 U.S.C. § 230, or alternatively the First Amendment; and (2) Plaintiffs fail to state a claim, pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.  Dkt. No. 114.  Defendants also argue that the Foundation lacks standing.  Plaintiffs oppose the motion.  Dkt. No. 115.  The Court held a hearing on the motion on July 22, 2025.  Dkt. No. 120.  After the hearing, at the Court's invitation, the parties filed supplemental briefing addressing the Ninth Circuit's recent decision in *Doe 1 v. Twitter, Inc.,* 148

---

[1] With respect to claims asserted against original defendants Alphabet Inc. and XXVI Holdings Inc., the Court granted defendants' motion to dismiss with prejudice.  Dkt. No. 108 at 10.

1  F.4th 635 (9th Cir. 2025).  *See* Dkt. Nos. 125, 127, 128.

2      Having considered the moving and responding papers, the applicable law, and the

3  arguments made at the hearing, the Court grants Defendants' motion to dismiss, as explained

4  below.

5  **I.    BACKGROUND**

6      The Court's February 24, 2025 order sets out in detail the pertinent facts alleged by

7  Plaintiffs.  *See* Dkt. No. 108 at 2-6.  As Plaintiffs acknowledge, the amended complaint contains

8  few new or different factual allegations; instead, the amended complaint reflects Plaintiffs' efforts

9  to reframe the existing factual allegations and their claims.  *See* Dkt. No. 124 at 4:16-21

10  (Plaintiffs' counsel conceding that "there are no completely new set of facts that are brought forth

11  in the amended complaint, but it was an attempt and an effort to try to clarify based on the

12  previous decision, and this current motion to dismiss, where the, perhaps, clarifying boundaries

13  are"); 19:15-23 ("Again, you know, there is nothing extremely new, because we don't make up

14  facts as they come, but I think we were able to delineate at least three kinds of harms, too . . .

15  which were already in the original complaint . . . and I think it was a bit vague in the original

16  complaint . . . .").

17      The most significant change in the amended complaint is that instead of challenging,

18  collectively, Defendants' "reporting tools," "reporting features," and "reporting practices" for

19  videos containing harmful content, Plaintiffs now contend that the Google Defendants and the

20  TikTok Defendants rely on "automated reporting tools" to review user-reported content on the

21  YouTube and TikTok platforms for violations of Defendants' Community Guidelines, and that

22  these automated reporting tools "are not capable of conducting [such] a review."  *See* Dkt. No. 110

23  ¶¶ 9, 11, 15, 20, 111, 121, 128, 136, 138.  That is, in the amended complaint, Plaintiffs purport to

24  challenge only Defendants' automated reporting tools and not other aspects of Defendants' content

25  review and reporting processes.

26      The amended complaint, like the original complaint, asserts eight claims:  strict products

27  liability against all Defendants (claim 1); negligence against all Defendants (claim 2); fraudulent

28  misrepresentation against all Defendants (claim 3); negligent misrepresentation against all

United States District Court
Northern District of California

Defendants (claim 4); a claim by Ms. Bogard against all Defendants for violations of the Indiana Deceptive Consumer Sales Act (IDCSA), Ind. Code § 24-5-0.5 *et seq.* (claim 5); a claim by Ms. McGrath against the Google Defendants[2] for violations of the Wisconsin Deceptive Trade Practices Act (WDTPA), Wis. Stat. § 100.18 *et seq.* (claim 6); a claim by Ms. Doe against the TikTok Defendants for violations of the Oregon Unlawful Trade Practices Act (OUTPA), ORS § 646.605 *et seq.* (claim 7); and claims by Ms. Bogard, Ms. McGrath, and the Foundation against the Google Defendants, and by Ms. Bogard, Ms. Doe, and the Foundation against the TikTok Defendants, for violations of the California Business and Professions Code §§ 17200 and 17500 *et seq.* (claim 8). Plaintiffs seek compensatory and punitive damages, as well as declaratory relief, injunctive relief, attorneys' fees, and costs. Dkt. No. 110 at 52-54.

## II.    LEGAL STANDARD

### A.    Rule 12(b)(6)

A motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6) tests the legal sufficiency of the claims in the complaint. *Navarro v. Block*, 250 F.3d 729, 732 (9th Cir. 2001). Dismissal is appropriate where there is no cognizable legal theory or an absence of sufficient facts alleged to support a cognizable legal theory. *Id.* (citing *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1988)). In such a motion, all material allegations in the complaint must be taken as true and construed in the light most favorable to the claimant. *Id.*

However, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice," *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009), and "[f]actual allegations must be enough to raise a right to relief above the speculative level," *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citations omitted). Moreover, the Court is not required to "'assume the truth of legal conclusions merely because they are cast in the form of factual allegations.'" *Prager Univ. v. Google LLC*, No. 17-cv-06064-LHK, 2018 WL 1471939, at *3 (N.D. Cal. Mar. 26, 2018) (quoting *Fayer v. Vaughn*, 649 F.3d 1061, 1064 (9th Cir. 2011) (per

---

[2] As in the original complaint, the amended complaint states that this claim is brought against TikTok on behalf of an Oregon subclass but as all of the subsequent allegations reference YouTube and Wisconsin, the Court assumes the TikTok/Oregon references were included in error. *See* Dkt. No. 108 at 6 n.3.

United States District Court
Northern District of California

1    curiam)).  Nor does the Court accept "allegations that are merely conclusory, unwarranted

2    deductions of fact, or unreasonable inferences."  *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049,

3    1055 (9th Cir. 2008).

4        Under Rule 9(b), allegations of fraud or mistake must be pled "with particularity."  Fed R.

5    Civ. P. 9(b).  "A pleading is sufficient under Rule 9(b) if it identifies the circumstances

6    constituting fraud so that the defendant can prepare an adequate answer from the allegations."

7    *Neubronner v. Milken*, 6 F.3d 666, 671-72 (9th Cir. 1993) (citations and quotations omitted).  This

8    includes pleading "the who, what, when, where, and how of the misconduct charged."  *Whiteside*

9    *v. Kimberly Clark Corp.*, 108 F.4th 771, 785 (9th Cir. 2024) (citation and quotations omitted).

**B.    Section 230 of the Communications Decency Act**

11        Section 230(c)(1) of the CDA states that "[n]o provider or user of an interactive computer

12    service shall be treated as the publisher or speaker of any information provided by another

13    information content provider."  47 U.S.C. § 230(c)(1).  The Ninth Circuit has interpreted this

14    provision to protect from liability:  "(1) a provider or user of an interactive computer service (2)

15    whom a plaintiff seeks to treat, under a state law cause of action, as a publisher or speaker (3) of

16    information provided by another information content provider."  *Barnes v. Yahoo!, Inc.*, 570 F.3d

17    1096, 1100–01 (9th Cir. 2009), *as amended* (Sept. 28, 2009).

18        Defendants bear the burden of establishing immunity under Section 230.  *Doe I*, 148 F.4th

19    at 642.

**III.    DISCUSSION**

21        In this order, the Court first addresses whether the Becca Schmill Foundation has Article

22    III standing.  Then, the Court considers whether Plaintiffs have stated claims for relief.  Finally,

23    the Court considers Defendants' Section 230 immunity defense and their First Amendment

24    defense.

**A.    Standing for Becca Schmill Foundation**

26        Defendants again challenge the Becca Schmill Foundation's standing, arguing that the

27    Foundation fails to plausibly allege a basis for organizational standing, including an injury in fact.

28    Dkt. No. 114 at 25-26.  Plaintiffs counter that they have suffered concrete injury, explaining that

United States District Court
Northern District of California

4

the Foundation's "mission was frustrated because [its] mission and activities—to provide education and protection for minors from online harms—were threatened by Defendants' defective reporting tools" and alleged misrepresentations to Congress.[3]  Dkt. No. 115 at 26.

To establish standing on its own behalf, an organization "must satisfy the usual standards for injury in fact, causation, and redressability that apply to individuals."  *Food & Drug Admin. v. All. for Hippocratic Med.*, 602 U.S. 367, 394 (2024).  Thus, the Foundation must plausibly allege (i) that it has suffered an injury in fact, (ii) that the injury likely was caused by Defendants, and (iii) that the injury likely would be redressed by the requested judicial relief.  *Id.* at 380.  An injury in fact must be "concrete," meaning that it must be real and not abstract, and the injury must also be "particularized," meaning that it must affect the Foundation in a "personal and individual way" rather than as a generalized grievance.  *Id.* at 381.  If the Foundation demonstrates a cognizable injury, it must also plausibly allege that the injury likely was caused by Defendants' conduct.  *Id.* at 382.

Here, the Foundation's mission is "to fund research, sponsor community programming, and advocate for policies that promote and safeguard the emotional wellbeing of adolescents and young adults."  Dkt. No. 110 ¶ 104.  The Foundation "conducts research and promotes advocacy in the areas of social media accountability and online safety" and "aims to educate the public and lawmakers to enact laws that foster accountability and safety on tech platforms."  *Id.* ¶ 105.  In the amended complaint, Plaintiffs now also allege that:

> The Foundation's core activities include legislative advocacy which includes the Kids Online Safety Act (KOSA), a bipartisan legislation that aims to protect children online. One of the major provisions of KOSA has been to require social media platforms to implement easy-to-use reporting tools and establish [a] dedicated harms-report-channel for users.
>
> Defendants' conduct of developing defective reporting tools [and] the Defendants' misrepresentations about the tools and commitment

---

[3] Although the amended complaint, like the original complaint, includes an assertion that the Foundation sues "on behalf of itself and its members," Dkt. No. 110 ¶ 45, Plaintiffs do not rely on a theory of associational standing.  *See* Dkt. No. 108 at 8; Dkt. No. 115 at 26-27.

United States District Court
Northern District of California

to remove harmful videos in Senate Hearings directly cause harm to the core activities of the Becca Schmill Foundation who have been advocating tirelessly in Congress to show the deficiencies of the Defendants' conduct and the need for regulation.

*Id.* ¶¶ 106-07.

In its prior order, the Court found that the Foundation lacked standing because it did not "plausibly allege that conducting the research described in the complaint harms its core activities; rather, conducting such research is described as one of its core activities." Dkt. No. 108 at 9. The Court agrees with Defendants that the amended complaint does not address this deficiency. Moreover, to the extent Plaintiffs argue that the Foundation has standing because Defendants' conduct and statements undermine its efforts to advocate for legislation and regulation protecting children from online content, Plaintiffs have neither alleged nor explained how the Foundation has suffered a concrete injury to its core activities when those activities expressly include the very same advocacy efforts. Defendants have done nothing to interfere with the Foundation's ability to continue these activities in support of its mission. The Foundation "cannot assert standing simply because [it] object[s] to [Defendants'] actions." *Hippocratic Med.*, 602 U.S. at 394.

Plaintiffs also argue that the Foundation "had to take on substantial costs" associated with its research and advocacy efforts with respect to the particular content at issue in this case. Dkt. No. 115 at 26; *see* Dkt. No. 110 ¶¶ 108-109. However, allegations that a plaintiff has incurred costs or diverted resources are generally not sufficient to support standing. As the Supreme Court has observed, a plaintiff "cannot spend its way into standing simply by expending money to gather information and advocate against the defendant's action." *Hippocratic Med.*, 602 U.S. at 394; *see also Satanic Temple v. Labrador*, 149 F.4th 1047, 1054 (9th Cir. 2025) ("[A]n organization 'cannot manufacture the injury by incurring litigation costs or simply choosing to spend money fixing a problem that otherwise would not affect the organization at all.'") (quoting *La Asociacion de Trabajadores de Lake Forest v. City of Lake Forest*, 624 F.3d 1083, 1088 (9th Cir. 2010)). Here, the costs the Foundation claims to have incurred appear to be for the research and advocacy efforts that are part of its core activities. *See* Dkt. No. 110 ¶¶ 108-109. These expenditures do not confer standing on the Foundation.

1    Accordingly, the Court concludes that the Foundation lacks Article III standing.

**B.    Plaintiffs' Common Law Tort Claims**

As before, and for the same reasons, *see* Dkt. No. 108 at 10, the Court assumes California law governs Plaintiffs' common law tort claims.

**1.    Claim 1: Strict Products Liability - Design Defect**

In its prior order, the Court found that Plaintiffs failed to state a claim for strict products liability based on a design defect.  Dkt. No. 108 at 12.  Observing that Plaintiffs "[did] not challenge Defendants' reporting tools *per se*," the Court focused on Plaintiffs' allegations that Defendants' reporting features were "ineffective" because Defendants did not always remove the videos Plaintiffs reported—essentially, an objection to Defendants' decisions to not remove certain reported videos, but not an objection to the reporting tool itself.  *Id.*  Citing *In re Social Media Adolescent Addiction/Personal Injury Products Liability Litigation*, 702 F. Supp. 3d 809, 853 (N.D. Cal. 2023), the Court acknowledged that "in certain circumstances," a "reporting tool" could be a defective product and could plausibly support a products liability theory of relief but found that Plaintiffs alleged no such theory.  Dkt. No. 108 at 12.

In their amended complaint, Plaintiffs identify the product at issue as "an automated reporting tool" made available by the Google Defendants and the TikTok Defendants on their respective platforms.  *E.g.,* Dkt. No. 110 ¶¶ 15, 164.  Plaintiffs appear to contend that each reporting tool is not merely a vehicle for users to alert Defendants about content that violates their respective Community Guidelines, but rather a tool that *itself* determines whether such a violation exists.  *See, e.g., id.* ¶¶ 15, 20, 21, 71, 98, 100, 102, 136.  Specifically, Plaintiffs allege that the automated reporting tools are defective because they are "not capable of conducting a review of the harmful content against the Defendants' Community Guidelines."  *Id.* ¶ 164.

While Plaintiffs now describe their products liability claim using only conventional "product" language ("automated reporting tool"), their theory of liability is the same as in the original complaint:  Plaintiffs contend that Defendants' reporting tools are defective because Plaintiffs' reports do not produce the outcomes that Plaintiffs believe they should—i.e., a determination that the reported videos violate Defendants' Community Guidelines.  As the Court

concluded in its prior order, the alleged "defect" is not "content-agnostic," but instead reflects a disagreement about "ideas, content, and free expression upon which products liability claims cannot be based." *In re Soc. Media Adolescent Addiction*, 702 F. Supp. 3d at 849; *see also Winter v. G.P. Putnam's Sons*, 938 F.2d 1033, 1036 (9th Cir. 1991) ("[W]e decline to expand products liability law to embrace the ideas and expression in a book."); *id.* at 1036 n.6 (collecting cases).

Plaintiffs argue that their claim is not based on content moderation, such as the outcome of Defendants' review decisions, but the allegations in the amended complaint belie that characterization. For example, Plaintiffs allege:

> The videos that Plaintiffs reported were prime examples of choking challenges depicting asphyxiation, sexual conduct involving obvious underaged children, graphic portrayals of nudity, and overt sales of illicit drugs. **These were very clear examples that violated Defendants' own community guidelines. However, according to the automated responses of the Defendants' reporting tools, less than 5% of these were deemed violative of the Community Guidelines**. This leaves only one possibility: the review process of the reporting tool is defective.

Dkt. No. 110 ¶ 21 (emphasis added). They also allege:

> The **discrepancy of the removal decision between the reporting tool's review and the human review** (after press media had reached out to YouTube) indicates that the automated reporting tool is defective.

*Id.* ¶ 138 (emphasis added). Given these allegations, it is difficult to escape the conclusion that the design defect Plaintiffs describe is bound entirely to Defendants' content moderation decisions, including how closely the determinations of the automated reporting tools track human review decisions. Plaintiffs have cited no California authority recognizing a claim for strict products liability in any similar context.[4]

In its prior order, the Court also considered whether the original complaint alleged any injury "tethered to a product defect," and found that it did not. Dkt. No. 108 at 14. In the amended complaint, Plaintiffs continue to rely on the same or similar allegations that they suffered

---

[4] The amended complaint contains new allegations regarding other design defects that were not pled in the original complaint, including that the reporting tools were "difficult to use" and that the platforms rely on algorithms that "amplify" the harm of reported content by showing users more of the same content. Dkt. No. 110 ¶¶ 16, 17, 67, 73. However, Plaintiffs do not rely on these allegations in support of their strict products liability claim. *See id.* ¶¶ 160-172.

harm when they had to "watch the traumatic scenes of childrens'[*sic*] suffering over and over" and that "making reports [that do] not lead to any meaningful review" of this content caused them to experience "severe mental harm, leading to emotional distress, pain, and suffering as well as a futile waste of time." Dkt. No. 110 ¶¶ 167, 170. "[R]ecovery under the doctrine of strict liability is limited solely to 'physical harm to person or property.'" *Jimenez v. Superior Ct.*, 29 Cal. 4th 473, 482 (Cal. 2002) (quoting *Seely v. White Motor Co.*, 63 Cal. 2d 9, 18 (Cal. 1965)). While it is not entirely clear whether emotional harm can be considered physical injury under California law, the Court assumes, without deciding, that Plaintiffs plausibly allege emotional distress of such severity that it could satisfy the requisite element of harm for purposes of a strict products liability claim. Nevertheless, as the Court previously observed, the harm Plaintiffs allege here is tied to watching distressing content and to their frustration when content they have reported is not removed by Defendants. In these circumstances, the Court is not persuaded that Plaintiffs have alleged harm attributable to a defect in Defendants' reporting tools, so much as harm stemming from their repeated viewing of distressing content and their reactions to Defendants' subsequent decisions to not remove content they reported.

Thus, even if Defendants' reporting tools properly may be considered "products," Plaintiffs fail to state a claim under products liability law.

### 2.    Claim 2: Negligence

In its prior order, the Court found that Plaintiffs failed to state a claim for negligence because they failed plead a cognizable duty owed by Defendants. Dkt. No. 108 at 15-16. In their original complaint, Plaintiffs asserted that Defendants were negligent because they "had a duty . . . to protect users from an unreasonable risk of harm arising out of the use of their apps" and that, in offering a reporting system, "Defendants put users in a worse position of feeling frustrated, helpless and anxious about the reporting process, retraumatizing those whose reports are invalidated, and wasting valuable time and resources of users . . . ." Dkt. No. 1 ¶¶ 177-178. The Court found that Plaintiffs had not plausibly alleged that Defendants assumed a duty to protect Plaintiffs from the harm they alleged simply because Defendants offered an opportunity for users to report videos that users believe violate Defendants' policies or guidelines to Defendants for

1    review.  *See* Dkt. No. 108 at 15.

2         In the amended complaint, Plaintiffs have not materially changed their allegations

3    regarding the duty or duties Defendants owed to them.  As before, Plaintiffs rely on the same

4    alleged duties, including a duty to protect users from an "unreasonable risk of harm" associated

5    with using the reporting tools, the affirmative duty of "a rescuer or a safety hotline," and a "special

6    duty and relationship to prevent harm to [] minors."  Dkt. No. 110 ¶¶ 176-178.  However, in their

7    opposition to Defendants' motion to dismiss, Plaintiffs argue that their negligence claim should be

8    understood to allege a revised theory of liability—i.e., by offering reporting tools and soliciting

9    user reports, Defendants assumed a duty to review the reports, and a further duty to respond to

10   such reports or to warn users of the danger of making reports that do not result in the removal of

11   reported content.  *See* Dkt. No. 115 at 15-16.  Plaintiffs continue to rely exclusively on *Barnes v.*

12   *Yahoo!* to support their contention that Defendants owed these duties to Plaintiffs.  *Id.* at 15.

13        To state a claim for negligence under California law, a plaintiff must plausibly allege "(1)

14   the existence of a duty to exercise due care, (2) breach of that duty, (3) causation, and (4)

15   damages."  *Dyroff v. Ultimate Software Grp., Inc.*, No. 17-cv-05359-LB, 2017 WL 5665670, at

16   *12 (N.D. Cal. Nov. 26, 2017), *aff'd*, 934 F.3d 1093 (9th Cir. 2019).  With respect to the duty to

17   exercise due care, there is a general duty to not "create an unreasonable risk of injury to others."

18   *Zelig v. Cnty. of Los Angeles*, 27 Cal. 4th 1112, 1128 (Cal. 2002) (citation omitted); *see also* Cal.

19   Civ. Code § 1714(a).  However, "if a person has not created a danger, then generally he [or she]

20   has no duty to come to the aid of another person (a victim) absent a relationship that gives rise to a

21   duty to protect."  *Dyroff*, 2017 WL 5665670, at *12.  The existence of a particular duty of care is a

22   question of law.  *Paz v. State of Cal.*, 22 Cal. 4th 550, 557 (Cal. 2000).

23        With respect to their revised theory of negligence, Plaintiffs do not identify any authority

24   under California law for the premise that because Defendants offer a reporting tool or solicit user

25   feedback, they have an affirmative duty to the users who make reports to respond to those reports

26   in a certain way or in a manner that avoids causing distress to reporting users.  Under California

27   law "there is no duty to avoid negligently causing emotional distress to another."  *Potter v.*

28   *Firestone Tire & Rubber Co.*, 6 Cal. 4th 965, 984 (Cal. 1993).  Rather, a plaintiff must plausibly

*United States District Court*
*Northern District of California*

10

allege a defendant's breach of "some other legal duty" that proximately causes the emotional distress, "unless the defendant has assumed a duty to plaintiff in which the emotional condition of the plaintiff is an object." *Id.* at 985. Plaintiffs do not contend that Defendants assumed a duty to protect their "emotional condition." Nor do they plausibly allege a special relationship between themselves and Defendants. *See Regents of Univ. of Cal. v. Superior Ct.,* 4 Cal. 5th 607, 619 (Cal. 2018) ("[A] duty to warn or protect may be found if the defendant has a special relationship with the potential victim that gives the victim a right to expect protection.") (citing examples). As before, Plaintiffs cite no authority for the proposition that Defendants have a special relationship with Plaintiffs by virtue of the fact that Plaintiffs use Defendants' platforms.[5] *See* Dkt. No. 108 at 15-16. Nor do they plausibly allege that Defendants are subject to a duty created by law to respond to users' reports or to warn users that some reports will not result in the removal of reported content. *Cf. Doe 1*, 148 F.4th at 647 (recognizing negligence claim based on service provider's statutory duty to report known child pornography to NCMEC).

In short, Plaintiffs have not identified any authority or source for the duty they ascribe to Defendants, and they have provided the Court with no analysis or argument that might support the existence of such a duty. Thus, the Court concludes that Plaintiffs fail to state a claim for negligence.

### 3.    Claims 3 and 4: Fraudulent and Negligent Misrepresentation

In its prior order, the Court found that Plaintiffs failed to adequately plead their claims of negligent misrepresentation and fraudulent misrepresentation with respect to three statements by the Google Defendants and four statements by the TikTok Defendants. Dkt. No. 108 at 16-21. In their amended complaint, Plaintiffs challenge these same seven statements. Defendants argue that Plaintiffs have made few amendments to their claims and that those amendments fail to address the deficiencies identified in the original complaint. Dkt. No. 114 at 15-17.

---

[5] Plaintiffs continue to assert that "Defendants assumed a special duty and relationship to prevent harm to [] minors." Dkt. No. 110 ¶ 178. However, as the Court previously found, Plaintiffs are adults who assert claims on their own behalf, not on behalf of children, and their claims are based on their own interactions with Defendants' platforms. *See* Dkt. No. 108 at 16. For the reasons explained in the Court's prior order, Plaintiffs cannot state a claim for negligence based on a duty owed to minors.

United States District Court
Northern District of California

As before the challenged statements are:

(1) **YouTube Policies**: "YouTube doesn't allow content that encourages dangerous or illegal activities that risk serious physical harm or death. If you find content that violates this policy, report it. Instructions for reporting violations of our Community Guidelines are available here. When content is reported, it's not automatically taken down. Reported content is reviewed along these guidelines: Content that violates our Community Guidelines is removed from YouTube."

(2) **YouTube Guidelines**: We enforce these Community Guidelines using a combination of human reviewers and machine learning, and apply them to everyone equally—regardless of the subject or the creator's background, political viewpoint, position, or affiliation.

(3) **YouTube Policies**: The following types of content are not allowed on YouTube. This isn't a complete list. Asphyxiation: Any activity that prevents breathing or can lead to suffocation like: Choking, drowning, or hanging games.

(4) **TikTok Guidelines:** We don't allow: Content that shows or suggests inappropriate use of dangerous tools or objects. Content that shows dangerous driving behavior. Content that shows or promotes ingesting substances that are not meant for consumption and could lead to severe harm. Content that describes or provides instructions on how to perform a dangerous activity. Dangerous games, dares, challenges or stunts that might lead to injury or property damage.

(5) **TikTok Statement at Senate Hearing:** Senator we have not been able to find any evidence of a black out challenge on TikTok at all. And again it would violate our guidelines but it's something that we would proactively search [for] both with AI and Human Moderators. We have found absolutely no evidence of it.

(6) **TikTok's self-created public campaign and content, "#safertogether" in November 2021:** TikTok claims in their "Learn How Reporting Works" video that "every report that is sent to TikTok is checked."

(7) **TikTok's statement in the Safety Page:** We remove content that features dangerous, harmful or criminal behaviors. We will also remove videos that discuss dangerous challenges if they contain unfounded warnings which seek to spread fear and panic, or include instructions or depictions of harmful behavior. If you're not sure whether a video is potentially harmful, report it to us and we'll take a look.

Dkt. No. 110 ¶¶ 19, 65.

12

To state a claim of negligent misrepresentation, a plaintiff must plausibly allege: "(1) a misrepresentation of a past or existing material fact, (2) made without reasonable ground for believing it to be true, (3) made with the intent to induce another's reliance on the fact misrepresented, (4) justifiable reliance on the misrepresentation, and (5) resulting damage." *Alafi v. Cohen*, 106 Cal. App. 5th 46, 65 (Cal. Ct. App. 2024) (quoting *Ragland v. U.S. Bank Nat'l Ass'n*, 209 Cal. App. 4th 182, 196 (Cal. Ct. App. 2012)). A claim of fraudulent misrepresentation requires similar allegations, except that a plaintiff must also allege that the defendant knew "the representation was false when the defendant made it, or the defendant made the representation recklessly and without regard for its truth." *Graham v. Bank of Am., N.A.*, 226 Cal. App. 4th 594, 605-06 (Cal. Ct. App. 2014).[6] "While a misrepresentation is generally only actionable if the misrepresentation concerns past or existing material facts, . . . a promise to do something in the future may constitute intentional misrepresentation if it was made without any intention to perform . . . ." *R Power Biofuels, LLC v. Chemex LLC*, No. 16-cv-00716-LHK, 2016 WL 6663002, at *11 (N.D. Cal. Nov. 11, 2016) (citations omitted).

### i.    Statements regarding Defendants' policies

In its prior order, the Court found that the challenged statements that merely describe content that is allowed or not allowed on the platform, or that describe Defendants' general policies, are not "equivalent to a representation that Defendants' platforms *do not have* content that violates Defendants' policies or guidelines." *See* Dkt. No. 108 at 19. Having considered the allegations in the amended complaint and the parties' current briefing, the Court finds no reason to reconsider its prior determination that such statements are not actionable misrepresentations of fact. Specifically, Plaintiffs do not plausibly allege that the first four sentences of statement (1) and statements (2)-(4), reproduced above, are misrepresentations of material fact.

### ii.    TikTok Defendants' statements to lawmakers

Plaintiffs continue to claim that the TikTok Defendants "misled lawmakers" and the

---

[6] Defendants argue that Plaintiffs' allegations must satisfy the heightened pleading standard requirements of Rule 9(b) for their fraudulent misrepresentation and negligent misrepresentation claims. Dkt. No. 114 at 15 n.13. Plaintiffs appear to concede that Rule 9(b) applies to their misrepresentation claims. *See* Dkt. No. 115 at 17-18.

United States District Court
Northern District of California

1    "public" generally based on Senate testimony described in statement (5).  *See* Dkt. No. 110 ¶¶ 19,

2    119.  There are perhaps many reasons why a witness's testimony in a Senate hearing cannot form

3    the basis of a state common law misrepresentation claim, but at a minimum, Plaintiffs fail to state

4    a claim for negligent or fraudulent misrepresentation *on their own behalf* with respect to this

5    testimony.

6                         **iii.    Defendants' "review and remove" statements**

7            Three of the remaining statements—the last sentence of statement (1) and statements (6)

8    and (7)—are a closer call.  These statements can be understood as including two assertions:  first,

9    that Defendants *review* reported content (i.e., "review" (YouTube); "check" or "take a look"

10   (TikTok)), and second, that Defendants *remove* harmful content or content that violates the

11   Community Guidelines (i.e., "Content . . . is removed" (YouTube); "[w]e remove"/"[w]e will . . .

12   remove" (TikTok)).  Plaintiffs contend that these are actionable misrepresentations of fact.  They

13   characterize these statements as "representation[s] that once [Defendants] are made aware of

14   content that objectively violates Defendants' policies or guidelines, they have promised to remove

15   [such content], or at least review it, and they have intentionally failed to do so."  Dkt. No. 115 at

16   19 (emphasis omitted).  Defendants argue that these "review and remove" statements are not

17   actionable because they are statements about future conduct.  Dkt. No. 114 at 17.  Defendants also

18   argue that these statements are not susceptible of being "true" or "false" because the decision to

19   remove content depends entirely on Defendants' subjective determination regarding whether

20   content violates their guidelines.  *Id.* at 16-17; Dkt. No. 116 at 10-11.  Finally, Defendants argue

21   that Plaintiffs fail to plead the elements of justifiable reliance and damage caused by such reliance.

22   Dkt. No. 114 at 17; Dkt. No. 116 at 11.

23           Construing the allegations of the amended complaint in Plaintiffs' favor, the Court finds

24   that Plaintiffs plausibly allege that Defendants' "review and remove" statements are not merely

25   promises about future conduct, or qualified representations that removal depends on Defendants'

26   subjective determinations, but rather (allegedly false) statements of fact about how Defendants

27

28

United States District Court
Northern District of California

actually handle reported content, and that these statements are susceptible of being true or false.[7]

*See Est. of Bride by & through Bride v. Yolo Techs., Inc.*, 112 F.4th 1168, 1178-79 (9th Cir. 2024)

(addressing similar representation by service provider that it "would unmask and ban abusive

users" in the context of section 230 immunity analysis); *In re Yahoo! Inc. Customer Data Sec.*

*Breach Litig.*, No. 16-md-02752-LHK, 2017 WL 3727318, at *26 (N.D. Cal. Aug. 30, 2017)

(finding statement that defendants had "physical, electronic, and procedural safeguards that

comply with federal regulations to protect personal information about you" was a specific

statement of fact that defendants use safeguards that complied with federal regulations to protect

users' information); *see also In re Soc. Media Adolescent Addiction/Pers. Inj. Prods. Liab. Litig.*,

753 F. Supp. 3d 849, 890 (N.D. Cal.) (even typically inactionable statements can become

actionable when "the defendant knows facts that makes the at-issue statement deceitful or makes

the statement in a context that renders it deceitful"), *appeal dismissed sub nom. Fla. Off. of Att'y*

*Gen. v. Meta Platforms, Inc.*, No. 24-7019, 2024 WL 5443167 (9th Cir. Dec. 16, 2024), *and*

*motion to certify appeal denied*, No. 4:22-md-3047-YGR, 2025 WL 1182578 (N.D. Cal. Mar. 11,

2025); *Jolley v. Chase Home Fin., LLC*, 213 Cal. App. 4th 872, 892 (Cal. Ct. App. 2013) (bank

agent's statement that there was a "high probability" the bank could modify plaintiff's loan to

avoid foreclosure could be an actionable misrepresentation), *as modified on denial of reh'g* (Mar.

7, 2013); *Hinesley v. Oakshade Town Ctr.*, 135 Cal. App. 4th 289, 295-97 (Cal. Ct. App. 2005)

(landlord's statement to tenant that three chain businesses would start operations within a

shopping center later in the year was a "false assertion of existing fact, not an opinion regarding

future actions of third parties").  While the amended complaint does contain allegations reflecting

that Defendants advised users that Defendants would remove content only if *they* determined it

violated their Community Guidelines, *see, e.g.,* Dkt. No. 110 ¶ 68 (citing statement: "*If we find*

---

[7] There is still an issue regarding Plaintiffs' allegations about what makes these statements false. As Defendants note, Plaintiffs continue to allege that Defendants failed to conduct a "meaningful" review or "accurate enough" removal of reported content, which suggest that Plaintiffs' allegations of falsity are based on a subjective standard.  *See* Dkt. No. 110 ¶¶ 28, 191, 198; *see also* Dkt. No. 108 at 19-20 (discussing these allegations).  However, Plaintiffs also allege that Defendants do not remove reported content that "clearly" violates their respective Community Guidelines, despite Defendants' representations that they do.  *See* Dkt. No. 110 ¶¶ 21, 66, 72, 81, 199, 207.

1    this content to be in violation of our Community Guidelines, we will remove it.") (emphasis

2    added), the Court is not prepared to conclude, at the pleading stage, that such statements trump the

3    other "review and remove" statements Plaintiffs challenge.

4         The Court next considers whether Plaintiffs plausibly allege justifiable reliance and

5    damage caused by reliance on these statements.  Defendants argue that Plaintiffs' allegations of

6    reliance are conclusory and not supported by factual allegations that *any* Plaintiff saw and relied

7    on a specific alleged misrepresentation.  Dkt. No. 114 at 17; Dkt. No. 116 at 11.  Plaintiffs do not

8    respond to this argument in their opposition, except to say that Plaintiffs relied on Defendants'

9    representations about their reporting tools.  Dkt. No. 115 at 3, 9.  Even so, the Court has reviewed

10   the amended complaint for allegations that any named Plaintiff relied on any of the "review and

11   remove" statements identified above and has found no such allegations.[8]  Actual reliance on an

12   alleged misrepresentation is an essential element of Plaintiffs' claims.  *See Conroy v. Regents of*

13   *Univ. of Cal.*, 45 Cal. 4th 1244, 1256 (Cal. 2009).  Plaintiffs have not pled actual reliance on any

14   of these three statements.  In the absence of plausible factual allegations of reliance on these

15   particular alleged misrepresentations, Plaintiffs also cannot plead harm caused by reliance on such

16   misrepresentations.  *See Mirkin v. Wasserman*, 5 Cal. 4th 1082, 1092 (Cal. 1993) ("specific

17   pleading [of reliance] is necessary to 'establish a complete causal relationship' between the

18   alleged misrepresentations and the harm claimed to have resulted therefrom.").

19        **C.    Plaintiffs' State Statutory Claims**

20        As before, Defendants argue that Plaintiffs still fail to state any claim for relief under the

21   state statutes identified in their amended complaint because all such claims rely on the same

22   alleged misrepresentations asserted in claims 3 and 4.[9]  Defendants also raise additional challenges

23   to each of claims 5-8.

24

25

26   [8] Plaintiffs do assert that they relied on Defendants' statements about what content is "not
     allowed" on their respective platforms, but for the reasons explained above, these statements

27   cannot be understood in the manner Plaintiffs advocate and are not actionable.

28   [9] Defendants contend, and Plaintiffs do not dispute, that claims 5-8 must also be pled with
     particularity according to Rule 9(b).  *See* Dkt. No. 114 at 15 n.13; Dkt. No. 115 at 17-18.

United States District Court
Northern District of California

United States District Court
Northern District of California

1.      **Claim 5: Indiana Deceptive Consumer Sales Act (IDCSA)**

In claim 5, plaintiff Joann Bogard asserts that Defendants violated the Indiana Deceptive Consumer Sales Act (IDCSA), Ind. Code Ann. § 24-5-0.5 *et seq.* Dkt. No. 110 ¶¶ 211-217. The IDCSA provides in relevant part:

> A supplier may not commit an unfair, abusive, or deceptive act, omission, or practice in connection with a consumer transaction. Such an act, omission, or practice by a supplier is a violation of this chapter whether it occurs before, during, or after the transaction. An act, omission, or practice prohibited by this section includes both implicit and explicit misrepresentations.

Ind. Code Ann. § 24-5-0.5-3(a). A "supplier" includes a corporation that "regularly engages in or solicits consumer transactions." *Id.* § 24-5-0.5-2(a)(2), (3)(A). A "consumer transaction" is defined, in relevant part, as:

> a sale, lease, assignment, award by chance, or other disposition of an item of personal property, real property, a service, or an intangible, except securities and policies or contracts of insurance issued by corporations authorized to transact an insurance . . ., to a person for purposes that are primarily personal, familial, charitable, agricultural, or household, or a solicitation to supply any of these things.

*Id.* § 24-5-0.5-2(a)(1).

In its prior order, the Court found that Ms. Bogard failed to plausibly allege a misrepresentation, a consumer transaction at issue, and physical impact or harm, as required by the statute. Dkt. No. 108 at 22. In the amended complaint, Ms. Bogard asserts that Defendants "engaged in 'unfair, abusive, or deceptive act[s] or practice[s] in connection with a consumer transaction,'" by misrepresenting the capabilities of its "reporting tools which they knew to be defective and ineffective." Dkt. No. 110 ¶ 214 (quoting Ind. Code Ann. § 24-5-0.5-3(a)). In addition to focusing on Defendants' "reporting tools," Ms. Bogard amended her IDCSA claim to add the following allegation:

> Defendants misrepresented about the reporting tools so that they may continue to upkeep a pretense of safety, while they gained profit such as advertising packages specifically targeting children and minor users. Those advertisements allowed Defendants to purposely derive economic benefits, including ad revenue. Defendants designate a monetary value per each user who are subject to the targeted ads and makes profit out of each user's timed

engagement.

*Id.* ¶ 215**.**

### a.    Misrepresentation, deceptive act

For claim 5, the amended complaint incorporates by reference all preceding factual allegations and relies on the same alleged misrepresentations at issue in claims 3 and 4.  *Id.* at 46. For the reasons discussed above, the Court finds that Ms. Bogard has not plausibly alleged an actionable misrepresentation Defendants made about their respective reporting tools and upon which she relied.  *See supra* secs. III.B.1, III.B.3.  Moreover, the Court agrees with Defendants that Ms. Bogard does not plausibly allege that she was induced to engage with Defendants' platforms and reporting tools as a result of any alleged misrepresentations, rather than out of her desire to continue reporting videos that contain content she believes violates Defendants' Community Guidelines.  *See, e.g.,* Dkt. No. 110 ¶¶ 62-63, 75.

### b.    Consumer transaction

In its prior order, the Court found that Ms. Bogard failed to identify a "consumer transaction" within the scope of the IDCSA.  Dkt. No. 108 at 22.  Defendants argue that to the extent Ms. Bogard relies on advertising revenue Defendants allegedly obtained from "advertising packages specifically targeting children and minor users," she fails to identify a consumer transaction in which she, as an adult, participated.  Dkt. No. 114 at 18 (quoting Dkt. No. 110 ¶ 215).  In her opposition, Ms. Bogard argues that "[t]he consumer transaction . . . is the exchange of Plaintiff's data and engagement for Defendants' product (including reporting tools)."  Dkt. No. 115 at 20 (citing Dkt. No. 110 ¶ 215).  In response, Defendants argue:

> If Plaintiffs mean to say that Defendants' sale of advertising to third parties is a consumer transaction that pertains to Plaintiffs within the meaning of the IDCSA, they provide no authority to support it. Indeed, the FAC does not allege that *Bogard herself* was a party to such a sale or that her claims regarding Defendants' misrepresentations are "in connection with" it.  Moreover, Bogard does not plausibly allege that she was motivated to engage with Defendants' advertising as a result of the challenged statements, rather than out of her desire to continue reporting videos—she does not allege that she was exposed to any advertising on YouTube or TikTok at all.

Dkt. No. 116 at 12.

18

1       For purposes of a claim under the IDCSA, a consumer transaction is not limited to an

2  "exchange for money," but instead must be "liberally" interpreted to include "*any* consideration to

3  effectuate the transfer of property."  *State v. TikTok Inc.*, 245 N.E.3d 681, 693, 694 (Ind. Ct. App.

4  2024) (emphasis in original) (holding that "TikTok's business model of exchanging access to its

5  content library for end-user personal data is a 'consumer transaction'").  Here, while it is not

6  entirely clear from the amended complaint what Ms. Bogard contends the "transaction" is, the

7  Court construes Ms. Bogard's allegations in the light most favorable to her as follows:

8  Defendants provide users like Ms. Bogard access to their reporting tools and other features on

9  their platforms, and in exchange, users provide "data" and "engagement" to Defendants, which has

10  value to Defendants for purposes of selling advertising to third parties.  Such an exchange satisfies

11  the "consumer transaction" requirement of the IDCSA.  *Id.* at 693; *see In re Soc. Media*, 753 F.

12  Supp. 3d at 909-10 (concluding that when a social media company "provides access to its platform

13  in exchange for its users' personal data and time spent viewing, among other content,

14  advertisements which generate profit," there is "an exchange for valuable consideration" that

15  meets the "consumer transaction" requirement of the IDCSA).

16                          **c.      Physical impact**

17       With respect to all claims in the amended complaint, Ms. Bogard alleges that as a result of

18  Defendants' conduct, she experienced "emotional distress, anxiety, helplessness, invalidation,

19  grief, re-traumatization, and frustration."  Dkt. No. 110 ¶ 74.  Under the IDCSA, "[a] person

20  relying upon an uncured or incurable deceptive act may bring an action for *the damages actually*

21  *suffered as a consumer* as a result of the deceptive act . . . ."  Ind. Code Ann. § 24-5-0.5-4(a)

22  (emphasis added).  This requires more than a showing of emotional distress; a plaintiff must

23  demonstrate that he or she "experienced a direct physical impact because of [defendant]'s

24  conduct."  *Bank v. Huizar*, 178 N.E.3d 326, 341 (Ind. Ct. App. 2021).  As before, Ms. Bogard

25  does not allege any physical impact in connection with her IDCSA claim.  *See* Dkt. No. 108 at 22.

26  Plaintiffs do not address this issue in their opposition.

27       Because the amended complaint does not plausibly allege facts supporting all elements of

28  the claim, the Court concludes that Ms. Bogard fails to state a claim for violation of the IDCSA.

United States District Court
Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

United States District Court
Northern District of California

### 2.    Claim 6: Wisconsin Deceptive Trade Practices Act (WDTPA)

In claim 6, plaintiff Annie McGrath asserts that the Google Defendants violated the Wisconsin Deceptive Trade Practices Act (WDTPA), Wis. Stat. § 100.18 *et seq.*  Dkt. No. 110 ¶¶ 218-226.  To plead a violation of the WDTPA, a plaintiff must plausibly allege that: "(1) the defendant made a representation to the public with the intent to induce an obligation, (2) the representation was untrue, deceptive or misleading, and (3) the representation materially induced (caused) a pecuniary loss to the plaintiff."  *Novell v. Migliaccio*, 309 Wis.2d 132, 151 (Wis. 2008) (citing *K & S Tool & Die Corp. v. Perfection Mach. Sales, Inc.*, 301 Wis. 2d 109, 122 (Wis. 2007)).

In its prior order, the Court found that Ms. McGrath had not alleged that she suffered a pecuniary loss as a result of any misrepresentation by the Google Defendants, but had instead alleged that her inability to return to work for three years was due to the death of her son.  Dkt. No. 108 at 24.  The amended complaint now alleges that "Annie McGrath took days off from work after making reports and being dismissed, in part due to the anxiety, frustration, re-traumatization, and inability to find closure, in part caused by the [Defendants'] repeated dismissal and invalidation when they failed to review the harmful contents against their Community Guidelines . . . . This caused financial harm . . . ."  Dkt. No. 110 ¶ 224; *see also id.* ¶ 86.  As amended, claim 6 omits any reference to Ms. McGrath missing work due to the loss of her son. *See id.* ¶¶ 218-226.

### a.    Misrepresentation

For claim 6, the amended complaint incorporates by reference all preceding factual allegations and relies on the same alleged misrepresentations at issue in claims 3 and 4.  Dkt. No. 110 ¶ 218.  For the reasons discussed above, the Court finds that Ms. McGrath has not plausibly alleged an actionable misrepresentation the Google Defendants made about their reporting tool which induced or caused her to report content.  *See supra* secs. III.B.1, III.B.3.

### b.    Pecuniary loss

Ms. McGrath's amended allegations regarding the circumstances of her pecuniary loss are somewhat unclear.  However, construing these amended allegations in the light most favorable to

20

her, the Court understands that Ms. McGrath now alleges she suffered financial loss from missing "days" of work after experiencing emotional distress (i.e. "anxiety, frustration, re-traumatization, and inability to find closure") due "in part" to the Google Defendants' failure to remove content she reported using the reporting tool on the YouTube platform. Defendants question whether these amended allegations are plausible in view of Ms. McGrath's original allegations that she was unable to work for three years primarily as a result of her son's death. Dkt. No. 114 at 18-19. Plaintiffs respond that Ms. McGrath "suffered pecuniary loss due to leave from work before and after she discovered the extent of Defendants' defective reporting systems." Dkt. No. 115 at 21. Although the nature and extent of Ms. McGrath's pecuniary loss are not clearly alleged even after an opportunity to amend, or even clearly explained in the opposition, the Court assumes, without deciding, that Ms. McGrath has adequately pled she suffered a pecuniary loss—i.e., loss of income from missing days of work—based in part on distress she experienced when the Google Defendants failed to remove content she reported.

Nevertheless, the Court agrees with Defendants that Ms. McGrath does not plausibly allege causation. While she does allege that she suffered distress when content she reported was not removed, she does not allege that she was induced to report content based on any specific untrue, deceptive, or misleading representation, such as the "review and remove" statements discussed above, made by the Google Defendants; in other words, she has not connected her alleged loss to any particular misrepresentation of fact. *See, e.g., Giasson v. MRA - Mgmt. Ass'n, Inc.*, 777 F. Supp. 3d 913, 944 (E.D. Wis. 2025) (dismissing claim where "[t]here is no factual allegation in the complaint that suggests that Defendant's representations in its privacy policy played any role in Plaintiff's decision to disclose her PII").

Because the amended complaint does not plausibly allege facts supporting all elements of the claim, the Court concludes that Ms. McGrath fails to state a claim for violation of the WDTPA.

### 3.    Claim 7: Oregon Unfair Trade Practices Act (OUTPA)

In claim 7, plaintiff Jane Doe asserts that the TikTok Defendants violated the Oregon Unlawful Trade Practices Act (OUTPA), Or. Rev. Stat. Ann. § 646.605 *et seq.* Dkt. No. 110

¶¶ 227-238.  To plead a violation of the OUTPA based on a misrepresentation, a plaintiff must plausibly allege, among other things, a misrepresentation and "an ascertainable loss of money or property."  Or. Rev. Stat. Ann. § 646.608(1)(e), § 646.638(1).  "Pleading an ascertainable loss of money or property is an essential element of a private UTPA claim."  *Egbukichi v. Wells Fargo Bank, NA,* 184 F. Supp. 3d 971, 978 (D. Or. 2016).  A qualifying ascertainable loss must be "objectively verifiable" and "specifically of 'money or property.'"  *Pearson v. Philip Morris, Inc.*, 358 Or. 88, 117 (Or. 2015) (quoting Or. Rev. Stat. Ann. § 646.638(1)).  "[N]oneconomic losses cognizable in a civil action—such as physical pain, emotional distress, or humiliation [citation omitted]—will not satisfy a private UTPA plaintiff's burden."  *Id.*

In its prior order, the Court found that Ms. Doe failed to plausibly allege an actionable misrepresentation or an ascertainable loss of money or property, as required by the statute.  Dkt. No. 108 at 25-26.  In the amended complaint, Ms. Doe continues to allege that she relied on representations that TikTok would "meaningfully review" and respond to reported content, although she does not identify any particular representations on which she relied.  *See* Dkt. No. 110 ¶¶ 88-96, 232-233.  In addition, Ms. Doe also alleges that she "lost time and resources because of the futile efforts she made using [TikTok's] reporting tools."  *Id.* ¶ 233.  Defendants argue that these new allegations are insufficient because "time" is not "money or property" and because Ms. Doe's alleged loss of unspecified "resources" does not satisfy the pleading requirements for a claim under the OUTPA.  Dkt. No. 114 at 20; Dkt. No. 116 at 13.  Plaintiffs respond that Ms. Doe's loss may be "inherently difficult to quantify," and suggest that Ms. Doe's loss could be "estimated or inferred from" how *TikTok* values user data and engagement.  Dkt. No. 115 at 22-23.  She cites no authority for this suggestion.

The Court agrees with Defendants that Ms. Doe does not allege an actionable misrepresentation or an ascertainable loss of money or property.  Thus, Ms. Doe fails to state a claim for violation of the OUTPA.

### 4.    Claim 8: California Business and Professions Code

In claim 8, Plaintiffs assert that Defendants violated California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code § 17200 *et seq.* and its False Advertising Law ("FAL"), Cal.

Bus. & Prof. Code § 17500 *et seq.*  Defendants again challenge these claims on the basis that the amended complaint does not allege an economic injury and, therefore, Plaintiffs lack standing to sue.  Dkt. No. 114 at 21.

To establish standing to sue under the UCL or the FAL, a plaintiff must "(1) establish a loss or deprivation of money or property sufficient to qualify as injury in fact, i.e., *economic injury*, and (2) show that that economic injury was the result of, i.e., *caused by*, the unfair business practice or false advertising that is the gravamen of the claim."  *Kwikset Corp. v. Superior Ct.*, 51 Cal. 4th 310, 322 (Cal. 2011).  Economic injury may be shown, for example, where a plaintiff "(1) surrender[s] in a transaction more, or acquire[s] in a transaction less, than he or she otherwise would have; (2) ha[s] a present or future property interest diminished; (3) [is] deprived of money or property to which he or she has a cognizable claim; or (4) [is] required to enter into a transaction, costing money or property, that would otherwise have been unnecessary."  *Id.* at 323.

In its prior order, the Court found that "Plaintiffs do not explain how Defendants' alleged misrepresentations about their reporting system allowed Defendants to obtain, let alone monetize, the Plaintiffs' personal data (or anyone else's)."  Dkt. No. 108 at 28.  In the amended complaint, Plaintiffs add allegations that Defendants "designate a monetary value per each user who are subject to [] targeted ads and makes profit out of each user's timed engagement."  Dkt. No. 110 ¶ 247.

In support of their assertion that their exposure to Defendants' targeted advertising constitutes a cognizable economic injury, Plaintiffs principally rely on the Ninth Circuit's decision in *In re Facebook, Inc. Internet Tracking Litig.* ("*In re Facebook*"), 956 F.3d 589 (9th Cir. 2020). In that case, the Ninth Circuit considered Facebook's collection of users' browsing history and its alleged profiting from the browsing history data.  *In re Facebook*, 956 F.3d at 596, 600.  The court observed that "California law recognizes a right to disgorgement of profits resulting from unjust enrichment, even where an individual has not suffered a corresponding loss," *id.* at 599, and concluded that the plaintiffs had sufficiently pled "an entitlement to Facebook's profits from users' personal data sufficient to confer Article III standing," even though the plaintiffs had not suffered an actual financial loss, *id.* at 600-01.

To the extent Plaintiffs contend that they suffered an economic injury because Defendants have unjustly profited off of the ad revenue gained from Plaintiffs' continued engagement with the platform, which Plaintiffs assert occurred as a result of Defendants' misrepresentations about the reporting process, they have not plausibly alleged a theory of unjust enrichment caused by Defendants' misrepresentations.  First, as discussed above, Plaintiffs have not pled reliance on any actionable misrepresentations.  Second, the unjust enrichment theory that supported standing in *In re Facebook* was based on the alleged sale of Plaintiffs' personal data to advertisers.  Plaintiffs allege no such sale here, but only that Defendants benefited more generally from Plaintiffs' increased engagement with Defendants' platforms.  Plaintiffs identify no authority for the proposition that Defendants' profiting generally from user engagement, including Plaintiffs' engagement, constitutes economic injury sufficient to support a claim for relief under the UCL or the FAL.  *See, e.g., Hazel v. Prudential Fin., Inc.*, No. 22-cv-07465-CRB, 2023 WL 3933073, at *5-6 (N.D. Cal. June 9, 2023) ("[T]o bring a UCL claim, a plaintiff must have UCL standing, which is distinct from Article III standing," and requires an actual loss of money or property, distinct from the consideration of whether the defendant has gained a profit) (citation omitted); *Pruchnicki v. Envision Healthcare Corp.*, 845 F. App'x 613, 614-15 (9th Cir. 2021) (finding that while "personal information may have value in general," the "mere misappropriation of personal information does not establish compensable damages") (internal quotation marks and citation omitted); *Folgelstrom v. Lamps Plus, Inc.*, 195 Cal. App. 4th 986, 993-94 (Cal. Ct. App. 2011), *as modified* (June 7, 2011) (holding that retailer's request of plaintiff's ZIP code for marketing purposes did not constitute economic injury under the UCL because "even if plaintiff had an intellectual property interest in his address, he does not explain how that interest has been economically diminished by [defendant]"); *Doe I v. Google LLC*, 741 F. Supp. 3d 828, 845 (N.D. Cal. 2024) ("[S]imply because a plaintiff's information 'is valuable in the abstract,' and simply because a company 'might have made money from it,' that does not mean that the plaintiff has 'lost money or property as a result.'" (quoting *Hazel*, 2023 WL 3933073, at *6)).

The Court agrees with Defendants that Plaintiffs do not plausibly allege an economic injury caused by their alleged reliance on any of the statements they identify as

1    misrepresentations.  The Court again concludes that Plaintiffs fail to state a claim for violations of

2    the California Business and Professions Code.

3        **D.    Proximate Cause**

4        In its prior order, the Court noted that because Plaintiffs had generally failed to state

5    cognizable tort claims against Defendants as to the elements of duty, breach, and harm in the

6    original complaint, it was difficult to assess whether they adequately pled causation.  Dkt. No. 108

7    at 29.  In their motion to dismiss the amended complaint, Defendants again assert that Plaintiffs

8    fail to plead a "causal nexus" between the asserted claims and the harm they claim to have

9    suffered.  Dkt. No. 114 at 22.  Defendants also argue that any such harm was not foreseeable

10   because Plaintiffs independently and voluntarily chose to seek out and report videos they believe

11   violate Defendants' Community Guidelines.  *Id.*  Plaintiffs counter that "it is Defendants'

12   independent and intentional conduct—providing a defective reporting system while representing it

13   as functional—that started the chain of causation, for Plaintiffs would not have voluntarily

14   subjected themselves to this process had they known Defendants' reporting system was this

15   defective and substandard."  Dkt. No. 115 at 25.

16       "As a matter of practical necessity, legal responsibility must be limited to those causes

17   which are so close to the result, or of such significance as causes, that the law is justified in

18   making the defendant pay."  *Modisette v. Apple Inc.*, 30 Cal. App. 5th 136, 154 (Cal. Ct. App.

19   2018) (citation omitted).  "Case law recognizes that even when a defendant's conduct is a cause in

20   fact of a plaintiff's injuries, the connection between the conduct and the injury may be so remote

21   as not to satisfy the causation element of [a claim]."  *Lorenzo v. Calex Eng'g, Inc.*, 110 Cal. App.

22   5th 49, 72 (Cal. Ct. App. 2025), *reh'g denied* (Apr. 16, 2025), *review denied* (July 16, 2025).

23   "Thus, where there is an independent intervening act that is not reasonably foreseeable, the

24   defendant's conduct is not deemed the 'legal' or proximate cause."  6 Witkin, Summary of

25   California Law: Torts (11th ed. 2025), § 1335; *see also Riggs v. Apple Inc.*, No. 17-cv-308219,

26   2017 WL 4018064, at *2 (Cal. Super. Ct. Aug. 24, 2017).  "A defendant 'is not liable for harm

27   when the tortious aspect of the [defendant's] conduct . . . was of a type that does not generally

28   increase the risk of [the plaintiff's] harm.'"  *Shih v. Starbucks Corp.*, 53 Cal. App. 5th 1063, 1069,

United States District Court
Northern District of California

25

1    *as modified on denial of reh'g* (Cal. Ct. App. Aug. 24, 2020) (citation omitted).

2        The Court agrees with Defendants that to the extent Plaintiffs allege they suffered

3    emotional harm from watching distressing videos prior to reporting them, their independent and

4    voluntary decision to search out such videos cannot be attributed to Defendants, and Defendants

5    cannot be said to cause that harm.  While Plaintiffs assert that they would not have *used*

6    *Defendants' reporting tools* had they known the tools were "defective," Plaintiffs do not allege

7    that they would not have searched for and watched the videos at all.  Indeed, Plaintiffs allege that

8    they are highly motivated to identify harmful content posted on Defendants' platforms and get

9    Defendants to remove such content.  *See, e.g.,* Dkt. No. 110 ¶¶ 7-9.  Plaintiffs do not clearly or

10   plausibly allege harm proximately caused by Defendants' conduct that is distinct from the

11   emotional harm they suffered from reviewing these videos in the first instance.

12       **E.      Section 230 Immunity**

13       Defendants argue that all of Plaintiffs' claims are barred by Section 230(c)(1) of the CDA.

14   Dkt. No. 114 at 7-11.  Plaintiffs respond that Defendants should not be permitted to raise Section

15   230 immunity at the pleadings stage, as it is an affirmative defense.  Dkt. No. 115 at 6.  In

16   addition, Plaintiffs argue that their claims are not barred by Section 230(c)(1) because they do not

17   challenge Defendants' content moderation decisions *per se* but instead challenge Defendants'

18   reporting tools and representations.  *Id.* at 7-10.

19       As noted above, Section 230(c)(1) protects from liability:  "(1) a provider or user of an

20   interactive computer service (2) whom a plaintiff seeks to treat, under a state law cause of action,

21   as a publisher or speaker (3) of information provided by another information content provider."

22   *Barnes*, 570 F.3d at 1100-01.  Acting as a publisher includes "reviewing, editing, and deciding

23   whether to publish or to withdraw from publication third-party content."  *Id.* at 1102.  However,

24   "it is not enough that a claim, including its underlying facts, stems from third-party content for

25   Section 230 immunity to apply."  *Calise v. Meta Platforms, Inc.*, 103 F.4th 732, 742 (9th Cir.

26   2024).  Rather, "[t]he proper analysis is to examine closely the duty underlying each cause of

27   action and decide if it 'derives from the defendant's status or conduct as a publisher or speaker.'"

28   *Bride*, 112 F.4th at 1179 (quoting *Barnes*, 570 F.3d at 1107).  As the court in *Bride* explained:

United States District Court
Northern District of California

> First, we examine the "right from which the duty springs." Does it stem from the platform's status as a publisher (in which case it is barred by § 230)? Or does it spring from some other obligation, such as a promise or contract (which, under *Barnes*, is distinct from publication and not barred by § 230)? Second, we ask what "this duty requir[es] the defendant to do." If it *requires* that [defendant] moderate content to fulfill its duty, then § 230 immunity attaches.

*Id.* at 1177 (internal citations omitted); *see also Calise*, 103 F.4th at 742.

There is no dispute that Defendants are providers of interactive computer services. The question is whether Plaintiffs' amended claims seek to treat Defendants as a publisher or speaker of information provided by others. The Court first considers Plaintiffs' argument that the Court may not resolve this question at the pleadings stage, and then, following *Bride*'s two-step approach, the Court considers each of Plaintiffs' claims.

### 1.    Consideration of Affirmative Defense at Pleadings Stage

Plaintiffs argue that "Defendants are prohibited from using an affirmative defense based on the CDA as a ground for dismissal under a Rule 12(b)(6) motion." Dkt. No. 115 at 6. This argument is not supported by applicable law. "Whether a particular ground for opposing a claim may be the basis for dismissal for failure to state a claim depends on whether the allegations in the complaint suffice to establish that ground." *Jones v. Bock*, 549 U.S. 199, 215 (2007). Here, Defendants argue that Section 230(c)(1) bars Plaintiffs' claims for relief based on the allegations in the amended complaint and do not rely on any matters outside of the pleadings. Courts in this Circuit routinely consider this defense at the motion to dismiss stage in similar circumstances. *See, e.g., Castronuova v. Meta Platforms, Inc.*, No. 4:24-cv-02523-YGR, 2025 WL 1914860, at *3 (N.D. Cal. June 10, 2025).

For this reason, it is not improper for the Court to consider Defendants' Section 230(c)(1) arguments as a basis for dismissal of the amended complaint.

### 2.    Strict Products Liability

Defendants argue that, as in the original complaint, Plaintiffs' amended product-defect claim (claim 1) seeks to hold Defendants liable for failing to remove third-party content reported by Plaintiffs. Dkt. No. 114 at 7. In opposing Defendants' immunity arguments, Plaintiffs do not

distinguish between their different claims for relief, contrary to the Ninth Circuit's direction in *Bride* and *Calise*. Rather, they argue more broadly that their claims are not directed to "Defendants' failure to remove content," but instead concern "the defects inherent in the Defendants' reporting tools that were offered to users, which turned out to be completely useless." Dkt. No. 115 at 8. Plaintiffs emphasize that their claims "*are not* predicated upon the third-party content itself, but Defendants' *response* to Plaintiffs' reports of violative content[.]" *Id.* at 9 (citing Dkt. No. 110 ¶ 11).

As discussed above, the Court has carefully considered the nature of Plaintiffs' amended strict products liability claim based on alleged design defect. *See supra*, sec. III.B.1. Specifically, Plaintiffs allege that Defendants' automated reporting tools are defective because they are "not capable of conducting a review of the harmful content against the Defendants' Community Guidelines." Dkt. No. 110 ¶ 164. This theory of liability is essentially the same as alleged in the original complaint—i.e., the reporting tools are defective because Plaintiffs' reports do not result in a determination that the reported videos violate Defendants' Community Guidelines. As before, the focus of Plaintiffs' claim is that Defendants undertook a duty to moderate third-party content based on receiving reports from users via the reporting tool and then failed to accurately determine that the reported content should be removed. *See* Dkt. No. 108 at 31 (discussing original claim). As such, the alleged duty that forms the basis of Plaintiffs' product-defect claim "stem[s] from [Defendants'] status as a publisher." *See Barnes*, 570 F.3d at 1107; *Bride*, 112 F.4th at 1180 (product liability claim barred by Section 230 where it "essentially fault[ed] [service provider] for not moderating content in some way, whether through deletion, change, or suppression").

Moreover, by Plaintiffs' own account, to avoid liability Defendants would need to alter their reporting tools to do a better job of moderating (i.e. removing) content reported by users, or alter their "responses" to Plaintiffs' reports. *See, e.g.,* Dkt. No. 115 at 9; *id.* at 11 ("Plaintiffs are challenging the (mal)functionality Defendant's reporting tool that was made to execute the editorial decisions already set . . . and stated by the Defendants."). That is, fulfilling the duty Plaintiffs have identified would necessarily require Defendants to provide "meaningful review," *see* Dkt. No. 110 ¶¶ 10, 28, 167, 198, of reported third-party content for violations of their

1  Community Guidelines, and to determine with greater accuracy whether reported content violates

2  those guidelines.

3  Plaintiffs' products liability claim here differs in important respects from the "reporting"

4  product-defect claim addressed by Ninth Circuit in *Doe 1 v. Twitter, Inc.*, 148 F.4th 635 (9th Cir.

5  2025).  In that case, the Ninth Circuit concluded that a product-defect claim based on deficiencies

6  in Twitter's infrastructure for reporting child sexual abuse material ("CSAM") was not barred by

7  Section 230 because Twitter "could fulfill its purported duty to cure reporting infrastructure

8  deficiencies without monitoring, removing, or in any way engaging with third-party content," such

9  as by making it easier to report CSAM material.  *Doe 1*, 148 F.4th at 645.  The Ninth Circuit

10  contrasted this "reporting infrastructure" product-defect claim with another asserted product-

11  defect claim based on Twitter's failure to block harmful content while it was under investigation,

12  concluding that such a claim "attempt[ed] to hold Twitter liable for its failure to remove (even if

13  automatically) harmful third-party content" and *was* barred by Section 230.  *Id.*  Here, Plaintiffs

14  do not challenge the ease with which Defendants' reporting tools may be accessed, but rather how

15  good the reporting tools (or Defendants) are at determining whether reported content violates

16  Defendants' Community Guidelines and should therefore be removed.  Such content moderation is

17  "quintessential publisher conduct," and Defendants cannot be held liable for it.  *See Calise*, 103

18  F.4th at 741; *see also Doe (K.B.) v. Backpage.com, LLC*, 768 F. Supp. 3d 1057, 1065 (N.D. Cal.

19  2025) ("The duty to include these challenged [age and identity verification] features is 'not

20  independent' of Meta's role as the 'facilitator and publisher of third-party content' published on

21  the platform.  To the contrary, the duty cuts to the core of Meta's role as a publisher: that is,

22  determining who can and cannot speak on its platform.") (quoting *Doe v. Grindr Inc.*, 128 F.4th

23  1148, 1153 (9th Cir. 2025)).

24  Because Plaintiffs have not identified any duty owed by Defendants that is independent of

25  their roles as publishers of third-party content, Plaintiffs' products liability claim is barred by

26  Section 230(c)(1).

27  ### 3.  Negligence

28  Defendants also argue that, as in the original complaint, Plaintiffs' amended negligence

United States District Court
Northern District of California

claim (claim 2) seeks to hold Defendants liable for failing to remove third-party content reported by Plaintiffs.  Dkt. No. 114 at 9.   As summarized above, Plaintiffs contend that Defendants had the following duties:  a duty to protect users from an "unreasonable risk of harm" associated with using the reporting tools, including specifically a duty to review and respond to user reports; the affirmative duty of "a rescuer or a safety hotline"; and a "special duty and relationship to prevent harm to [] minors."  Dkt. No. 110 ¶¶ 176-178; Dkt. No. 115 at 15-16.

    For the reasons explained in the Court's prior order, to the extent Plaintiffs contend that Defendants have a duty arising from Defendants' role as manufacturers or providers of a product, and a corresponding obligation to remove content, this claim is barred by Section 230(c)(1) for the same reasons Plaintiffs' claim 1 is barred.  Dkt. No. 108 at 31.  Likewise, to the extent Plaintiffs contend that Defendants have a duty to protect others because they assumed responsibility for creating a reporting system that reliably resulted in removal of all prohibited content, such a claim also is barred under Section 230(c)(1) because it attempts to hold Defendants responsible for their inadequate content moderation generally or for their incorrect determinations about whether content should be removed from their platforms.  *See Bride*, 112 F.4th at 1175-76 ("In short, § 230 protects apps and websites which receive content posted by third-party users (i.e., Facebook, Instagram, Snapchat, LinkedIn, etc.) from liability for any of the content posted on their services, even if they take it upon themselves to establish a moderation or filtering system, *however imperfect it proves to be*.") (emphasis added); *see also Backpage.com,* 768 F. Supp. 3d at 1067 (finding Section 230 barred plaintiff's negligence claim based on Meta's "failure to warn of the generalized risk of sex trafficking content on its platform, and the use of fake accounts that might facilitate that content").  Unlike the negligence claim addressed in *Doe I*, where Twitter had a statutory duty to promptly report CSAM to NCMEC once it obtained actual knowledge of such material, *Doe I*, 148 F.4th at 647-48, Plaintiffs here identify no duty independent of Defendants' duty as a publisher of third-party content.

    Thus, Plaintiffs' negligence claim is barred by Section 230(c)(1).

### 4.    Fraudulent and Negligent Misrepresentation

    In its prior order, the Court determined that Plaintiffs' misrepresentation claims (claims 3

and 4) sought to hold Defendants liable for their representations about how they handle prohibited content on their platforms, including prohibited content reported to them, and that as originally pled, these claims treated Defendants as publishers. Dkt. No. 108 at 32. Plaintiffs' amended misrepresentation claims rely on the same seven statements at issue in the original complaint. Dkt. No. 114 at 9-10. Defendants argue that these statements are either non-actionable statements that describe what is allowed on Defendants' platforms and cannot be false, or they concern Defendants' subjective determinations about whether reported content violates their Community Guidelines—that is, they are false *only* when Plaintiffs disagree with Defendants' decision to not remove reported content. *Id.* at 9. Defendants argue that Plaintiffs' claims depend solely on duties arising from their role as publishers of third-party content. *Id.*

As noted above, most of the challenged statements cannot fairly be considered actionable statements. They are either merely descriptions of Defendants' moderation policies or otherwise non-actionable statements made to others during a Senate hearing. *See supra*, secs. III.B.3.i-ii. These statements are not like the "specific promise or representation" at issue in *Barnes* and *Bride*, for which the defendants in those cases could be held accountable, independent of their roles as publishers. *See Grindr*, 128 F.4th at 1154 (distinguishing *Barnes* and *Bride* on this basis). Accordingly, as before, the Court concludes that in seeking to hold Defendants liable for the first four sentences of statement (1) and statements (2)-(5), reproduced above, Plaintiffs assert claims that are barred by Section 230.

However, as explained above, and construing the allegations in the amended complaint in Plaintiffs' favor, three of the challenged statements, which the Court refers to as Defendants' "review and remove" statements (i.e., the last sentence of statement (1) and statements (6) and (7)), are not merely descriptions of policy or qualified representations that removal depends on Defendants' subjective determinations, but rather (allegedly false) statements of fact about how Defendants actually handle reported content, and these statements are susceptible of being true or false. *See supra,* sec. III.B.3.iii. The duty at issue for these three statements is Defendants' duty to not make false or misleading statements to users of their platforms. Such a duty is distinct from Defendants' roles as publishers. *See Bride*, 112 F.4th at 1177-79 (breach of promise to "unmask

and ban abusive users" not barred by Section 230 because plaintiff sought to hold defendant accountable for a specific promise or representation, not for failure to take certain moderation actions); *Barnes*, 570 F.3d at 1107-09 (promissory estoppel claim not barred by Section 230 because duty sprang from the contract, even though promise at issue involved taking down third party content); *cf. Grindr*, 128 F.4th at 1154 ("Grindr's general statement that the App is 'designed to create a safe and secure environment for its users,' is not a specific promise, but a description of its moderation policy, and thus protected from liability under § 230.").

The fact that these three statements happen to be about content moderation does not immunize them. At least theoretically, Defendants' duty can be fulfilled by changing their *statements*, without changing the way they moderate content. "[M]oderation . . . must be the only option"; if there are multiple ways the identified duty could be satisfied, Section 230 does not bar the claim. *Bride*, 112 F.4th 1177 n.3; *see also HomeAway.com, Inc. v. City of Santa Monica,* 918 F.3d 676, 682 (9th Cir. 2019) ("We look instead to what the duty at issue actually requires: specifically, whether the duty would necessarily require an internet company to monitor third-party content."). As Defendants correctly observe, Plaintiffs do not merely seek correction or clarification of Defendants' alleged misrepresentations; rather, they seek to force Defendants to *comply* with these statements by conducting a "meaningful review" of reported content (or dispense with a reporting tool altogether). *See, e.g.* Dkt. No. 110 ¶¶ 40, 198-200, 206-208; *id.* at 53-54 (Prayer for Relief, para. H). However, because fulfillment of the alleged duty to not make false or misleading representations would not necessarily require Defendants to make any changes to their contention moderation practices or to any other publisher-related conduct, Section 230 would not bar Plaintiffs' misrepresentation claims as to the three "review and remove" statements, if Plaintiffs had stated any claim for relief based on these statements.[10]

### 5.    State Statutory Claims

The parties do not address Plaintiffs' state statutory claims (claims 5-8) as raising issues for purposes of Section 230 immunity that are distinct from Plaintiffs' misrepresentation claims.

---

[10] As discussed above, Plaintiffs fail to state any claim for relief as to these three statements.

United States District Court
Northern District of California

1    *See* Dkt. No. 114 at 10-11; Dkt. No. 115 at 7-10.  The Court follows the parties' lead, and its

2    analysis regarding immunity based on the seven challenged statements is the same for these state

3    statutory claims.

4    ### F.    First Amendment Defense

5        Defendants again assert that all of Plaintiffs' claims are independently barred by the First

6    Amendment because Plaintiffs seek to hold Defendants liable for their expressive activity, i.e.

7    Defendants' content moderation decisions.  Dkt. No. 114 at 23.  Plaintiffs respond that the First

8    Amendment does not bar their claims because (1) they are not challenging Defendants' content

9    moderation decisions and (2) Defendants' statements are commercial speech and not protected by

10    the First Amendment.  Dkt. No. 115 at 10.

11        Content moderation by social media platforms is generally considered expressive activity

12    and is protected under the First Amendment.  *See Moody v. NetChoice, LLC*, 603 U.S. 707, 731

13    (2024) ("Deciding on the third-party speech that will be included in or excluded from a

14    compilation—and then organizing and presenting the included items—is expressive activity of its

15    own."); *O'Handley v. Padilla*, 579 F. Supp. 3d 1163, 1186-87 (N.D. Cal. 2022) ("Like a

16    newspaper or a news network, Twitter makes decisions about what content to include, exclude,

17    moderate, filter, label, restrict, or promote, and those decisions are protected by the First

18    Amendment.").  However, "[t]he Supreme Court has recognized a 'distinction between speech

19    proposing a commercial transaction, which occurs in an area traditionally subject to government

20    regulation, and other varieties of speech.'"  *Kellman v. Spokeo, Inc.*, 599 F. Supp. 3d 877, 899

21    (N.D. Cal. 2022) (quoting *Bolger v. Youngs Drug Prods. Corp.*, 463 U.S. 60, 64 (1983)).  Thus,

22    "[t]he Constitution accords less protection to commercial speech than to other constitutionally

23    safeguarded forms of expression."  *Bolger*, 463 U.S. at 64-65.  "Where the facts present a close

24    question, 'strong support' that the speech should be characterized as commercial speech is found

25    where [1] the speech is an advertisement, [2] the speech refers to a particular product, and [3] the

26    speaker has an economic motivation."  *X Corp. v. Bonta*, 116 F.4th 888, 900 (9th Cir. 2024)

27    (citations and quotations omitted).

28        As another judge in this District recently observed, "the undisputed core of Section 230

United States District Court
Northern District of California

33

immunity protects a website's moderation decisions" and "those moderation decisions are *also* protected by the First Amendment." *Backpage.com*, 768 F. Supp. 3d at 1063. Thus, to the extent the Court has concluded that Defendants are entitled to Section 230 immunity for the statements and conduct Plaintiffs challenge, for the same reasons, the Court finds that such statements and conduct are also protected by the First Amendment. However, as to the three "review and remove" statements Plaintiffs challenge, the Court does not find that these statements are protected by the First Amendment.

## IV.    CONCLUSION

For the reasons set forth above, the Court grants Defendants' motion to dismiss as follows:

1.  Claims 1-8 are dismissed for failure to state a claim for relief; and

2.  Claims 1-8 are barred by Section 230 immunity and the First Amendment, except for Defendants' "review and remove" statements (i.e., the last sentence of statement (1) and statements (6) and (7) at issue in claims 3-8).

As the Court has already afforded Plaintiffs an opportunity to amend their complaint, and because it does not appear that any additional amendments could be made to address the deficiencies identified in this order and in the Court's prior order, the Court concludes that further leave to amend would be futile. *See Leadsinger, Inc. v. BMG Music Publ'g*, 512 F.3d 522, 532 (9th Cir. 2008). Accordingly, the Court dismisses this action, without leave to amend.

**IT IS SO ORDERED.**

Dated: December 15, 2025

Virginia K. DeMarchi
United States Magistrate Judge